# Exhibit

# 3

# DECLARATION OF ALEXANDER BLUMROSEN

## Pursuant to 28 U.S.C. § 1746

I, Alexander Blumrosen, Esq, hereby state that I have personal knowledge of the facts set forth below and, if called to testify, I could and would testify as follows:

1.      I am a United States citizen and I am over twenty-one years of age.

2.      I am an American attorney, licensed in New York State (1st Dep't) since 1987 and a member of the Paris Bar since January 1, 1992.  I have an A.B. degree from Dartmouth College, an M.A. from New York University (Institute of French Studies), a J.D. degree from Georgetown University Law Center and a French post-graduate law degree from the University of Paris, Panthéon-Sorbonne.

3.      I was a member of the Working Group of the French National Bar Council that published its recommendations on how to organize an internal corporate investigation (see "The French lawyer and Internal Investigations" (2020)).

4.      I advise the U.S. Department of Justice (Office of Foreign Litigation) on French law and international judicial assistance matters.  I have never advised the U.S. Federal Trade Commission in any matter.

5.      I have been an expert in U.S. litigation on issues of French law.  I frequently submit declarations in U.S. court proceedings about French law and procedure, at the request of a litigant in support of a claim or motion.

6.      Attached hereto as Attachment A is a true and correct copy of my expert report that is

based upon my experience, the legal research I performed, and evidence provided by the Federal

Trade Commission.

I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct.


Executed on November 9, 2021, in Paris, France.



/s/

Alexander Blumrosen, Esq

## I. Qualifications

1.      I am an American attorney, licensed in New York State (1st Dep't) since 1987 and a member of the Paris Bar since January 1, 1992.  I have an A.B. degree from Dartmouth College, an M.A. from New York University (Institute of French Studies), a J.D. degree from Georgetown University Law Center and a French post-graduate law degree from the University of Paris, Panthéon-Sorbonne.

2.      I have resided in France since 1989 and the focus of my practice throughout my career has been the litigation and arbitration of commercial disputes in French courts and before arbitration tribunals, both in France and in the United States.

3.       I advise American companies on commercial transactions and disputes in France, and write and speak on matters of international arbitration law, Hague Convention International Judicial Assistance, and technology law matters including EU data protection.

4.      In the context of my data protection advising, I often work on internal corporate investigations for US companies during which issues of legal privilege of the company's legal advisers, internal counsel and outside attorneys, to determine at the outset of an investigation who should be the principal adviser to the company, how witnesses are to be interviewed, and more generally how the flow of information in the investigation will be managed in order to ensure confidentiality and non-waiver of any applicable legal privilege. I was a member of the Working Group of the French National Bar Council that published its recommendations on how to organize an internal corporate investigation (see "The French lawyer and Internal Investigations (2020), https://www.cnb.avocat.fr/sites/default/files/cnb_guide_the_french_lawyer_and_internal_inve stigations.pdf)

5.      I am a past President of the International Technology Law Association, the leading association of technology lawyers in the world, and the former Chair of the ABA International Law Section's Litigation Committee and Arbitration Committee.

6.      I advise the U.S. Department of Justice (Office of Foreign Litigation) on French law and international judicial assistance matters.  I have never advised the U.S. Federal Trade Commission in any matter.

7.      I have been an expert in U.S. litigation on issues of French law.  I frequently submit declarations in US court proceedings about French law and procedure, at the request of a litigant in support of a claim or motion.  Most such declarations have been made in connection with French procedure for obtaining evidence under the Hague Evidence Convention from France for use in US litigation, as listed in my attached CV.  Other cases in which I have made an expert declaration about French law include:

- Harrell v. Harrell, Case No.: BD 614 893, Superior Ct., California (Los Angeles) (2017) (Service of process under the Hague Service Convention of 1965 in France in connection with a US divorce proceeding)

- Baker Marquart v. Lab sarl, Marc Seban, and Barbara Coignet, Los Angeles County Superior Court Case No. BC636123 (2017) (Service of process in France)

- Zurich Insurance v. Universal Pictures, (Case No.  09MC345, C. Dist. Cal. 2009)

(scope of available discovery under 28 USC §1782 for use in French litigation)

- Garamendi v. Altus Finance S.A. et al. (Case no. CV 99-2829 AHM (CWx))

- AIG Retirement Services, Inc. v. Altus Finance, C. Dist. Cal. 2007 (Case No. CV 05-1035-JFW (CWx)) (Scope of attorney-client privilege under French law invoked by a duly certified attorney (avocat) seconded to a company to work as legal adviser)

8.    I am compensated by the Federal Trade Commission for preparing this report at my billing rate of approximately $439 per hour (360 euros per hour) at a total price of approximately $8,000.

## II. Description of Engagement and Conclusions

9.    The U.S. Federal Trade Commission ("FTC") has engaged me to provide expert services in its Nexway investigation. Specifically, the FTC has asked me to review the currently known facts pertaining to Mr. Oliver Von Kroog, juriste/in-house legal counsel for the French company Nexway, and give my expert opinion on whether Nexway can properly invoke the attorney-client privilege under French law, to "clawback" documents previously produced in response to an FTC civil investigative demand ("CID") issued to Nexway because the documents were "correspondence" between Nexway and "attorney Oliver Von Kroog."

10.    For the reasons set out hereafter, it is my expert opinion that, pursuant to French law, Nexway cannot invoke any attorney-client privilege related to any communications with Mr. Von Kroog. In France, there is no debate that only communications between a client and duly registered attorneys are covered by privilege (called "professional secrecy"). Mr. Von Kroog is a juriste, Nexway's in-house corporate counsel, not a duly registered attorney. Pursuant to French law, since juriste/in-house corporate counsel are not registered attorneys in France, companies may not assert any kind of legal privilege based on their profession or status. Therefore, it is clear that under French law, Nexway cannot justify non-disclosure/clawback of the documents vaguely identified by Nexway that they have produced to the FTC.

11.    Moreover, it is my expert opinion that no reasonably well-informed French business person could have concluded, at any time over the past 10 years, that any privilege or professional secrecy attaches to company communications with a juriste/in-house corporate counsel. Indeed, the lack of privilege for juriste/in-house corporate counsel under French law is well known in legal and business circles in France and has been a subject of widespread debate in French business circles and the general press for over 20 years. The lack of privilege for communications with juriste/in-house corporate counsel were widely covered especially after:

(a) the European Court of Justice ("ECJ") 2011 decision in *Akzo Chemicals Ltd v. European Commission* (holding that in the EU, "internal communications between in-house counsel and their companies' employees are not privileged.");
(b) public debates about the reform of the French Justice system in 2015, and
(c) public discussion further to the publication of 2019 report by French parliament about whether the absence of privilege for corporate counsel in France creates a

geo-strategic imbalance to the disadvantage of French economic interests. (Commonly referred to as the Gauvain Report).

## III. Factual Background

### a. The request for documents by the FTC

12.    I am informed that in September 2019, the FTC initiated a non-public investigation into Nexway, and that on January 28, 2020, the FTC issued a CID to Nexway seeking various documents and information relevant to the investigation.  I am informed that the CID and the attached cover letter make it clear that Nexway's business practices were a subject of the investigation.  I am informed that Nexway, through counsel:  (1) subsequently produced documents electronically, in a Relativity ready format, on a rolling basis, in March, May and June 2020; and (2) did not provide a privilege log with its productions, or otherwise identify any privileged documents.

13.    I understand that for more than seven months, the FTC searched and reviewed the documents produced by Nexway in connection with its investigation and responsibility to protect consumers from unlawful activity.  I understand that during that time, the FTC notified Nexway that it would be disclosing documents that Nexway produced to witnesses in investigational hearings or to the public, and informed Nexway that it could seek a protective order.  I am informed that Nexway did not seek a protective order and Nexway did not identify any particular documents as inadvertently produced or covered by the attorney-client privilege.

14.    I am informed that on March 5, 2021, Nexway sent the FTC a letter, which, among other things, for the first time claimed that one document – bates number 7247 – was covered by the attorney-client privilege.  I have reviewed Nexway's March 5, 2021 letter, and in it Nexway counsel claims that document 7247 is covered by the attorney-client privilege because the document was shared with Nexway/Asknet counsel, Oliver Von Kroog, for the purpose of obtaining legal advice, and was inadvertently produced by Nexway.

15.    I am further informed that on April 19, 2021, Nexway sent another letter to the FTC: (1) reiterating its claim that document bates number 7247 was privileged; and (2) further requesting that the FTC return any documents, including correspondence, between Nexway and Oliver Von Kroog (who they claimed was an attorney) that Nexway may have inadvertently produced to the FTC.

16.    Additionally, I understand that the FTC sent Nexway a letter dated April 27, 2021. Among other things, the April 27 letter pointed out that (1) neither Nexway's correspondence nor the FTC's inquiry established or provided any evidence that Oliver Von Kroog is a member of a Bar – a requirement for any attorney-client privilege claim to apply to any documents sent to him; (2) Mr. Von Kroog's  public LinkedIn page identified him as a "Legal Advisor/Juriste" and in-house employee of Nexway; and (3) in France, a juriste/legal advisor is not a member of a Bar.  Finally, I have been told that Nexway has not produced any evidence that Mr. Von Kroog had ever been a member of a Bar in the U.S. or France, in response to multiple requests by the FTC.

### b. Nexway

17.    Nexway SAS ("Nexway") is a French company incorporated on February 23, 2002, registered with the Commercial Court of Nanterre, France, under the number 440 943 859. This company has a its headquarters in Paris located at 1 Avenue du General de Gaulle 92074 Paris, La Defense France; and a branch office located in Nîmes, France, at 19 Avenue Feuchères, 30000 Nîmes France, registered under the same number.  A true copy of the company's current registration document is attached to this report hereto as Attachment 1. The corporate headquarters of the company in France is in the business district of Paris, called "La Défense".

18.    Nexway, Inc., is a Delaware corporation with its principal place of business at 4804 Mission Street, Suite 208, San Francisco, CA 94112.  A copy of Nexway, Inc.'s Delaware registration is attached as Attachment 2.

19.    Nexway's website (www.nexway.com) corroborates this information, listing Nexway offices in (1) Paris at 1 Avenue du General de Gaulle 92074 Paris, La Defense France; (2) Nimes at 19 Avenue Feuchères, 30000 Nîmes France; and (3)  San Francisco at 4804 Mission Street, Suite 208, San Francisco, CA 94112.[1]  Nexway's website identifies itself as Nexway SASU with its headquarters at Tour PB5, 1 avenue du Général de Gaulle 92074 Paris – La Défense France.

20.    asknet, Inc. is a Delaware Corporation, and its principal place of business is 4804 Mission Street, Suite 208, San Francisco, California.   A copy of asknet, Inc.'s Delaware registration is attached as Attachment 3.

### c. Mr. Oliver Von Kroog

21.    Mr. Von Kroog is an employee of Nexway located, according to his LinkedIn profile, in Nîmes, France.  His LinkedIn profile states that he is the Nexway "Legal Advisor" and a juriste.  It also indicates that he holds law degrees from the University of Koln (Germany), the University of Cergy-Pontoise, and the University of Paris.  His profile does not state that he is admitted to any Bar, whether in France, Germany, the United States, or elsewhere.[2]

22.    On October 5, 2021, I searched the attorney directory maintained by the National Bar Council of all attorneys registered in France with one of the 164 local Bar Councils,[3]but did not find any listing for Oliver Von Kroog. A copy the National Bar Council search results for both "Von Kroog" with no first name, and "Oliver Von Kroog" are attached with Attachment 5 (the indication in French "AUCUN RESULTAT" directly under the search term in English means "NO RESULT").  I also searched on the same date the German federal Bar directory that lists attorneys admitted in all German Bars,[4] but did not find any listing for Oliver Von Kroog.

---

[1] https://www.nexway.com/about-us/
[2] The information on Mr. Von Kroog's Linkedin page is confirmed by another document provided to me by the FTC that was produced by Nexway in which Mr. Von Kroog is identified  as Legal for Nexway,   A copy of Mr. Von Kroog's Linkedin page is attached to this report as Attachment 4.  The Nexway document is attached to the FTC's Filings as Exhibit 21.
[3] https://www.cnb.avocat.fr/fr/annuaire-des-avocats-de-france
[4] https://www.bea-brak.de/bravsearch/index.brak

23.     I conclude from my review of said directories that, while Mr. Von Kroog may have law degrees in France and Germany, he is not admitted to a French or German Bar or qualified as an attorney in either jurisdiction. As we will see below – this would be consistent with his position as juriste/in-house corporate counsel for Nexway.

## IV. Legal privilege in France

### a.      French law reserves legal privilege to bar-admitted attorneys only

24.     French law is code based.  The law that governs the organization, access to the profession and regulation of practicing attorneys is Act 71-1130 of December 31, 1971, as amended (Law n° 71-1130 of December 31, 1971) (henceforth, "Act 71-1130").

25.     Act 71-1130 (art. 3) requires that each attorney swear the following oath:

> *"I swear, as an attorney, to perform my duties with dignity, conscience, independence, probity and humanity".*

26.     Act 71-1130 (art. 4) provides for a monopoly by attorneys in representing others before courts and regulatory bodies:

> *"No one who is not a lawyer may assist or represent the parties, apply to and plead before the courts and judicial or disciplinary bodies of any kind ..."*

27.     Act 71-1130 (art. 11) sets out the educational and other other prerequisites for becoming an attorney, which include having the *"Certificat d'aptitude à la profession d'avocat"*, also known as the CAPA, which can only be obtained through an 18-month course of post-university practical legal training with lectures, exams, required clerkships, all of which is organized not by the university but by the Bar.

28.     The training of attorneys in France is specific to the profession, and is different from the training for judges, which is a 31-month course of post-university study at the National School for Judges ("Ecole National de la Magistrature").

29.     Access to these specialized schools to become an attorney or a judge in France is dependent on passing rigorous entrance exams.

30.     By contrast, no specialized training other than a university law degree is needed to become a juriste/in-house corporate counsel, and no oath of any kind is required.  Juristes are employees of a company.  In France, juriste/in-house corporate counsel are not the functional equivalent of in-house corporate counsel in the United States.

31.     French attorneys are subject to the oversight and professional discipline of the President of the Bar Council in which they are registered.[5]  There are 164 separate Bars in France; all registered attorneys must be affiliated with a Bar Council; each Bar elects a Bar

---

[5] The National Bar Council ("Conseil National des Barreaux") keeps statistics on the numbers of registered French attorneys in each of the 164 local Bar Councils; France on January 1, 2020, had approximately 70,073 registered avocats (see report of the National Bar Council, https://www.cnb.avocat.fr/fr/les-chiffres-cles-de-la-profession-davocat) ); 42% of them are members of the Paris bar.

President who has the authority to protect the professional secrecy of attorneys, and who can sanction attorneys who fail to comply with such secrecy.  For example, during an administrative "raid" of a law firm's premises to obtain evidence, a representative of the Bar Council President must by law be present to verify that privileged client documents are not taken by investigators.  More generally, the Bar Council has the authority by law "to consider all questions concerning the practice of the profession and to ensure the compliance with the duties of the lawyers as well as the protection of their rights." (art. 17).

32.    Each attorney admitted to practice is required to have professional liability insurance, must avoid conflicts of interest and "must respect professional secrecy in accordance with the provisions of articles 226-13 and 226-14 of the penal code."

33.    This obligation of professional secrecy that applies to attorneys is more fully set out at article 66-5 of the Law:

> *"In all matters, whether in the area of advice or defense, consultations addressed by an attorney to his client or intended for the latter, correspondence exchanged between the client and his attorney, between the attorney and his colleagues, with the exception of correspondence marked "official", interview notes and, more generally, all documents in the file are covered by professional secrecy... "*

34.    A licensed attorney who violates professional secrecy is subject to criminal sanctions set out at Article 226-13 of the French Penal Code:

> *"The disclosure of secret information by a person who is in possession of such information either by virtue of his or her status or profession, or by reason of an office or temporary assignment, is punishable by one year's imprisonment and a fine of 15,000 euros."*

35.    The French government decree of July 12, 2005, on the ethical obligations of attorneys confirms this obligation of professional secrecy:

> *"Unless required for his own defense before any court, and when disclosure is provided for by law, the attorney shall not, in any matter, make any disclosure in violation of professional secrecy."*

36.    Established by the laws cited above, the National Bar Council has adopted guidance regarding the scope of professional secrecy of attorneys. The guidance states that "*The professional secrecy of the lawyer is a matter of public policy. It is general, absolute and unlimited in time*."  The guidance then describes the scope of professional secrecy as follows:

> *Professional secrecy covers in all matters, in the area of advice or defense, and whatever the medium, material or immaterial (paper, fax, electronic ...):*
>
> - *consultations addressed by a lawyer to his client or intended for the latter;*

- *correspondence exchanged between the client and his lawyer, between the lawyer and his colleagues, with the exception of those marked "official" ;*
- *the notes of interviews and more generally all the documents in the file, all information and confidences received by the attorney in the exercise of the profession; ;*
- *the names of clients and the lawyer's agenda;*
- *the pecuniary settlements and all handling of funds made in application of article 27 paragraph 2 of the law n°71-1130 of December 31, 1971;*
- *information requested by the auditors or any third party (information that can only be communicated by the lawyer only to his client).*

37.     These rules are designed to ensure the client that the information entrusted to an attorney in the course of an engagement will not be disclosed to any third parties, including the State. Professional secrecy reinforces the client's trust in his lawyer as counsel and advocate, and ensures that the client is able to receive objective and informed advice when needed.  Moreover, France protects the independence of attorneys/advocates by mandating that they NOT be an employee of the client company.  This is not true for jurists/in-house corporate counsel in France who are employees of their client.

38.     The above rules of professional secrecy apply <u>only</u> to duly qualified attorneys who have the title "avocat" as they are under the professional supervision of the President of the Bar Council who has authority to sanction non-compliance.  The President of the Bar Council has no oversight or authority to sanction non-Bar member juriste/in-house corporate counsel for non-compliance with the Bar's rules.  Juriste/in-house counsel are not subject to Bar rules. Juriste/in-house counsel are not members of a Bar.

39.     Based on the record provided to me, it is clear that Oliver Von Kroog is not an attorney, nor subject to the rights and obligations of that position as defined by French law (including Bar discipline); and there is no evidence that Mr. Von Kroog has graduated from any of the specialized schools to become an attorney or a judge in France, nor passed any of these schools' rigorous entrance exams.  Moreover, (1) Mr. Von Kroog is an employee of Nexway and (2) juriste/in-house corporate counsel are not Bar members in France.  Therefore, under French law, Nexway cannot claim that they can assert any claim of attorney-client privilege to any documents or communications shared with Mr. Von Kroog, as he is not an avocat/attorney.

40.     It does not matter if Nexway is corresponding with juriste/in-house corporate counsel Mr. Von Kroog about legal matters or actions in France, Germany, the United States, or anywhere else in the world.  Under French law, those communications are not privileged.

    **b.  In France, there is no professional secrecy protection for Juriste/In-house Corporate Counsel**

41.     Professional secrecy exists in French law only if a law or government regulation specifically provides for such secrecy.  The French Supreme Court has stated that:

> *"Any person receiving a confidence made to him in the exercise of his*
> *profession is not, by that very fact, bound to professional secrecy. What*
> *the law wanted to guarantee is the protection of information that a*
> *private individual is obliged to give to a person whose position or*
> *profession, in the general interest and in the interest of public policy,*
> *makes him a necessary confidant."* French Supreme Court, November
> 19, 1985, case no. 83-92.813

42.     As no law in France protects the secrecy of communications of juriste/corporate in-house counsel, there is no secrecy or privilege that attaches to the communications of such counsel.  Communications with a juriste are not privileged under French law.

**c. EU law also provides that there is no legal privilege for in-house corporate counsel (*AkzoNobel*)**

43.     EU rules on attorneys and legal representation, and the very public debate about the effects of the exclusion of in-house corporate counsel from any legal privilege in the EU by Europe's highest court, confirm that Mr. Von Kroog is not eligible to claim any professional secrecy.

44.     EU rules on attorneys do not preempt the national rules in effect in EU member states. Accordingly, there is no EU Directive or Regulation that would take preeminence over the above-mentioned Law and Decree governing the professional secrecy of French attorneys and apply such a privilege to jurists/in-house corporate counsel despite French national law to the contrary.

45.     Neither is there any EU rule that would grant professional secrecy to jurists/in-house corporate counsel in connection with EU investigations or proceedings.  Indeed, the highest judicial court on EU matters, the ECJ specifically decided in in the *Akzo-Nobel* case that in-house corporate counsel under EU law do NOT have any professional secrecy in EU investigations.

46.     The scope of the professional secrecy at the European level has been long defined by the *AM & S Europe* decision (case 155/79, May 18, 1982), which states that two cumulative conditions be met for attorney-client privilege to apply under EU law: (1) the exchange with the attorney must be related to the exercise of the client's <u>right of defense</u>, and (2) this exchange must emanate from an <u>independent attorney</u> who is not linked to the client by an employment relationship.

47.     The second condition was central to the ECJ's decision in *AkzoNobel* (2010).[6] The Swedish paint company was the target of an EU competition authority investigation; internal documents and memoranda were seized by the authorities; the company asserted that certain documents were privileged as they were drafted by in-house corporate counsel and should be covered by the same privilege as attorneys because in-house corporate counsel fulfill the same advisory function in a company as an attorney; the argument to extend privilege to in-house corporate counsel was supported by a number of *amicus* including the American Corporate Counsel Association (ACCA).  However, the European Court of Justice refused to extend the

---

[6] Akzo Nobel Chemicals Ltd, and Akcros Chemicals Ltd., European Court of Justice  Case C-550/07 P, September 14, 2010, https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:62007CJ0550.  The copy of the opinion is attached to this Report as Attachment 6.

professional secrecy of attorneys in EU administrative proceedings to include in-house corporate counsel, even though AkzoNobel's corporate counsel was a registered attorney in the Netherlands and accordingly subject to Bar oversight and discipline of the Netherlands Bar Council.

48.    Indeed, AkzoNobel had argued that,

> *"the rules of professional ethics and discipline applicable in the present case make the employment relationship fully compatible with the concept of an independent lawyer. They argue that the contract between Mr S. and the company which employed him provided that the company was to respect the lawyer's freedom to perform his functions independently and to refrain from any act which might affect that task..." (Akzo Nobel at par. 35)*

49.    The Court rejected this argument, stating that,

> "*It follows that the requirement of independence means the absence of any employment relationship between the lawyer and his client, so that legal professional privilege does not cover exchanges within a company or group with in-house lawyers." (Akzo Nobel at par. 44)*

50.    The Court explained the rationale for not extending professional secrecy to in-house counsel:

> *"the concept of the independence of lawyers is determined not only positively, that is by reference to professional ethical obligations, but also negatively, by the absence of an employment relationship. An in-house lawyer, despite his enrolment with a Bar or Law Society and the professional ethical obligations to which he is, as a result, subject, does not enjoy the same degree of independence from his employer as a lawyer working in an external law firm does in relation to his client. Consequently, an in-house lawyer is less able to deal effectively with any conflicts between his professional obligations and the aims of his client." (Akzo Nobel at par. 45)*

51.    The Court focused on the employment relationship of the in-house counsel with the company, which necessarily, according to the Court, leads to a lack of economic independence from the company.   Accordingly, the Court held that any employment relationship that in-house counsel may have with his employer – even if they are also members of the Bar – renders in-house corporate counsel economically dependent on his/her employer and accordingly unable under EU law to assert any claim of professional secrecy over their documents and communications.[7]

52.    This approach was later confirmed in EU law in 2012, in the ECJ decision in *Prezes Urzędu Komunikacji Elektroniczne* (C-422/11 et 423/11), in which the EU court citing *AkzoNobel* held that any lawyer in an employment relationship with its client is disqualified from representing their client before the ECJ.

---

[7] Indeed, this is followed in France where attorneys must give up their Bar membership and status as an attorney when they become in-house corporate counsel for a French company.

**d. this rule is widely-known and is regularly the subject of news reports in the business press, conferences.**

53.      There has much been public discussion in France for many years about juriste/in-house corporate counsel's lack professional secrecy protection/privilege and the idea of extending those protections to them, but the debate has not resulted in any change to the status of in-house corporate counsel in France.

<u>Lobbying Efforts from French corporate counsel associations</u>

54.      In 2013, the largest lobby of French corporate counsel, the "Association Français des Juristes d'Entreprises" (AFJE) devoted a 153 page special edition of its newsletter in 2013 entirely to the topic, "Confidentiality of Advice Provided by Corporate Counsel" featuring over 40 articles by leading business people, auditors, and attorneys.

<u>The Gauvain Report</u>

55.      More recent public discussion about professional secrecy was related to the proposals in the 2019 Gauvain Report, a report drafted by member of parliament Raphaël Gauvain at the request of the Prime Minister, and submitted to the Government on June 26, 2019.[8]  The Gauvain Report concluded that the lack of professional secrecy protection for in-house corporate counsel is a source of vulnerability for French companies, which as a result are more exposed than companies in other countries to the extraterritorial administrative and judicial proceedings of major powers such as the United States, and this increased risk places French companies at a strategic disadvantage in the global economy that is harming French competitivenss. The Gauvain Report noted that almost all European countries (Spain, Italy, the Netherlands, Belgium) and the G7 member countries protect the legal opinions of in-house counsel, with the exception of France and Germany.

56.      The Gauvain Report considered that French companies are accordingly not on an equal footing with their foreign competitors, who may object to the communication of the opinions of their in-house lawyers to administrative and judicial authorities.  According to the authors of the Gauvain Report, this inequality of treatment is likely to encourage them to relocate all or part of their legal departments abroad, in order to give their legal departments the benefit of professional secrecy that does not exist in France.

57.      The Gauvain Report was widely followed in the general press, as exemplified by frequent articles since 2019 about professional secrecy in the leading French newspapers Le Figaro and La Tribune, and English language summaries of the report by law firms( Copies of these articles are attached to this report as Attachment 7; the La Tribune article is at pages 1-6; the Le Figaro article is at pages 7-8).

<u>Debate in the French Parliament</u>

58.      Additionally, the lack of professional secrecy of jurists/in-house corporate counsel has been the focus of extensive public debate in Parliament and the general press at least twice in the last 5 years.  First, French President Emmanuel Macron proposed in 2015, when he was

---

[8] The Gauvain Report (in French) is accessible at https://www.vie-publique.fr/sites/default/files/rapport/pdf/194000532.pdf

the Minister of the Economy, a new law to revitalize the economy (Law n° 2015-990 – commonly referred to as the Macron Law). One of the novel proposals in the draft law that attracted much commentary was the extension of attorney-client privilege, which applies only to registered attorneys, to juriste/in-house corporate counsel as well. Despite extensive lobbying by many corporate counsel associations, the proposal was ultimately not kept in the final law that was adopted by Parliament.

59.    Second, early this year, the new Minister of Justice, Mr. Dupond-Moretti, proposed a law to reform the French legal profession. This law would have created a new profession of corporate counsel that would benefit from professional secrecy. However, by March, due to political pressures from the Bar and others, this proposal was dropped in the proposed law and does not appear in the final law as adopted.

60.    In both cases, there was extensive lobbying and press coverage about the status of French corporate counsel including, in particular, their lack of professional secrecy. Copies of examples of news articles are attached to this report as Attachment 8 (an article about the Loi Macron is at pages 1-2; an article about the 2021 abandoned reform is at pages 3-4).

**e. Given the wide coverage, a reasonably well-informed business person in France would be aware of this rule**

61.    Over the years, the (1) extensive coverage given to the Gauvain Report since 2019, (2) the energy devoted to attempting to change the current rule for in-house corporate counsel deployed by the major French corporate counsel associations (since even before the ECJ's *AkzoNobel* decision in 2011; and (3) the coverage of the debates in Parliament in 2015 and 2020 about the status of corporate counsel in France, confirms that a reasonably well-informed French company business-person would know that exchanging communications with anyone but a duly qualified attorney would not be covered by any professional secrecy and thus not qualify for any type of attorney-client privilege protection in France. Certainly, an in-house counsel working in France would be keenly aware that they are not eligible for the professional secrecy protections of external attorneys.[9] It is no coincidence that AFJE devoted a 153 page special edition of its newsletter in 2013 entirely to the topic.

**f. No Reasonable Belief Exemption or Defense *Nemo Censetur Ignorare Lege* and the lack of the concept of "Clawback" in France**

62.    Moreover, as I previously noted, French law is code based, and French law relies on the Latin adage "*nemo censetur ignorare lege*" ("no one is supposed to ignore the law"). While this is more a legal fiction that allows the law to be applied equally to everyone notwithstanding their specific knowledge or understanding of the law, the French Supreme Constitutional Court infused this adage with legal meaning starting in 1999 by requiring the French government to provide simple and democratic access to all French laws and

---

[9] Indeed, in order to address the lack of secrecy in communications with in-house counsel, French companies have resorted to a variety of strategies to ensure that their communications remain secret. As noted in the Gauvain Report, some companies have "off-shored" their internal group legal function to a country in which in-house counsel communications are protected ( *Rapport Gauvain at 51*) Other companies have arranged with their external law firm to have duly qualified law firm associates seconded for long periods of time to the company, where they would have an office and participate in the daily work with the client, but would continue to be paid by, and report to, the external law firm (see Décideurs, 10/03/2014, *L'avocat en détachement n'est pas un prestataire comme les autres* ("*The seconded attorney is not just any service provider*"), https://www.magazine-decideurs.com/news/l-avocat-en-detachement-n-est-pas-un-prestataire-comme-les-autres.

regulations using the internet.[10]There is no provision in the French code that would allow a company to claim that professional secrecy applied because they had a reasonable (but mistaken) belief that an individual was an attorney. Thus, under French law, Nexway could not claim privilege for documents shared with a juriste/in-house corporate counsel, even if they truly did believe some privilege attached. There is no reasonable belief exception or defense under French law.

63.    Given the extensive public debate about the status of corporate counsel in France as it relates to confidentiality of communications, and the easy access to all French legal and regulatory sources, I conclude that a reasonably well-informed French business person would know that communications with a corporate counsel are not covered by any professional secrecy under French law.

64.    Finally, a note on the concept (or lack thereof) of clawing back inadvertently produced privileged documents – "clawbacks." Clawbacks do not exist in French law. The rules on French attorney-client privilege are both grounded in public policy considerations and impossible to modify even by agreement of the parties. Unlike the treatment of privilege during the discovery process in the United States where parties can agree to "clawback" unintentionally produced privileged documents and thereby restore a privilege that might have been waived, in France it is impossible to agree to restore a privilege through "clawback" or other party agreement. The disclosure of privileged documents by an attorney is accordingly definitive and incapable of being "undone," even if the parties so agree precisely because the privilege is a matter of public policy and impossible to modify by agreement, or to make special accommodations, for example by extending the attorney-client privilege to documents shared with a juriste/in-house corporate counsel. Again, privilege only applies to duly certified avocats, registered as such with a French Bar, and is impossible of extension to juriste/in-house corporate counsel no matter how similar their professional activity might look to that of a duly licensed attorney.

## V. Conclusion

65.    Under French law, only communications between a client and duly registered attorneys are covered by privilege/professional secrecy. In France, attorneys must pass a difficult exam to get into law school, complete law school, pass a bar exam, and be admitted to a Bar; only then can they appear in court. Juriste/in-house corporate counsel, by contrast, are not members of a Bar, and are not subject to Bar rules and disciplinary proceedings; and generally have studied law at a college or university, but have not gone to law school. Additionally, in France juriste/in-house corporate counsel are employees of the company for whom they work, while attorneys cannot be an employee of the client company (to protect their independence).

66.    Mr. Von Kroog is a juriste, Nexway's in-house corporate counsel, not a duly registered attorney. He does not appear to be a member of a Bar, and is an employee of his "client," and therefore is not independent of his client. Therefore, it is clear that under French law, Nexway <u>cannot</u> invoke any attorney-client privilege related to any communications with Mr. Von Kroog.

67.    Additionally, the status of jurists/in-house corporate counsel has been well publicized in France. No reasonably well-informed French business person could have concluded, at any

---

[10] Conseil Constitutionnel, decision 99-421, December 16, 1999.

time over the past 10 years, that any privilege or professional secrecy attaches to company communications with a juriste/in-house corporate counsel.  Moreover, even if Nexway mistakenly believed communications with Mr. Von Kroog were privileged, there is no provision under French law that allows a company or individual to claim that the attorney-client privilege applies because they had a reasonable belief that an individual was an attorney.  Indeed, a bedrock principle of French law is that "no one is supposed to ignore the law."

Signed in Paris, France
November 9, 2021

_____

VI. Appendix A: Curriculum Vitae of Alexander Blumrosen, Esq.
VII. Appendix B: Documents and Materials Considered

# Appendix A

# Curriculum Vitae of Alexander Blumrosen, Esq.

# Polaris Law

4, Avenue Hoche
75008 Paris, France



## ALEXANDER B. BLUMROSEN

Avocat Associé / Partner

*Avocat au Barreau de Paris*
*Member of the New York Bar*

English, French

Téléphone :   Office +33 1 43 18 02 60
             Cell +33 6 80 01 14 13
Email :         ablumrosen@polarislaw.eu

---

### Educational background

1978-82: Dartmouth College, A.B. 1982, *cum laude*
1982-83: New York University, Institute of French Studies, M.A.
1983-86: Georgetown University Law Center, J.D. 1986. Editor, American Criminal Law Review
1990-91: University of Paris I - Panthéon-Sorbonne, *Diplôme d'Etudes Approfondies* (D.E.A.)
          in International Economic Law, *mention bien* (with honors), 1991

---

### Professional Experience

After beginning his career in New York (Shearman & Sterling) and Paris (Paul Weiss), and then as the partner in charge of the international arbitration practice group at Bernard-Hertz-Béjot (Paris), Mr. Blumrosen's practice now focuses on the following areas:

**Arbitration and litigation of business disputes**. International commercial arbitration, generally appearing as counsel to parties in institutional and ad hoc arbitrations, or as arbitrator, in matters involving commercial contracts, joint ventures, franchise and distribution, trademark and patent disputes, and e-commerce/technology disputes. He appears on the arbitrator lists of many international arbitration institutions, including the "*TechList*" of the Silicon Valley Arbitration and Mediation Center (SVAMC). Mr. Blumrosen also litigates disputes before French courts in all areas of commercial law, including enforcement of foreign judgments and awards, provisional measures, and more generally, asset recovery. Mr. Blumrosen acts as counsel to litigants in U.S. proceedings (service and discovery in France under the Hague Conventions) or by appointment by US Courts as Commissioner and *Privacy Monitor* for Hague Convention discovery; as expert witness on French commercial or procedural law issues; advising US companies on investigations and compliance under Sarbanes-Oxley and the FCPA.

**Technology/Data Privacy**. Representing computer software and hardware companies regarding licensing, distribution, joint ventures and the regulation of encryption technology; advising on data privacy and security compliance (creating, training, auditing and defending programs under the GDPR), and acting as US Court-appointed Privacy Monitor in connection with discovery in France; acting for ISPs in connection with intellectual property, antitrust, web-hosting and licensing; advising Telecommunications providers and ISPs with respect to e-commerce and French regulatory issues. Litigation and arbitration of all types of IT disputes. Mr. Blumrosen was appointed in 2018 as an arbitrator on the Privacy Shield arbitration panel by the EU Commission and the US Department of Commerce.

2

# Polaris Law

| **Teaching/Media** |
| --- |

- Frequent appearances on French radio and TV in connection with US and transatlantic litigation matters, including the Alien Tort Claims Act, the death of Lady Diana, Dominique Strauss-Kahn, or significant US Supreme Court decisions such as in *Morrison* v. *National Australia Bank (2010).*

- Ecole des Mines, Lecturer on international data privacy

- Ecole Nationale de la Magistrature (ENM), Lecturer on comparative civil/common law procedure

- Visiting Professor, Hamline University School of Law - Dispute Resolution Institute, Summer programs on international arbitration in Paris and Minneapolis

- Member, French Supreme Court Working Party on the use of court-appointed experts in civil litigation (2007) (appointed by Chief Judge of the French *Cour de Cassation*)

- Faculty, International Chamber of Commerce (ICC), Institute of International Business Law and Practice, PIDA Mock International Commercial Arbitration

| **Selected Publications** |
| --- |

- *The allocation of GDPR compliance in Arbitration*, chapter contribution to "International Arbitration and EU Law", edited by José Mata Dona and Nikos Lavranos, Edward Elgar Publishing, March 2021

- *Disclosure Issues in International IP Arbitration,* Chapter contribution to *"The Guide to IP Arbitration"*, edited by John Pierce and Pierre-Yves Gunter, Global Arbitration Review, February 2021

- *International comity and Chapter II of the Hague Evidence Convention*, International Dispute Resolution News (American Bar Association), Spring 2019

- *NML Capital Ltd. v. Republic of Argentina: French Court of Cassation judgment on Argentina's immunity from provisional attachment of funds*, Alexander Blumrosen and Fleur Malet-Deraedt, American Journal of International Law (2013) at p. 638

- *The Globalization of American Class Actions: International Enforcement of Class Action Arbitral Awards*, in "Multiple Party Actions in International Arbitration", Oxford University Press, 2009 (pp. 355-372)

- *L'expertise judiciaire civile en droit américain,* (Fact investigation in U.S. civil proceedings), Report to the French Supreme Court *Concensus Conference* on Court-appointed expert investigations, 2007

- *Use of Foreign Counsel in International Discovery*, ABA International Section conference materials, December, 2006

| **Selected Speaking** |
| --- |

- HCCH a|Bridged 2020, program by the Hague Conference on Private International Law on the operation of Chapter II of the Hague Evidence Convention of 1970, December 2020.

- *Parallel proceedings in International Arbitration,* ICC Dubai MENA conference, April 2017

- *The regulation of drones and drone technology*, ITechLaw Paris, October 2014

- *Data Security: Strategies to Follow in the Wake of "United States v. Nosal"*, ITechLaw, Phoenix, May 2013

- *EU Money Laundering Disclosure Obligations: What Non-EU Lawyers Need to Know in Joint Representations*, American Bar Association, International Section, Washington DC,

**Polaris Law**

April 2013

- *EU privacy regulations; Conducting due diligence, internal inquiries and discovery from the US* and *Cross-Border Implications of Cloud Computing*, American Bar Association, International Section, Paris, November 2010

- *Open Secrets:  The receptivity of U.S. courts, prosecutors and regulators to claims of secrecy and privacy under non-U.S. law*, American Bar Association, International Section, New York, April 2010

- *Clash of Laws and Cultures: Cross Border E-Discovery and International Data Management*, Georgetown E-Discovery Institute, Washington, November 2009

### Associations/honors

**French Legion of honor** (Chevalier)

**Council on Foreign Relations** (Life Member)

**American Bar Association**, Section of International Law

- *International Arbitration Committee Co-Chair (2013-2015):  International Litigation Committee Chair (2008-2010); European Law Committee Chair (1999-2002)*

- *Section Council Member (2005-07; 2010-13)*

**International Technology Law Association**
*Member of the Advisory Board;  President (2011-12); Vice-President (2010-11; Treasurer (2009-10); Secretary (2008-09); Assistant Secretary (2007-08);*

**Swiss Arbitration Association** (*Association Suisse de l'Arbitrage*)

**CEPANI** (Belgian national arbitration association)

**US Council on International Business** (USCIB, the US national committee of the International Chamber of Commerce)

### Biographical Information

Date of birth: August 7, 1960
Place of birth: New Jersey, U.S.A.
Nationality: American
Languages: Bilingual English/French

### Bar Admissions

- New York State, *1st dep't (1987); Paris, France 1992*

- *Southern and Eastern New York Districts of the Federal Court (1987)*

- *Federal Court of International Trade (1991)*

- *Supreme Court of the United* States (2014)

# Appendix B

## Documents and Materials Considered

**Blumrosen Declaration**

**Attachment 1**

**Nexway's current French registration document**

12 RUE CITE FOULC
30000 NIMES

Code de vérification : 0zTv7WnL5n
https://www.infogreffe.fr/controle

N° de gestion 2006B01279

*Extrait Kbis*

## EXTRAIT D'IMMATRICULATION SECONDAIRE AU REGISTRE DU COMMERCE ET DES SOCIETES
à jour au 29 août 2021

### IDENTIFICATION DE LA PERSONNE MORALE

| | |
|---|---|
| *Immatriculation au RCS, numéro* | 440 953 859 R.C.S. Nanterre |
| *Dénomination ou raison sociale* | **NEXWAY** |
| *Forme juridique* | Société par actions simplifiée (Société à associé unique) |
| *Adresse du siège* | Tour Pb5 1 Avenue du Général de Gaulle Paris la Defense 92074 Puteaux Cedex |

### RENSEIGNEMENTS RELATIFS A L'ACTIVITE ET A L'ETABLISSEMENT SECONDAIRE

| | |
|---|---|
| *Date d'immatriculation* | 09/08/2006 |
| *Adresse de l'établissement* | 19 Avenue Feucheres 30000 Nîmes |
| *Activité(s) exercée(s)* | Distribution électronique de logiciels |
| *Date de commencement d'activité* | 10/01/2020 |
| *Origine du fonds ou de l'activité* | Création |
| *Mode d'exploitation* | Exploitation directe |

### OBSERVATIONS ET RENSEIGNEMENTS COMPLEMENTAIRES

| | |
|---|---|
| *- Mention n° F20/000262 du 07/01/2020* | Transfert de l'établissement du 1 Boulevard Amiral Courbet 30000 NIMES au 19 Avenue Feucheres 30000 NIMES à compter du 10/01/2020 |

Le Greffier



FIN DE L'EXTRAIT

**Blumrosen Declaration**

**Attachment 2**

**Nexway, Inc.'s Delaware registration**

# Statement and Designation
# by Foreign Corporation

**FILED**
in the office of the Secretary of State
of the State of California

JAN 0 6 2011

Nexway, Incorporated
_____
(Name of Corporation)

_____, a corporation organized and existing under the

laws of _____ Delaware _____, makes the following statements and designation:
                    (State or Place of Incorporation)

1. The address of its principal executive office is _____

    _____ 1001 Marshall Street, Suite 300, Redwood City, CA  94063 _____

2. The address of its principal office in the State of California is _____
                                                                          (If none, leave Item 2 blank.)

    _____

## Designation of Agent for Service of Process in the State of California
### (Complete either Item 3 or Item 4.)

3. (Use this paragraph if the process **agent is a natural person**.)

    _____ Christian Désert _____, a natural person residing in the State of

    California, whose complete street address is _____ 1001 Marshall Street, Suite 300

    _____ Redwood City, CA  94063 _____, is designated as agent upon whom process directed to
    this corporation may be served within the State of California, in the manner provided by law.

4. (Use this paragraph if the process **agent is another corporation**.)

    _____

    a corporation organized and existing under the laws of _____
    is designated as agent upon whom process directed to this corporation may be served within the State
    of California, in the manner provided by law.

5. It irrevocably consents to service of process directed to it upon the agent designated above, and to
    service of process on the Secretary of State of the State of California if the agent so designated or the
    agent's successor is no longer authorized to act or cannot be found at the address given.

_____                    Christian Désert, Chief Officer Executive
        (Signature of Corporate Officer)                    (Typed Name and Title of Officer Signing)

*If an individual is designated as the agent for service of process, include the agent's business or residential street address in California (a P.O. Box address is not acceptable). If another corporation is designated as the agent for service of process, do not include the address of the designated corporation.* **Note:** *Corporate agents must have complied with California Corporations Code section 1505 prior to designation, and a corporation cannot act as its own agent.*

Secretary of State **Form**
S&DC-STOCK/NONPROFIT (REV 04/2010)

# Delaware

*The First State*

PAGE  1

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "NEXWAY, INCORPORATED" IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SIXTH DAY OF JANUARY, A.D. 2011.

4912661   8300

110001867

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 8475877

DATE: 01-06-11

20-603739



**Secretary of State
Statement of Information**
(California Stock, Agricultural
Cooperative and Foreign Corporations)

**SI-550**

VK**150**

**IMPORTANT** — Read instructions **before completing this form.**

**Fees (Filing plus Disclosure) – $25.00;**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**FILED
Secretary of State
State of California**

**FEB 1 1 2020**

31|NF|cc|25R-

This Space For Office Use Only  2-18-20

**1. Corporation Name** (Enter the exact name of the corporation as it is recorded with the California Secretary of State. Note: If you registered in California using an assumed name, see instructions.)

NEXWAY, INCORPORATED

**2.  7-Digit Secretary of State File Number**

**C3347727**

**3. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Executive Office - Do not list a P.O. Box<br>4804 Mission Street, Suite 208 | San Francisco | CA | 94112 |
| b. Mailing Address of Corporation, if different than Item 3a | City (no abbreviations) | State | Zip Code |
| c. Street Address of Principal California Office, if any and if different than Item 3a - Do not list a P.O. Box<br>4804 Mission Street, Suite 208 | City (no abbreviations)<br>San Francisco | State<br>CA | Zip Code<br>94112 |

**4.  Officers** The Corporation is required to list all three of the officers set forth below. An additional title for the Chief Executive Officer and Chief Financial Officer may be added; however, the preprinted titles on this form must not be altered.

| | First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|---|
| a. Chief Executive Officer/<br>VICTOR | | | IEZUITOV | | |
| Address<br>4804 Mission Street, Suite 208 | | City (no abbreviations)<br>San Francisco | State<br>CA | Zip Code<br>94112 | |
| b. Secretary<br>LAURETTE | First Name | Middle Name | Last Name<br>BERIER | | Suffix |
| Address<br>4804 Mission Street, Suite 208 | | City (no abbreviations)<br>San Francisco | State<br>CA | Zip Code<br>94112 | |
| c. Chief Financial Officer/<br>LAURETTE | First Name | Middle Name | Last Name<br>BERIER | | Suffix |
| Address<br>4804 Mission Street, Suite 208 | | City (no abbreviations)<br>San Francisco | State<br>CA | Zip Code<br>94112 | |

**5.  Director(s)** California Stock and Agricultural Cooperative Corporations ONLY: Item 5a: At least one name **and** address must be listed. If the Corporation has additional directors, enter the name(s) and addresses on Form SI-550A (see instructions).

| | First Name | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|---|
| a. First Name<br>VICTOR | | | IEZUITOV | | |
| Address<br>4804 Mission Street, Suite 208 | | City (no abbreviations)<br>San Francisco | State<br>CA | Zip Code<br>94112 | |
| b. Number of Vacancies on the Board of Directors, if any | | | | | |

**6.  Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | | Suffix |
|---|---|---|---|---|
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State<br>CA | Zip Code | |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| C T CORPORATION SYSTEM     (C016 8406) |

**7.  Type of Business**

Describe the type of business or services of the Corporation
E-COMMERCE SOFTWARE PROVIDER

**8. The information contained herein, including in any attachments, is true and correct.**

| 02/10/2020 | Julie Alimi-Londner | Representative | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | | Signature |

Title SI-550 (REV 11/2019)

2019 California Secretary of State
bizfile.sos.ca.gov

**Blumrosen Declaration**

**Attachment 3**

**asknet, Inc.'s Delaware registration**

**FILED**
in the office of the Secretary of State
of the State of California

SEP 0 4 2007

## STATEMENT AND DESIGNATION
## BY FOREIGN CORPORATION

ASKNET, INC.
(Name of Corporation)

_____ , a corporation organized and existing under the

laws of _____ Delaware _____ ,makes the following statements and designation:
(State or Place of Incorporation)

1.  The address of its principal executive office is   235 Montgomery Street, Suite 1025,

    San Francisco, CA 94104 _____ .

2.  The address of its principal office in the State of California is   235 Montgomery Street, Suite 102

    San Francisco, CA 94104 _____ .

### DESIGNATION OF AGENT FOR SERVICE OF PROCESS IN THE STATE OF CALIFORNIA
(Complete either Item 3 or Item 4.)

3.  (Use this paragraph if the process **agent is a natural person.**)

    _____ ,a natural person residing in the State of

    California, whose complete address is _____

    _____ , is designated as agent upon whom process directed to
    this corporation may be served within the State of California, in the manner provided by law.

4.  (Use this paragraph if the process **agent is a corporation.**)

    CT CORPORATION System _____ , a corporation organized and existing

    under the laws of _____ Delaware _____ , is designated as agent upon whom process directed
    to this corporation may be served within the State of California, in the manner provided by law.

    **NOTE: Corporate agents must have complied with California Corporations Code Section 1505
    prior to designation.**

5.  It irrevocably consents to service of process directed to it upon the agent designated above, and to service
    of process on the Secretary of State of the State of California if the agent so designated or the agent's
    successor is no longer authorized to act or cannot be found at the address given.

_____        Robert Lamvik   President
(Signature of Corporate Officer)        (Typed Name and Title of Officer Signing)

Secretary of State Form
S&DC-STOCK/NONPROFIT (REV 03/2005)

# *Delaware*

PAGE  1

### *The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "ASKNET INC." IS DULY INCORPORATED
UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING
AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF
THIS OFFICE SHOW, AS OF THE THIRTEENTH DAY OF AUGUST, A.D. 2007.



3811622  8300

070798786

Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 5919834

DATE: 08-13-07



# State of California
## Secretary of State

### Statement of Information
**(Foreign Corporation)**
**FEES (Filing and Disclosure): $25.00.**
**If this is an amendment, see instructions.**
**IMPORTANT – READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**F**

1. **CORPORATE NAME**

2. **CALIFORNIA CORPORATE NUMBER**

This Space for Filing Use Only

**No Change Statement**  (Not applicable if agent address of record is a P.O. Box address.  See instructions.)

3. **If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no statement of information has been previously filed, this form must be completed in its entirety.**

☐  If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed **to Item 13.**

**Complete Addresses for the Following**  (Do not abbreviate the name of the city.  Items 4 and 5 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 4.   STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE | | | |
| 5.   STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY | | | |
| 6.   MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 4 | | | |

**Names and Complete Addresses of the Following Officers**  (The corporation must list these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 7.   CHIEF EXECUTIVE OFFICER/ | | | | |
| 8.   SECRETARY | | | | |
| 9.   CHIEF FINANCIAL OFFICER/ | | | | |

**Agent for Service of Process**  If the agent is an individual, the agent must reside in California and Item 11 must be completed with a California street address, a P.O. Box address is not acceptable.  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 11 must be left blank.

10.  NAME OF AGENT FOR SERVICE OF PROCESS

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 11.   STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, **IF AN INDIVIDUAL** | | | |

**Type of Business**

12.  DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION

13.  THE INFORMATION CONTAINED HEREIN IS TRUE AND CORRECT.

| DATE | TYPE/PRINT NAME OF PERSON COMPLETING FORM | TITLE | SIGNATURE |
|---|---|---|---|

SI-350 (REV 01/2013)                                                                              APPROVED BY SECRETARY OF STATE

**Blumrosen Declaration**

**Attachment 4**

**Mr. Von Kroog Linkedin page**



      

Home    My Network    Jobs    Messaging    Notifications    Me ▼    Work ▼

**Les chasseurs de têtes -** cherchent à vous recruter. Inscrivez-vous et consultez


Messaging    ···   ✎   ⌃











Home    My Network    Jobs    Messaging    Notifications    Me ▾    Work ▾



## Oliver von Kroog · 2nd
Legal Advisor chez Nexway

-  Nexway
-  Université Paris 1 Panthéon-Sorbonne

Greater Montpellier Metropolitan Area · Contact info

85 connections

 **1 mutual connection:** Avi Bitton

 Connect     🔒 Message     More

## Highlights

 **You both studied at Université Paris 1 Panthéon-Sorbonne**
Oliver started at Université Paris 1 Panthéon-Sorbonne after you started

Say hello

Activity

 Messaging    ⋯   ∧



See all activity

## Experience

**Legal Advisor / Juriste**
Nexway
May 2017 – Present · 4 yrs 6 mos
Nîmes

**Associate Manager / Associé gérant**
Apimex Sarl
Aug 2004 – May 2017 · 12 yrs 10 mos
Région de Paris, France

## Education

**Université Paris 1 Panthéon-Sorbonne**
Master's degree / Maîtrise, Laws / Droit
2001 – 2003

**Université de Cergy-Pontoise**
Master 2 (M2) / DESS, International Trade / Commerce international
2003 – 2004

**Universität zu Köln**
Master of Laws - LLM, Droit
1999 – 2001

Messaging



Allemand • Anglais • Français

**Promoted**     •••

Les chasseurs de têtes
cherchent à vous recruter. Inscrivez-
vous et consultez les offres! ⟩

Le Monde pour 5€ par mois
Vous aider à y voir plus clair dans les
débats qui agitent notre planète. ⟩

THÉBAÏDE    Préparez votre retraite
Thébaïde analyse et régularise votre
situation pour optimiser vos droits. ⟩

**People also viewed**

Messaging   •••  



in    🔍    Home    My Network    Jobs    Messaging

**Guillaume Pelofi** • 3rd+
Médecin généraliste

Connect

**Guillaume PELOFI** • 3rd+
Technicien multitechnique / Factotum chez ADEQUAT GROUPE

Connect

**Jonathan 🐧 CHARDON 🐧** • 3rd
Freelance consultant cloud GCP / Devops enabler (en mission non disponible)

Message

**Chloé Domenech** • 3rd
Account manager chez Adyen

Message

Show more

## People you may know

**Christina L. Beharry**
International Arbitration Counsel at Foley Hoag LLP

Connect

**David Hambrick**
Senior Counsel, Litigation & Investigations at EFG Bank

Connect

**Karolina Latasz**

Messaging  ...  ✎  ⌃










**Blumrosen Declaration**

**Attachment 5**

**National Bar Council search results**



CONSEIL NATIONAL
DES BARREAUX

LES AVOCATS

LE CONSEIL NATIONAL ⌄   VIE PROFESSIONNELLE ⌄   DEVENIR AVOCAT ⌄   ANNUAIRES ⌄   SITES SPÉCIALISÉS ⌄   ACTUALITÉS   FAQ

Accueil   ›   Annuaires   ›   Annuaire des avocats de France

# Annuaire des avocats de France

*Retrouvez les coordonnées des 70 000 avocats de France.*

Nouvelle recherche

Rappel des critères de recherches :

Nom : von kroog

AUCUN RÉSULTAT.

*Les résultats de cette recherche sont triés aléatoirement et sont limités à 200 réponses.*



LE CONSEIL NATIONAL ⌄   VIE PROFESSIONNELLE ⌄   DEVENIR AVOCAT ⌄   **ANNUAIRES** ⌄   SITES SPÉCIALISÉS ⌄   ACTUALITÉS   FAQ

**Accueil**  ›  **Annuaires**  ›  Annuaire des avocats de France

# Annuaire des avocats de France

*Retrouvez les coordonnées des 70 000 avocats de France.*

Nouvelle recherche

Rappel des critères de recherches :
Nom : von kroog
Prénom : oliver

AUCUN RÉSULTAT.

*Les résultats de cette recherche sont triés aléatoirement et sont limités à 200 réponses.*

**Blumrosen Declaration**

**Attachment 6**

**European Court of Justice Opinion in Akzo Nobel Chemicals Ltd**

JUDGMENT OF THE COURT (Grand Chamber)

14 September 2010\*

In Case C-550/07 P,

APPEAL under Article 56 of the Statute of the Court of Justice, brought on 30 November 2007,

**Akzo Nobel Chemicals Ltd,** established in Hersham (United Kingdom),

**Akcros Chemicals Ltd,** established in Hersham,

represented by M. Mollica, avocate, and subsequently by M. van der Woude, avocat and C. Swaak, advocaat,

appellants,

---

\* Language of the case: English.

supported by

**United Kingdom of Great Britain and Northern Ireland,** represented by V. Jackson and E. Jenkinson, acting as Agents, and M. Hoskins, Barrister,

**Ireland,** represented by D. O'Hagan, acting as Agent, and M. Collins SC, with an address for service in Luxembourg,

**Kingdom of the Netherlands,** represented by C. Wissels, Y. de Vries and M. de Grave, acting as Agents,

interveners in the appeal,

the other parties to the proceedings being:

**European Commission,** represented by F. Castillo de la Torre and X. Lewis, acting as Agents, with an address for service in Luxembourg,

defendant at first instance,

I - 8361

**Conseil des barreaux européens,** established in Brussels (Belgium), represented by J. Flynn QC,

**Algemene Raad van de Nederlandse Orde van Advocaten,** established in The Hague (Netherlands), represented by O. Brouwer and C. Schillemans, advocaten,

**European Company Lawyers Association,** established in Brussels, represented by M. Dolmans and K. Nordlander, avocats, and J. Temple Lang, solicitor,

**American Corporate Counsel Association (ACCA) – European Chapter,** established in Paris (France), represented by G. Berrisch, Rechtsanwalt, instructed by D. Hull, solicitor,

**International Bar Association,** established in London (United Kingdom), represented by J. Buhart and I. Michou, avocats,

interveners at first instance,

THE COURT (Grand Chamber)

composed of V. Skouris, President, A. Tizzano, J.N. Cunha Rodrigues, K. Lenaerts, J.-C. Bonichot, R. Silva de Lapuerta (Rapporteur) and E. Levits, Presidents of Chamber, A. Rosas, U. Lõhmus, M. Safjan and D. Šváby, Judges,

Advocate General: J. Kokott,
Registrar: L. Hewlett, Principal Administrator,

having regard to the written procedure and further to the hearing on 9 February 2010,

after hearing the Opinion of the Advocate General at the sitting on 29 April 2010,

gives the following

**Judgment**

1    By their appeal, Akzo Nobel Chemicals Ltd ('Akzo') and Akcros Chemicals Ltd ('Akcros') seek to have set aside the judgment of the Court of First Instance of the European Communities (now 'the General Court') of 17 September 2007 in Joined Cases T-125/03 and T-253/03 *Akzo Nobel Chemicals and Akcros Chemicals* v *Commission*

('the judgment under appeal'), in so far as it rejected the claim of legal professional privilege for correspondence with Akzo's in-house lawyer.

## I — European Union law

2    Article 14 of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles [81] and [82] of the Treaty (OJ, English Special Edition 1959-1962, p. 87) provides:

'1.  In carrying out the duties assigned to it by Article [105 TFEU] and by provisions adopted under Article [103 TFEU], the Commission may undertake all necessary investigations into undertakings and associations of undertakings.

To this end the officials authorised by the Commission are empowered:

(a)  to examine the books and other business records;

(b)  to take copies of or extracts from the books and business records;

(c)  to ask for oral explanations on the spot;

(d)  to enter any premises; land and means of transport of undertakings.

2.  The officials of the Commission authorised for the purpose of these investigations shall exercise their powers upon production of an authorisation in writing …

3.  Undertakings and associations of undertakings shall submit to investigations ordered by decision of the Commission. The decision shall specify the subject matter and purpose of the investigation, appoint the date on which it is to begin and indicate the penalties … and the right to have the decision reviewed by the Court of Justice.

…'

## II — Facts

3    In the judgment under appeal the General Court summarised the material facts as follows:

'1.  On 10 February 2003 the Commission adopted decision C(2003) 559/4, amending its decision C(2003) 85/4 of 30 January 2003, whereby the Commission ordered, inter alia, Akzo … and Akcros … and their respective subsidiaries to submit to an investigation on the basis of Article 14(3) of Regulation No 17… aimed at seeking

evidence of possible anti-competitive practices (together "the decision ordering the investigation").

2. On 12 and 13 February 2003, Commission officials, assisted by representatives of the Office of Fair Trading ("OFT", the British competition authority), carried out an investigation on the basis of the decision ordering the investigation at the applicants' premises in Eccles, Manchester (United Kingdom). During the investigation the Commission officials took copies of a considerable number of documents.

3. In the course of those operations the applicants' representatives informed the Commission officials that certain documents were likely to be covered by the protection of confidentiality of communications between lawyers and their clients ("legal professional privilege" or "LPP").

4. The Commission officials then informed the applicants' representatives that it was necessary for them to examine briefly the documents in question so that they could form their own opinion as to whether the documents should be privileged. Following a long discussion, and after the Commission officials and the OFT officials had reminded the applicants' representatives of the consequences of obstructing investigations, it was decided that the leader of the investigating team would briefly examine the documents in question, with a representative of the applicants at her side.

AKZO NOBEL CHEMICALS AND AKCROS CHEMICALS v COMMISSION

5.  During the examination of the documents in question, a dispute arose in relation to five documents which were ultimately treated in two different ways by the Commission.

...

8.  The third document which gave rise to a dispute consists of a number of handwritten notes made by Akcros' ... general manager, which are said by the applicants to have been written during discussions with employees and used for the purpose of preparing the typewritten memorandum of Set A. Finally, the last two documents in issue are two e-mails, exchanged between Akcros' ... general manager and Mr S., Akzo's ... coordinator for competition law. The latter is enrolled as an Advocaat of the Netherlands Bar and, at the material time, was a member of Akzo's ... legal department and was therefore employed by that undertaking on a permanent basis.

9.  After examining the last three documents and obtaining the applicants' observations, the head of the investigating team took the view that they were definitely not privileged. Consequently, she took copies of them and placed the copies with the rest of the file, without isolating them in a sealed envelope. The applicants identified the three documents as "Set B".

10.  On 17 February 2003 the applicants sent the Commission a letter setting out the reasons why, in their view, the documents ... in Set B were protected by LPP.

11. By letter of 1 April 2003, the Commission informed the applicants that the arguments set forth in their letter of 17 February 2003 were insufficient to show that the documents in question were covered by LPP. However, the Commission pointed out that the applicants could submit observations on those provisional conclusions within two weeks, after which the Commission would adopt a final decision.

…

14. On 8 May 2003 the Commission adopted decision C(2003) 1533 final concerning a claim of legal privilege in the context of an investigation pursuant to Article 14(3) of Regulation No 17 ("the rejection decision of 8 May 2003"). In Article 1 of that decision the Commission rejects the applicants' request for the return of the documents in … Set B and for confirmation by the Commission that all copies of those documents in its possession had been destroyed. …

…

18. On 8 September 2003 … at the request of the President of the Court of First Instance, the Commission sent the President, under confidential cover, a copy of the Set B documents…'

### III — Procedure before the General Court and the judgment under appeal

4    The actions brought by the appellants before the General Court on 11 April and 4 July 2003 respectively, sought (i) the annulment of Commission Decision C(2003) 559/4 of 10 February 2003, and so far as necessary, of Commission decision C(2003) 85/4 of 30 January 2003 ordering Akzo, Akcros and their respective subsidiaries to submit to an investigation on the basis of Article 14(3) of Regulation No 17 (Case COMP/E-1/38.589) and (ii) an order requiring the Commission to return certain documents seized in the course of the investigation in question and not to use their contents (Case T-125/03) and the annulment of the rejection decision of 8 May 2003 (Case T-253/03).

5    By the judgment under appeal, the General Court dismissed the action for annulment of the decision ordering the investigation (Case T-125/03) as inadmissible and the action for annulment of the rejection decision of 8 May 2003 (Case T-253/03) as unfounded.

### IV — Forms of order sought

6    Akzo/Akcros claim that the Court should:

— set aside that the judgment under appeal, in so far as the General Court rejected the claim of legal professional privilege for communications with Akzo's in-house lawyer;

— annul the rejection decision of 8 May 2003, in so far as it refused to return the e-mail correspondence with Akzo's in-house lawyer (part of Set B documents); and

— order the Commission to pay the costs of the appeal and of the proceedings before the General Court in as far as they concern the plea raised in the present appeal.

7   The Conseil des barreaux européen, intervener at first instance, claims that the Court should:

— set aside the judgment in so far as the General Court denies that the communications between Akzo and Mr S. benefit from legal professional privilege, and either annul the rejection decision of 8 May 2003 to the same extent or alternatively, if the Court should take the view that the matter is not in a state for it to rule upon the application, remit the matter to the General Court; and

— order the Commission to pay the costs incurred by it in the appeal proceedings and the proceedings before the General Court, in so far as they relate to the issues taken on appeal.

8   The Algemene Raad van de Nederlandse Orde van Advocaten, intervener at first instance, claims that the Court should:

— set aside the judgment under appeal in so far as it rejected the claim by Akzo that two e-mails exchanged between Ackros' general manager and Akzo's in-house lawyer were not covered by the Community concept of legal professional

privilege in view of the employment relationship between that in-house lawyer and Akzo; and

— order the Commission to pay its costs in the proceedings before the General Court and in this appeal.

9    The European Company Lawyers Association, intervener at first instance, claims that the Court should:

— set aside the judgment under appeal in so far as the General Court held that the communications between Akcros and the member of the legal department of Akzo were not subject to legal professional privilege; and

— order the Commission to pay its costs.

10   The Association of Corporate Council Association (ACCA) – European Chapter, intervener at first instance, claims that the Court should:

— set aside the judgment under appeal in so far as the General Court rejected the claim of legal professional privilege for e-mail correspondence with Akzo's in-house lawyer (part of the Set B documents);

— annul the Commission's decision of 8 May 2003 refusing to return to the appellants copies of that e-mail correspondence or, alternatively, refer the matter back to the General Court; and

— order the Commission to pay the costs in connection with these proceedings and the proceedings before the General Court in so far as they relate to the issue under appeal.

11    The International Bar Association, intervener at first instance, claims that the Court should:

— set aside the judgment under appeal to the extent that it denies that the Set B e-mails exchanged between Akzo Nobel and Mr S. benefit from legal professional privilege; and

— order the Commission to pay the International Bar Association's costs of the appeal proceedings and of the proceedings before the General Court to the extent that the costs relate to issues considered in the appeal.

12    The United Kingdom of Great Britain and Northern Ireland and the Kingdom of the Netherlands, interveners on appeal, endorse the form of order sought by Akzo and Akcros.

13    The Commission contends that the Court should:

—    dismiss the appeal; and

—    order the appellants to pay the costs.

## V — The appeal

### A — *Subject-matter of the appeal*

14    The appeal concerns exclusively one part of the Series B documents, namely two e-mails exchanged between the Director General of Akcros and Mr S. When the investigations were carried out at the appellants' premises in the United Kingdom, Mr S., a member of the Netherlands Bar, was employed in the legal department of Akzo, a company incorporated under English law. The Commission added copies of those e-mails to the file.

15    The Commission has stated, without being contradicted on that point by the appellants, that its decision of 11 November 2009 to impose fines in the context of the procedure which had given rise to the investigations carried out in 2003 at the premises of Akzo and Akcros (Case COMP/38.589 – Heat stabilisers; SEC(2009) 1559 and SEC(2009) 1560) was not based on those two e-mails. The Commission's statement

that no exchange of information with the national competition authorities has taken place with respect to those e-mails has also not been contradicted.

B — *Appellants' interest in bringing proceedings*

1. Arguments of the parties

16    First of all, the Commission questions whether Akzo and Akcros have an interest in bringing proceedings. The two e-mails do not fulfil the first condition for legal professional privilege set out in paragraphs 21 and 23 of the judgment in Case 155/79 *AM & S Europe* v *Commission* [1982] ECR 1575, according to which legal advice must be requested and given for the purposes of the client's rights of defence. The first e-mail is merely a request for comments on a draft letter to be sent to a third party. The second e-mail contains mere changes to the wording.

17    Therefore, the Commission takes the view that the two e-mails cannot in any event be covered by legal professional privilege.

18    Next, the Commission states that the appellants do not claim that the documents at issue fulfil the first condition for legal professional privilege laid down in paragraphs 21 and 23 of *AM & S Europe* v *Commission*.

19    Finally, the Commission adds that Akzo's and Akcros' interest in bringing proceedings ceased at the latest on the date of its decision of 11 November 2009 imposing fines on them.

20    Akzo and Akcros reply that the content of the two e-mails was never examined by the General Court. It upheld the rejection decision of 8 May 2003 on the basis that the documents at issue could not be privileged because they were not communications with an external lawyer. Moreover, that decision excluded legal professional privilege not because of the content of the documents at issue, but solely because of the status of the lawyer concerned.

21    Akzo and Akcros submit that the question whether the two e-mails fulfil the first condition required for legal professional privilege is a question of fact which has not yet been decided. That issue cannot be resolved in the present proceedings, which are limited to questions of law.

2. Findings of the Court

22    In answer to the objection raised by the Commission, it must be recalled that the interest in bringing proceedings is a condition of admissibility which must continue up to the Court's decision in the case (see, Joined Cases C-373/06 P, C-379/06 P and C-382/06 P *Flaherty and Others* v *Commission* [2008] ECR I-2649, paragraph 25 and the case-law cited).

23    The Court also stated that such an interest exists as long as the appeal may, if successful, procure an advantage to the party bringing it (see, Case C-277/01 P *Parliament* v *Samper* [2003] ECR I-3019, paragraph 28, and Case C-362/05 P *Wunenburger* v *Commission* [2007] ECR I-4333, paragraph 42, and order of 8 April 2008 in Case C-503/07 *Saint-Gobain Glass Deutschland* v *Commission* [2008] ECR I-2217, paragraph 48 and the case-law cited).

24    As regards the present appeal, the Commission's assertion that the two e-mails exchanged between the Director General of Akcros and Mr S. clearly could not be covered by legal professional privilege, is not capable of affecting the appellants' interest in bringing proceedings. Such an argument, which seeks to show that the General Court rightly held that the two e-mails at issue are not covered by legal professional privilege is not a matter of admissibility, but pertains to the substance of the appeal.

25    As to the Commission's argument that the adoption of the decision of 11 November 2009 eliminated the appellants' interest in pursuing the present proceedings, it must be recalled that, by the rejection decision of 8 May 2003, which is the subject-matter of the judgment under appeal, the Commission refused to accede to the appellants' request, inter alia, to return to them the two e-mails exchanged between the Director General of Akcros and Mr S. and to confirm that all the copies of those documents in its possession had been destroyed. Any breach of legal professional privilege in the course of investigations does not take place when the Commission relies on a privileged document in a decision on the merits, but when such a document is seized by one of its officials. In those circumstances, the appellants' interest in bringing proceedings continues for at least as long as the Commission has the documents referred to in the rejection decision of 8 May 2003 or copies thereof.

26  In those circumstances, Akzo and Akcros have an interest in bringing this appeal.

C — *Substance*

27  Akzo and Akcros put forward three grounds of appeal, the first as the principal ground of appeal and the second and third as alternative grounds.

28  All the grounds of appeal are directed against paragraphs 165 to 180 of the judgment under appeal. The appellants submit in essence that the General Court wrongly refused to apply legal professional privilege to the two e-mails exchanged with Mr S.

29  The European Company Lawyers Association, intervener at first instance, and Ireland, intervener before the Court, have argued that by the judgment under appeal the General Court infringed the right to property and professional freedom. It must be observed that Akzo and Akcros did not raise those pleas at first instance. In those circumstances they must be rejected as inadmissible.

1. The first ground of appeal

30    Akzo and Akcros base the first ground of appeal on two arguments. They submit, first of all, that the General Court incorrectly interpreted the second condition for legal professional privilege, which concerns the professional status of the lawyer with whom communications are exchanged, as laid down in the *AM & S Europe* v *Commission* judgment, and, second, that by that interpretation the General Court breached the principle of equality.

31    The Commission submits that that ground of appeal is unfounded.

(a) The first argument

(i) Arguments of the parties

32    Akzo and Akcros submit that the General Court, in paragraphs 166 and 167 of the judgment under appeal, gave a 'literal and partial interpretation' in *AM & S Europe* v *Commission* of the second condition of legal professional privilege relating to the lawyer's status. The General Court should have chosen a 'teleological' interpretation of that condition and should have held that the exchanges at issue were protected by that principle.

33    Akzo and Akcros submit that paragraph 21, read in conjunction with paragraph 24, of *AM & S Europe* v *Commission*, reveals that the Court of Justice does not equate the existence of an employment relationship with a lack of independence on the part of the lawyer.

34    Akzo and Akcros, and a number of the interveners, submit that the criterion that the lawyer must be independent cannot be interpreted so as to exclude in-house lawyers. An in-house lawyer enrolled at a Bar or Law Society is, simply on account of his obligations of professional conduct and discipline, just as independent as an external lawyer. Furthermore, the guarantees of independence enjoyed by an 'advocaat in dienstbetrekking', that is an enrolled lawyer in an employment relationship under Dutch law, are particularly significant.

35    Akzo and Akcros observe that the rules of professional ethics and discipline applicable in the present case make the employment relationship fully compatible with the concept of an independent lawyer. They argue that the contract between Mr S. and the company which employed him provided that the company was to respect the lawyer's freedom to perform his functions independently and to refrain from any act which might affect that task. The contract also authorised Mr S. to comply with all the professional obligations imposed by the Netherlands Bar.

36    Akzo and Akcros add that the employed lawyer concerned in this case is subject to a code of conduct and to the supervision of the Netherlands Bar. Furthermore, regulations lay down a certain number of additional guarantees aiming to resolve in an impartial manner any differences of opinion between the undertaking and its in-house lawyer.

37    The Commission states that the application, by the General Court, of legal professional privilege was correct. It is clear from paragraphs 24 to 26 of the judgment in *AM & S Europe* v *Commission* that the fundamental quality required of a lawyer so that communications with him are privileged is that he is not an employee of his client.

38    Accordingly, in the Commission's view, if the Court had wanted legal professional privilege to apply also to communications exchanged with lawyers who are employed by the person who asks their advice, it would not have limited the scope of the second condition, as set out in paragraph 21 of *AM & S Europe* v *Commission*.

39    The Commission submits that in *AM & S Europe* v *Commission* the Court placed lawyers in one of the following two categories: (i) employed salaried lawyers and (ii) lawyers who are not bound by a contract of employment. Only documents drafted by lawyers in the second category were regarded as being covered by legal professional privilege.

(ii) Findings of the Court

40    It must be recalled that, in *AM & S Europe* v *Commission*, the Court, taking account of the common criteria and similar circumstances existing at the time in the national laws of the Member States, held, in paragraph 21 of that judgment, that the confidentiality of written communications between lawyers and clients should be protected at Community level. However, the Court stated that that protection was subject to two cumulative conditions.

41    In that connection, the Court stated, first, that the exchange with the lawyer must be connected to 'the client's rights of defence' and, second, that the exchange must emanate from 'independent lawyers', that is to say 'lawyers who are not bound to the client by a relationship of employment'.

42    As to the second condition, the Court observed, in paragraph 24 of the judgment in *AM & S Europe* v *Commission*, that the requirement as to the position and status as an independent lawyer, which must be fulfilled by the legal adviser from whom the written communications which may be protected emanate, is based on a conception of the lawyer's role as collaborating in the administration of justice and as being required to provide, in full independence and in the overriding interests of that cause, such legal assistance as the client needs. The counterpart to that protection lies in the rules of professional ethics and discipline which are laid down and enforced in the general interest. The Court also held, in paragraph 24, that such a conception reflects the legal traditions common to the Member States and is also to be found in the legal order of the European Union, as is demonstrated by the provisions of Article 19 of the Statute of the Court of Justice.

43    The Court repeated those findings in paragraph 27 of that judgment, according to which written communications which may be protected by legal professional privilege must be exchanged with 'an independent lawyer, that is to say one who is not bound to his client by a relationship of employment'.

44    It follows that the requirement of independence means the absence of any employment relationship between the lawyer and his client, so that legal professional privilege does not cover exchanges within a company or group with in-house lawyers.

45    As the Advocate General observed in points 60 and 61 of her Opinion, the concept of the independence of lawyers is determined not only positively, that is by reference to professional ethical obligations, but also negatively, by the absence of an employment

relationship. An in-house lawyer, despite his enrolment with a Bar or Law Society and the professional ethical obligations to which he is, as a result, subject, does not enjoy the same degree of independence from his employer as a lawyer working in an external law firm does in relation to his client. Consequently, an in-house lawyer is less able to deal effectively with any conflicts between his professional obligations and the aims of his client.

46    As regards the professional ethical obligations relied on by the appellants in order to demonstrate Mr S.'s independence, it must be observed that, while the rules of professional organisation in Dutch law mentioned by Akzo and Akcros may strengthen the position of an in-house lawyer within the company, the fact remains that they are not able to ensure a degree of independence comparable to that of an external lawyer.

47    Notwithstanding the professional regime applicable in the present case in accordance with the specific provisions of Dutch law, an in-house lawyer cannot, whatever guarantees he has in the exercise of his profession, be treated in the same way as an external lawyer, because he occupies the position of an employee which, by its very nature, does not allow him to ignore the commercial strategies pursued by his employer, and thereby affects his ability to exercise professional independence.

48    It must be added that, under the terms of his contract of employment, an in-house lawyer may be required to carry out other tasks, namely, as in the present case, the task of competition law coordinator, which may have an effect on the commercial policy of the undertaking. Such functions cannot but reinforce the close ties between the lawyer and his employer.

49    It follows, both from the in-house lawyer's economic dependence and the close ties with his employer, that he does not enjoy a level of professional independence comparable to that of an external lawyer.

50    Therefore, the General Court correctly applied the second condition for legal professional privilege laid down in the judgment in *AM & S Europe* v *Commission*.

51    Accordingly, the first argument put forward by Akzo and Ackros under the first ground of appeal cannot be accepted.

(b) The second argument

(i) Arguments of the parties

52    Akzo and Akcros submit that, in paragraph 174 of the judgment under appeal, the General Court wrongly rejected the claim that refusing to apply legal professional privilege to correspondence exchanged with an in-house lawyer violates the principle of equal treatment. The independence guaranteed by the rules of professional ethics and discipline applicable in the present case should be the benchmark for determining the scope of that principle. According to that criterion, the position of in-house lawyers enrolled with a Bar or Law Society is no different from that of external lawyers.

53    The Commission takes the view that the General Court, in paragraph 174 of the judgment under appeal, rightly held that in-house lawyers and external lawyers are clearly in very different situations, owing, in particular, to the personal, functional, structural and hierarchical integration of in-house lawyers within the companies that employ them.

(iii) Findings of the Court

54    It must be recalled that the principle of equal treatment is a general principle of European Union law, enshrined in Articles 20 and 21 of the Charter of Fundamental Rights of the European Union.

55    According to settled case-law, that principle requires that comparable situations must not be treated differently and that different situations must not be treated in the same way unless such treatment is objectively justified (see Case C-344/04 *IATA and ELFAA* [2006] ECR I-403, paragraph 95; Case C-303/05 *Advocaten voor de Wereld* [2007] ECR I-3633, paragraph 56; and Case C-127/07 *Arcelor Atlantique et Lorraine and Others* [2008] ECR I-9895, paragraph 23).

56    As to the essential characteristics of those two categories of lawyer, namely their respective professional status, it is clear from paragraphs 45 to 49 of this judgment that, despite the fact that he may be enrolled with a Bar or Law Society and that he is subject to a certain number of professional ethical obligations, an in-house lawyer does not enjoy a level of professional independence equal to that of external lawyers.

57    As the Advocate General stated, in point 83 of her Opinion, that difference in terms of independence is still significant, even though the national legislature, the Netherlands legislature in this case, seeks to treat in-house lawyers in the same way as external lawyers. After all, such equal treatment relates only to the formal act of admitting an in-house lawyer to a Bar or Law Society and the professional ethical obligations incumbent on him as a result of such admission. On the other hand, that legislative framework does not alter the economic dependence and personal identification of a lawyer in an employment relationship with his undertaking.

58    It follows from those considerations that in-house lawyers are in a fundamentally different position from external lawyers, so that their respective circumstances are not comparable for the purposes of the case-law set out in paragraph 55 of this judgment.

59    Therefore, the General Court rightly held that there was no breach of the principle of equal treatment.

60    Consequently, the second argument put forward as part of the first ground of appeal must also be rejected.

61    Therefore, that ground of appeal must be rejected in its entirety.

2. The second ground of appeal

62    Should the Court consider that the General Court has not erred in its interpretation of *AM & S Europe* v *Commission*, and that, by that judgment pronounced in 1982, it

I - 8385

intended to exclude from the benefit of legal professional privilege correspondence with lawyers bound by a relationship of employment, Akzo and Akcros put forward, in the alternative, a second ground of appeal which consists of two arguments, each being divided into two parts.

63    In the first argument, the appellants, supported by a number of interveners, rely on the evolution of the national legal systems, on the one hand, and European Union law on the other. Akzo and Akcros base their second argument on the rights of defence and the principle of legal certainty.

64    In the Commission's view none of the arguments put forward support the ground of appeal.

(a) The first part of the first argument (evolution of the national legal systems)

(i) Arguments of the parties

65    Akzo and Akcros submit that, having regard to significant recent developments 'in the legal landscape' since 1982, the General Court should have 'reinterpreted' the judgment in *AM & S Europe* v *Commission*, as far as concerns the principle of legal professional privilege.

I - 8386

66    Akzo and Akcros take the view that, in paragraphs 170 and 171 of the judgment under appeal, the General Court wrongly refused to widen the personal scope of legal professional privilege on the ground that national laws are not unanimous and unequivocal in recognising legal professional privilege for communications with in-house lawyers. Notwithstanding the lack of a uniform tendency at national level, European Union law could set legal standards for the protection of the rights of defence which are higher than those set in certain national legal orders.

67    The Commission observes that, by their plea, the appellants are essentially asking the Court to change the case-law deriving from the judgment in *AM & S Europe* v *Commission.*

68    The Commission states that the appellants do not challenge the General Court's finding that there is no clear majority support in the laws of the Member States for the premiss that communications with in-house lawyers should be protected by legal professional privilege.

(ii) Findings of the Court

69    It must be recalled that the Court stated, in its reasoning in the judgment in *AM & S Europe* v *Commission* relating to legal professional privilege in investigation procedures in matters of competition law, that that area of European Union law must take into account the principles and concepts common to the laws of the Member States concerning the observance of confidentiality, in particular, as regards certain communications between lawyer and client (see paragraph 18 of that judgment). For that purpose, the Court compared various national laws.

70    The Court observed, in paragraphs 19 and 20 of the judgment in *AM & S Europe* v *Commission* that, although the protection of written communications between lawyer and client is generally recognised, its scope and the criteria for applying it vary in accordance with the different national rules. However, the Court acknowledged, on the basis of that comparison, that legal professional privilege should be protected under European Union law, as long as the two conditions laid down in paragraph 21 of that judgment are fulfilled.

71    As the General Court held, in paragraph 170 of the judgment under appeal, even though it is true that specific recognition of the role of in-house lawyers and the protection of communications with such lawyers under legal professional privilege was relatively more common in 2004 than when the judgment in *AM & S Europe* v *Commission* was handed down, it was nevertheless not possible to identify tendencies which were uniform or had clear majority support in the laws of the Member States.

72    Furthermore, it is clear from paragraph 171 of the judgment under appeal that a comparative examination conducted by the General Court shows that a large number of Member States still exclude correspondence with in-house lawyers from protection under legal professional privilege. Additionally, a considerable number of Member States do not allow in-house lawyers to be admitted to a Bar or Law Society and, accordingly, do not recognise them as having the same status as lawyers established in private practice.

73    In that connection, Akzo and Akcros themselves accept that no uniform tendency can be established in the legal systems of the Member States towards the assimilation of in-house lawyers and lawyers in private practice.

74    Therefore no predominant trend towards protection under legal professional privilege of communications within a company or group with in-house lawyers may be discerned in the legal systems of the 27 Member States of the European Union.

75    In those circumstances, and contrary to the appellants' assertions, the legal regime in the Netherlands cannot be regarded as signalling a developing trend in the Member States, or as a relevant factor for determining the scope of legal professional privilege.

76    The Court therefore considers that the legal situation in the Member States of the European Union has not evolved, since the judgment in *AM & S Europe* v *Commission* was delivered, to an extent which would justify a change in the case-law and recognition for in-house lawyers of the benefit of legal professional privilege.

77    The first part of the first argument must therefore be dismissed.

(b) The second part of the first argument (development of the law of the European Union)

(i) Arguments of the parties

78    Akzo and Akcros submit that the General Court, in paragraphs 172 and 173 of the judgment under appeal, disregarded the relevance of the development of European Union law, resulting in particular from the entry into force of Council Regulation (EC) No 1/2003 of 16 December 2002 on the implementation of the rules on competition laid down in Articles 81 and 82 of the Treaty (OJ 2003 L 1, p. 1).

79    According to Akzo and Akcros, the 'modernisation' of the procedural rules on cartels has increased the need for in-house legal advice, the importance of which should not be underestimated in preventing infringements of competition law, since in-house lawyers are able to rely on intimate knowledge of the undertakings and their activities.

80    Akzo and Akcros add that the establishment of compliance programmes, which are desirable in the interest of the correct application of European Union competition law, requires that exchanges within an undertaking or group with in-house lawyers may take place in a confidential environment.

81    The Commission takes the view that the findings of the General Court in the judgment under appeal concerning the ground of appeal put forward by Akzo and Akcros are in no way vitiated by an error of law.

82    The Commission submits that the provisions of Regulation No 1/2003 have no effect on the scope of legal professional privilege.

(ii) Findings of the Court

83    Although it is true that Regulation 1/2003 has introduced a large number of amendments to the rules of procedure relating to European Union competition law, it is also the case that those rules do not suggest that they require lawyers in independent practice and in-house lawyers to be treated in the same way with respect to

legal professional privilege, since that principle is not at all the subject-matter of the regulation.

84    It is clear from the provisions of Article 20 of Regulation No 1/2003 that the Commission may conduct all necessary inspections of undertakings and associations of undertakings, and in that context, examine the books and other records related to the business, irrespective of the medium on which they are stored, and also take or obtain in any form copies or extracts of such books or records.

85    That regulation, like Article 14(1)(a) and (b) of Regulation No 17, has therefore defined the powers of the Commission broadly. As it is clear from Recitals 25 and 26 in the preamble to Regulation No 1/2003, the detection of infringements of the competition rules is growing ever more difficult, and, in order to protect competition effectively and safeguard the effectiveness of inspections, the Commission should be empowered to enter any premises where business records may be kept, including private homes.

86    Thus, Regulation No 1/2003, contrary to the appellants' assertions, does not aim to require in-house and external lawyers to be treated in the same way as far as concerns legal professional privilege, but aims to reinforce the extent of the Commission's powers of inspection, in particular as regards documents which may be the subject of such measures.

87    Therefore, the amendment of the rules of procedure for competition law, resulting in particular from Regulation No 1/2003, is also unable to justify a change in the case-law established by the judgment in *AM & S Europe* v *Commission*.

88    Therefore, the second part of the first argument must also be dismissed.

89    It follows that the first argument put forward under the second plea must be rejected in its entirety.

(c) The first part of the second argument (rights of the defence)

(i) Arguments of the parties

90    Akzo and Akcros submit that the General Court's interpretation, in paragraph 176 of the judgment under appeal, concerning the scope of legal professional privilege, lowers the level of protection of the rights of defence of undertakings. Recourse to legal advice from an in-house lawyer would not be as valuable and its usefulness would be limited if the exchanges within an undertaking or group with such a lawyer were not protected by legal professional privilege.

91    The Commission takes the view that, contrary to the appellants' submissions, the rights of defence are in no way undermined by the interpretation of the scope of legal professional privilege adopted by the General Court.

(ii) Findings of the Court

92    It must be recalled that in all proceedings in which sanctions, especially fines or penalty payments, may be imposed observance of the rights of the defence is a fundamental principle of European Union law which has been emphasised on numerous occasions in the case-law of the Court (see, Case C-194/99 P *Thyssen Stahl* v *Commission* [2003] ECR I-10821, paragraph 30; Case C-289/04 P *Showa Denko* v *Commission* [2006] ECR I-5859, paragraph 68; Case C-3/06 P *Groupe Danone* v *Commission* [2007] ECR I-1331, paragraph 68), and which has been enshrined in Article 48(2) of the Charter of Fundamental Right of the European Union.

93    By this ground of appeal, the appellants seek to establish that the rights of the defence must include the right of freedom of choice as to the lawyer who will provide legal advice and representation and that legal professional privilege forms part of those rights, regardless of the professional status of the lawyer concerned.

94    In that connection, it must be observed that, when an undertaking seeks advice from its in-house lawyer, it is not dealing with an independent third party, but with one of its employees, notwithstanding any professional obligations resulting from enrolment at a Bar or Law Society.

95    It should be added that, even assuming that the consultation of in-house lawyers employed by the undertaking or group were to be covered by the right to obtain legal advice and representation, that would not exclude the application, where in-house lawyers are involved, of certain restrictions and rules relating to the exercise of the profession without that being regarded as adversely affecting the rights of the defence. Thus, in-house lawyers are not always able to represent their employer before

all the national courts, although such rules restrict the possibilities open to potential clients in their choice of the most appropriate legal counsel.

96    It follows from those considerations that any individual who seeks advice from a lawyer must accept the restrictions and conditions applicable to the exercise of that profession. The rules on legal professional privilege form part of those restrictions and conditions.

97    Therefore, the argument alleging breach of the rights of the defence is unfounded.

(d) The second part of the second argument (principle of legal certainty)

(i) Arguments of the parties

98    Akzo and Akcros submit that the findings of the General Court undermine the principle of legal certainty, since Article 101 TFEU is often applied in parallel with the corresponding national provisions. Legal professional privilege for correspondence with in-housel lawyers should not therefore depend on whether it is the Commission or a national competition authority which carries out an investigation.

99  The Commission argues to the contrary that, if legal professional privilege, which is applicable to its investigations, were no longer defined at European Union level but under national law, that would give rise to complex and uncertain situations for all the persons concerned, which would prejudice the principle of legal certainty relied on by Akzo and Akcros.

(ii) Findings of the Court

100  It must be recalled that legal certainty is a general principle of European Union law which requires in particular that rules involving negative consequences for individuals should be clear and precise and their application predictable for those subject to them (see Case C-110/03 *Belgium* v *Commission* [2005] ECR I-2801, paragraph 30; Case C-76/06 P *Britannia Alloys & Chemicals* v *Commission* [2007] ECR I-4405, paragraph 79; and Case C-226/08 *Stadt Papenburg* [2010] ECR I-131, paragraph 45).

101  In answer to the complaint based on the abovementioned principle, it should be observed that the General Court's interpretation in the judgment under appeal that exchanges within an undertaking or group with in-house lawyers are not covered by legal professional privilege in the context of an investigation carried out by the Commission does not give rise to any legal uncertainty as to the scope of that protection.

102  The Commission's powers under Regulation No 17 and Regulation No 1/2003 may be distinguished from those in enquiries which may be carried out at national level. Both

types of procedure are based on a division of powers between the various competition authorities. The rules on legal professional privilege may, therefore, vary according to that division of powers and the rules relevant to it.

103  The Court has held in that connection that restrictive practices are viewed differently by European Union law and national law. Whilst Articles 101 TFEU and 102 TFEU view them in the light of the obstacles which may result for trade between the Member States, each body of national legislation proceeds on the basis of considerations peculiar to it and considers restrictive practices solely in that context (see, to that effect, Case C-67/91 *Asociación Española de Banca Privada and Others* [1992] ECR I-4785, paragraph 11).

104  In those circumstances, the undertakings whose premises are searched in the course of a competition investigation are able to determine their rights and obligations vis-à-vis the competent authorities and the law applicable, as, for example, the treatment of documents likely to be seized in the course of such an investigation and whether the undertakings concerned are entitled to rely on legal professional privilege in respect of communications with in-house lawyers. The undertakings can therefore determine their position in the light of the powers of those authorities and specifically of those concerning the seizure of documents.

105  Therefore, the principle of legal certainty does not require that identical criteria be applied as regards legal professional privilege in those two types of procedure.

106    Accordingly, the fact that, in the course of an investigation by the Commission, legal professional privilege is limited to exchanges with external lawyers in no way undermines the principle relied on by Akzo and Akcros.

107    Therefore, the argument based on the principle of legal certainty is unfounded.

108    It follows that the second ground of appeal must be dismissed in its entirety.

3. The third ground of appeal

(a) Arguments of the parties

109    In the further alternative, Akzo and Akcros claim that the findings of the General Court, taken as a whole, violate the principle of national procedural autonomy and the principle of the conferred powers.

110    Akzo and Akcros state that Article 22(2) of Regulation No 1/2003 expresses the principle of national autonomy in procedural matters in the area in question. The European Union legislature expressly stated that, even in the case of inspections carried out at the request of the Commission in order to establish an infringement of the provisions of Article 101 TFEU or Article 102 TFEU, the agents of the national competition authority are to exercise their powers in accordance with their national rules.

The legislature has not given a harmonised definition of legal professional privilege, which means that the Member States remain sovereign to decide that specific aspect of the protection of rights of defence.

111    The Commission submits that the judgment under appeal does not breach the principles referred to in the third ground of appeal. The principle of national procedural autonomy governs situations in which the courts and administrations of the Member States are required to implement European Union law, but does not apply where the legal limits of the actions of the institutions themselves are at issue.

112    The Commission concludes that the uniform scope of legal professional privilege throughout the European Union with respect to the procedures seeking to establish an infringement of Article 101 TFEU and Article 102 TFEU constituted a proper application of the judgment in *AM & S Europe* v *Commission* by the General Court. Consequently there has also been no breach of the principle of conferred powers.

(b) Findings of the Court

113    It must be recalled that, in accordance with the principle of national procedural autonomy, in the absence of European Union rules governing the matter, it is for the domestic legal system of each Member State to designate the courts and tribunals having jurisdiction and to lay down the detailed procedural rules governing actions for safeguarding rights which individuals derive from European Union law (see, to that

effect, Case 33/76 *Rewe* [1976] ECR 1989, paragraph 5; Case C-213/89 *Factortame and Others* [1990] ECR I-2433, paragraph 19; Case C-312/93 *Peterbroeck* [1995] ECR I-4599, paragraph 12; and Case C-13/01 *Safalero* [2003] ECR I-8679, paragraph 49).

114    However, in the present case, the Court is called on to decide on the legality of a decision taken by an institution of the European Union on the basis of a regulation adopted at European Union level, which, moreover, does not refer back to national law.

115    The uniform interpretation and application of the principle of legal professional privilege at European Union level are essential in order that inspections by the Commission in anti-trust proceedings may be carried out under conditions in which the undertakings concerned are treated equally. If that were not the case, the use of rules or legal concepts in national law and deriving from the legislation of a Member State would adversely affect the unity of European Union law. Such an interpretation and application of that legal system cannot depend on the place of the inspection or any specific features of the national rules.

116    As far as concerns the principle of conferred powers, it must be stated that the rules of procedure with respect to competition law, as set out in Article 14 of Regulation No 17 and Article 20 of Regulation No 1/2003, are part of the provisions necessary for the functioning of the internal market whose adoption is part of the exclusive competence conferred on the Union by virtue of Article 3(1)(b) TFEU.

117    In accordance with the provisions of Article 103 TFEU, it is for the European Union to lay down the regulations or directives to give effect to the principles in Articles 101 TFEU and 102 TFEU concerning the competition rules applicable to undertakings.

That power aims, in particular, to ensure observance of the prohibitions referred to in those articles by the imposition of fines and periodic penalty payments and to define the Commission's role in the application of those provisions.

118    In that connection, Article 105 TFEU provides that the Commission is to ensure the application of the principles laid down in Articles 101 TFEU and 102 TFEU and to investigate cases of suspected infringement.

119    As the Advocate General stated, in paragraph 172 of her Opinion, national law is applicable in the context of investigations conducted by the Commission as European competition authority only in so far as the authorities of the Member States lend their assistance, in particular with a view to overcoming opposition by the undertakings concerned through the use of coercive measures, in accordance with Article 14(6) of Regulation No 17 or Article 20(6) of Regulation No 1/2003. However, the question of which documents and business records the Commission may examine and copy as part of its inspections under antitrust legislation is determined exclusively in accordance with EU law.

120    Accordingly, neither the principle of national procedural autonomy nor the principle of conferred powers may be invoked against the powers enjoyed by the Commission in the area in question.

121    Therefore, the third ground of appeal must also be dismissed.

122    It follows from all of the foregoing considerations that the appeal is unfounded.

**Costs**

123    Under Article 69(2) of the Rules of Procedure, which applies to appeal proceedings by virtue of Article 118 thereof, the unsuccessful party is to be ordered to pay the costs if they have been applied for in the successful party's pleadings. Since the Commission applied for costs and Akzo and Akcros have been unsuccessful, the latter must be ordered to pay the costs. As they have brought the appeal jointly, they are to be jointly and severally liable for them.

124    The United Kingdom of Great Britain and Northern Ireland and the Kingdom of the Netherlands, as interveners in the proceedings before the Court, are each to bear their own costs, in accordance with the first paragraph of Article 69(4) of the Rules of Procedure.

125    The other parties to the proceedings, which supported the appeal and which were unsuccessful, are to bear their own costs by analogous application of the third paragraph of Article 69(4) of the Rules of Procedure.

On those grounds, the Court (Grand Chamber) hereby:

1.    **Dismisses the appeal;**

2.    **Orders the United Kingdom of Great Britain and Northern Ireland, Ireland and the Kingdom of the Netherlands to bear their own costs;**

I - 8401

3. **Orders the Conseil des barreaux européens, the Algemene Raad van de Nederlandse Orde van Advocaten, the European Company Lawyers Association, the American Corporate Counsel Association (ACCA) – European Chapter and the International Bar Association to bear their own costs;**

4. **Orders the remainder of the costs of the proceedings to be born jointly and severally by Akzo Nobel Chemicals Ltd and Akcros Chemicals Ltd.**

[Signatures]

**Blumrosen Declaration**

**Attachment 7**

**General press articles about the Gauvain Report**



(/)

(/abonne/authentification)     S'abonner (Https://abonnement.latribune.fr)

(//www.latribune.fr)

**CAC 40**
6 671,26 PTS     **+0,02%** ▲
(http://bourse.latribune.fr/webfg/index/CAC-40)

| DOW JONES | +0,56% |
| NASDAQ 100 | +0,72% |
| FTSE 100 | -0,04% |

| EURONEXT 100 | +0,06% |
| Or | +0,29% |
| OAT 10 ans | +9,25% |

🏠 (//www.latribune.fr)
 > Économie (https://www.latribune.fr/actualites/economie/economie.html)
 > France (https://www.latribune.fr/actualites/economie/france/l-actualite-economique-france.html)

# Souveraineté juridique : la soumission de la France aux lois américaines (2/11)

**Avec le Patriot Act, puis le Cloud Act, la France a perdu une partie de sa souveraineté juridique, balayée par les lois extraterritoriales américaines. Mais une volonté de reconquête se fait désormais jour.**

 Michel Cabirol
13 Jan 2020, 9:00          8 mn

○  ○  ○  (mailto:saisissez-un-mail@example.com?subject=Souveraineté juridique : la soumission de la France aux lois américaines (2/11)&body=Article partagé : %0Ahttps://www.latribune.fr

Pour découvrir **le Nouveau Quotidien Numérique 100% audio augmenté** de La Tribune

**Abonnez-vous**



La France a perdu depuis l'instauration par les États-Unis du Patriot Act en 2001 une partie de sa souveraineté juridique. La cause : les lois extraterritoriales américaines. (Crédits : Carlo Allegri)

Le constat est implacable, la France a perdu depuis l'instauration par les États-Unis du Patriot Act en 2001 une partie de sa souveraineté juridique. La cause : les lois extraterritoriales américaines, qui ont contraint les entreprises françaises et du monde entier à se soumettre au droit américain grâce à des liens parfois très ténus (paiement en dollars par exemple) avec les États-Unis. En dépit de la loi Sapin 2 de décembre 2016, la France - tout comme l'Europe - n'a jusqu'ici rien pu faire pour s'y opposer vraiment... alors même que les États-Unis se sont servis du droit comme *"d'une arme de destruction dans la guerre économique"* qu'ils mènent contre le reste du monde, a affirmé le député Raphaël Gauvain, qui a remis en juin 2019 un rapport sur la reconquête de la souveraineté de la France au Premier ministre. Dans un entretien à La Tribune, le député LREM martèle qu'il y a une *"véritable instrumentalisation de cette procédure au service de l'économie et des entreprises américaines"* (https://www.latribune.fr/economie/france/washington-a-organise-un-pillage-de-donnees-des-entreprises-francaises-raphael-gauvain-3-13-836804.html).

## Les entreprises en situation de très grande vulnérabilité

Pour découvrir **le Nouveau Quotidien Numérique 100% audio augmenté** de La Tribune

**Abonnez-vous**

européennes, asiatiques et sud-américaines au motif que leurs pratiques commerciales, leurs clients ou certains de leurs paiements ne respectaient pas le droit américain. Les entreprises françaises *"sont dans une situation de très grande vulnérabilité, les autorités françaises donnant depuis de longues années le sentiment de la passivité et l'impression d'avoir renoncé"*, a d'ailleurs constaté le rapport Gauvain.

Elles le sont encore plus avec l'instauration du Cloud Act en mars 2018. Car les États-Unis sont passés à la vitesse supérieure en élargissant les prérogatives prévues par le Patriot Act. Le Cloud Act permet légalement aux autorités américaines d'accéder aux données de toute personne ou entreprise liée d'une façon ou d'une autre aux États-Unis, peu importe leur lieu de stockage.

## Une atteinte à la souveraineté diplomatique de la France

Longtemps, les enquêtes en matière de corruption active d'agents publics étrangers ont constitué l'élément central qui justifiait l'action extraterritoriale du ministère de la Justice américaine (DoJ). En quelque sorte un paravent éthique. Ce n'est plus aujourd'hui totalement le cas avec la multiplication des sanctions internationales décrétées par Washington, instaurées sans aucune concertation au niveau mondial. Cet unilatéralisme en matière de sanctions économiques et financières a d'ailleurs crû indépendamment de la couleur politique de l'administration américaine. Ou comment soumettre un pays sans envoyer un seul GI risquer sa vie... Résultat, certaines amendes infligées par les États-Unis ont été astronomiques comme celle record de près de 9 milliards de dollars payée par BNP Paribas pour violation des sanctions internationales en contournant entre 2000 et 2010 les embargos imposés par les États-Unis à Cuba, à l'Iran, au Soudan ou à la Libye.

ADVERTISING

Pour découvrir **le Nouveau Quotidien Numérique 100% audio augmenté** de La Tribune

**Abonnez-vous**



Résultat, d'année en année, la liste des pays coupés du monde augmente par la seule volonté des États-Unis. Au 1er décembre 2018, l'Ofac (Office of Foreign Assets Control), chargé de l'application des sanctions internationales américaines dans le domaine financier, infligeait 30 régimes ou programmes actifs de sanctions à presque autant de pays, régimes ou types d'organisations à travers le monde. Pourtant, les divergences stratégiques entre l'Europe et les États-Unis au sujet de la politique de sanctions internationales n'ont jamais été aussi grandes. C'est le cas notamment sur le dossier iranien bien avant l'assassinat ciblé du général iranien Qassem Soleimani par les Etats-Unis, qui a embrasé le Moyen Orient. Ainsi, le constructeur PSA, qui avait investi 350 millions d'euros en Iran, a été obligé de tirer un trait sur environ 450.000 voitures immatriculées par an (https://www.latribune.fr/entreprises-finance /industrie/automobile/psa-en-iran-pourquoi-la-suspension-des-activites-est-une-catastrophe-780739.html). Soit quasiment 15% de ses volumes mondiaux. Une telle situation est intolérable pour un pays comme la France, qui souhaite - en principe - mener une politique internationale non alignée à celle des États-Unis en tant que membre permanent au Conseil de l'ONU, et va très clairement à l'encontre de sa souveraineté diplomatique.

## La France réfléchit à casser les lois extraterritoriales américaines

Toutefois, ni la France ni l'Europe n'ont, pour l'heure, les moyens juridiques de réagir de manière efficace à des sanctions internationales prises par les États-Unis, qui n'iraient pas dans le sens de leurs intérêts. *"Notre environnement juridique mérite d'être adapté au rapport*

Pour découvrir **le Nouveau Quotidien Numérique 100% audio augmenté** de La Tribune

**Abonnez-vous**

peut-elle reconquérir sa souveraineté juridique ? Près de vingt ans après le Patriot Act et plusieurs rapports alarmistes tombés dans l'oubli par un incroyable manque de volonté politique (rapports Urvoas et Lellouche-Berger notamment), l'État français et l'Europe y travaillent enfin.

Le rapport Gauvain participe donc enfin à cette prise de conscience, qui devrait logiquement trouver un prolongement législatif en 2020. Avec un leitmotiv puissant, celui de laisser la naïveté des États au vestiaire face aux impératifs de souveraineté, comme le soulignait au Sénat en mai dernier Thierry Breton, alors encore PDG d'Atos et aujourd'hui commissaire européen.

## Des avis juridiques trop peu protégés

Dans ce contexte, *"le gouvernement et les administrations travaillent sur des textes"*, assure-t-on à La Tribune. Ainsi, sous l'impulsion de Matignon, un groupe interministériel (ministères de l'Économie, de la Justice et des Affaires étrangères) *"a amorcé une réflexion sur la base du rapport de Raphaël Gauvain, afin d'actualiser la loi de 1968, dite de blocage"*, a précisé en septembre au Sénat la garde des Sceaux, Nicole Belloubet. Cette loi était censée imposer aux autorités administratives et judiciaires étrangères, souhaitant se faire remettre des informations stratégiques détenues par des entreprises situées en France, de passer par le canal de la coopération. Mais cette loi a été piétinée par les États-Unis.

La France réfléchit aussi à la création d'un statut particulier pour les avocats en entreprise afin de protéger les précieux avis juridiques. Car elle est l'une des rares grandes puissances économiques à ne pas préserver la confidentialité des avis juridiques en entreprise. Cette lacune fragilise les sociétés françaises et *"contribue à faire de la France une cible de choix et un terrain de chasse privilégié pour les autorités judiciaires étrangères, notamment les autorités américaines"*, a fait valoir Raphaël Gauvain dans son rapport.

## Face au Cloud Act, l'arme du RGPD

Pour découvrir **le Nouveau Quotidien Numérique 100% audio augmenté** de La Tribune

**Abonnez-vous**

*monde sans utiliser le dollar. Il faut raisonner de la même manière au sujet du cloud et, plus largement, pour l'ensemble de nos outils"*. Mais le chemin sera trop long pour imposer l'euro dans les transactions internationales.

Pour se faire respecter des États-Unis, la confrontation passe surtout par le strict respect du Règlement général sur la protection des données (RGPD) afin de contrer le Cloud Act. Car *"l'Europe a réussi avec le RGPD à créer, sans le vouloir, un instrument à portée extraterritoriale qui défend nos valeurs"*, a souligné en juillet 2019 le président de la Fédération Syntec, Laurent Giovachini. *"Le RGPD a instauré un cadre juridique ambitieux et puissant"*, a d'ailleurs fait observer en juillet dernier la présidente de la Cnil, Marie-Laure Denis. Le RGPD a vocation à s'appliquer à un marché économique de plus de 500 millions de personnes auquel les acteurs du numérique s'intéressent.

*"Dans la perspective de tels conflits de normes, il est essentiel pour rester crédibles de pouvoir leur opposer des outils comme le RGPD ou une loi de blocage rénovée*, a estimé Claire Landais. *Ces textes normatifs auront, d'une part, un effet incitatif dans les négociations qui doivent s'engager entre États et, d'autre part, un effet dissuasif sur les sociétés étrangères concernées, exposées au risque d'être en infraction avec nos normes"*. Le RGPD interpelle déjà les entreprises américaines, comme s'en est aperçue Marie-Laure Denis : *"J'ai pu constater à quel point les entreprises américaines étaient intéressées par l'affirmation européenne d'une législation extraterritoriale"*. Car quoi qu'il arrive, les États-Unis ne respecteront que l'épreuve de force. La France semble y être prête, mais l'Europe des 28 le veut-elle ?

**Partager :**

 Michel Cabirol

(mailto:saisissez-un-mail@example.com?subject=Souveraineté juridique : la soumission de la France aux lois américaines (2/11)&body=Article partagé : %0Ahttps://www.latribune.fr/economie/france/souverainete-juridique-

Pour découvrir **le Nouveau Quotidien Numérique 100% audio augmenté** de La Tribune

**Abonnez-vous**

# Protection de la confidentialité: les juristes d'entreprise optimistes après un rapport

Par Le Figaro avec AFP
Publié le 27/06/2019 à 18:09

Les juristes d'entreprise saluent la remise au gouvernement d'un rapport préconisant la création d'un statut d'avocat en entreprise pour mieux protéger la confidentialité de leurs avis, a déclaré aujourd'hui l'un de leurs représentants. Cette proposition est contenue dans le rapport du député LREM Raphaël Gauvain visant à «protéger nos entreprises des lois et mesures à portée extraterritoriale». Selon ce rapport remis mercredi au Premier ministre Edouard Philippe, la règle de droit «est devenue aujourd'hui une arme de destruction dans la guerre économique que mènent les Etats-Unis contre le reste du monde».

## Les titres du matin
### Newsletter

**Tous les jours**

Recevez chaque matin, l'actualité du jour : politique, international, société...



La France est «une des rares grandes puissances économiques à ne pas protéger la confidentialité des avis juridiques en entreprise», d'après le document. «Cette lacune fragilise nos entreprises et contribue à faire de la France une cible de choix et un terrain de chasse privilégié pour les autorités judiciaires étrangères, notamment les autorités américaines»

entreprise comme il en existe en Espagne, en Italie ou aux Pays-Bas.

«Depuis de nombreuses années, on plaide pour que les juristes d'entreprise en France puissent bénéficier du principe de confidentialité comme leurs homologues dans la plupart des grands pays», a réagi Marc Mossé, président de l'Association française des juristes d'entreprise (AFJE). Ceci afin que «les entreprises françaises soient sur un pied d'égalité dans la compétition internationale pour protéger un certain nombre d'informations», a-t-il expliqué. Marc Mossé affirme qu'en France «beaucoup d'avocats sont favorables» à la création d'un statut d'avocat en entreprise, tout en reconnaissant que «la profession d'avocat n'est sans doute pas unanime à cet égard».

Le rapport Gauvain préconise de durcir la loi française datant de 1968 qui interdit déjà aux citoyens et aux dirigeants d'entreprise de transmettre à des autorités publiques étrangères des documents «de nature à porter atteinte à la souveraineté, à la sécurité et aux intérêts économiques essentiels de la France». Mais ce texte reste très peu utilisé et les sanctions encourues sont faibles (18000 euros et six mois de prison) au regard du risque encouru par les entreprises de perdre tout accès au marché américain.

**Blumrosen Declaration**

**Attachment 8**

**News articles about French Parliament debate**

# Les juristes d'entreprise applaudissent la loi Macron

Par **Marie-Cécile Renault**
Publié le 11/12/2014 à 18:37,
Mis à jour le 11/12/2014 à 21:56



Aujourd'hui, un avocat qui veut travailler au sein d'une entreprise doit abandonner son statut d'avocat pour celui de salarié juriste.
*VOISIN/PHANIE/phanie*

**Le projet de loi prévoit la création du statut d'avocat d'entreprise, qui leur permettrait d'entrer de plain-pied dans la profession. Et de s'aligner sur ce qui existe déjà dans 18 pays, comme l'Allemagne, l'Espagne ou le Royaume-Uni.**

Alors que les professions juridiques ont manifesté en masse mercredi, formant un front uni inédit contre la loi Macron sur l'activité, il est une catégorie qui, contre vents et marée, défend toujours le texte. Ce sont les 16.000 juristes d'entreprise, seconde profession du droit par le nombre. Et pour cause: ce projet de loi prévoit la création du statut d'avocat d'entreprise, qui leur permettrait d'entrer de plain-pied dans la profession. Et de s'aligner sur ce qui existe déjà dans 18 pays, comme l'Allemagne, l'Espagne ou le Royaume-Uni.

Aujourd'hui en France, le professionnel du droit qui travaille au sein d'une entreprise ne peut le

faire qu'en tant que salarié juriste d'entreprise. De même, un avocat qui veut travailler au sein d'une entreprise doit abandonner son statut d'avocat pour celui de salarié juriste. Or c'est une source de difficulté pour les entreprises, car, n'étant pas soumis au secret professionnel comme un avocat, le juriste peut voir ses avis saisis et utilisés comme pièces à charge.

«Cette situation peut parfois entraîner une certaine méfiance des filiales ou des partenaires étrangers dans leurs échanges avec les services juridiques français», affirme Bercy, soulignant un risque de délocalisation de services juridiques vers l'étranger. «Sur les 40 entreprises du CAC 40, 14 ont des directeurs juridiques anglo-saxons inscrits au barreau de leur pays!, observe Marc Mossé, administrateur de l'Association française des juristes d'entreprise et directeur juridique de Microsoft France. Nous ne cherchons pas un avantage catégoriel, mais à parler d'égal à égal avec nos homologues dans le monde et ainsi renforcer le modèle juridique français.»

_____

## Le projet du ministre se heurte à l'opposition d'une majorité d'avocats qui y voient une « braderie » de leur profession

_____

Le projet du ministre se heurte à l'opposition d'une majorité d'avocats, notamment de province, qui y voient une «braderie» de leur profession et craignent d'y perdre des dossiers. «Il faut les rassurer. Nous ne sommes pas des concurrents, nous n'aurons pas le droit de plaider, nous ne voulons pas développer de clientèles personnelles. Mais nos avis donnés à l'entreprise seront enfin couverts par la confidentialité et le secret professionnel. Cette réforme va dans le sens de l'intérêt général et de la compétitivité des entreprises», défend Marc Mossé. Malgré ce soutien rare en ces temps de fronde, Emmanuel Macron a indiqué il y a une semaine que le statut d'avocat d'entreprise serait débattu au Parlement. Et que, faute d'accord, il ne «s'y accrocherait pas». Dommage, car ils étaient la seule profession du droit à défendre un texte rejeté par toutes les autres…

# Protection de la confidentialité: les juristes d'entreprise optimistes après un rapport

Par Le Figaro avec AFP
Publié le 27/06/2019 à 18:09

Les juristes d'entreprise saluent la remise au gouvernement d'un rapport préconisant la création d'un statut d'avocat en entreprise pour mieux protéger la confidentialité de leurs avis, a déclaré aujourd'hui l'un de leurs représentants. Cette proposition est contenue dans le rapport du député LREM Raphaël Gauvain visant à «protéger nos entreprises des lois et mesures à portée extraterritoriale». Selon ce rapport remis mercredi au Premier ministre Edouard Philippe, la règle de droit «est devenue aujourd'hui une arme de destruction dans la guerre économique que mènent les Etats-Unis contre le reste du monde».

## Les titres du matin
### Newsletter

**Tous les jours**
Recevez chaque matin, l'actualité du jour : politique, international, société...



La France est «une des rares grandes puissances économiques à ne pas protéger la confidentialité des avis juridiques en entreprise», d'après le document. «Cette lacune fragilise nos entreprises et contribue à faire de la France une cible de choix et un terrain de chasse privilégié pour les autorités judiciaires étrangères, notamment les autorités américaines»

entreprise comme il en existe en Espagne, en Italie ou aux Pays-Bas.

«Depuis de nombreuses années, on plaide pour que les juristes d'entreprise en France puissent bénéficier du principe de confidentialité comme leurs homologues dans la plupart des grands pays», a réagi Mar Mossé, président de l'Association française des juristes d'entreprise (AFJE). Ceci afin que «les entreprises françaises soient sur un pied d'égalité dans la compétition internationale pour protéger un certain nombre d'informations», a-t-il expliqué. Marc Mossé affirme qu'en France «beaucoup d'avocats sont favorables» à la création d'un statut d'avocat en entreprise, tout en reconnaissant que «la profession d'avocat n'est sans doute pas unanime à cet égard».

Le rapport Gauvain préconise de durcir la loi française datant de 1968 qu interdit déjà aux citoyens et aux dirigeants d'entreprise de transmettre à des autorités publiques étrangères des documents «de nature à porter atteinte à la souveraineté, à la sécurité et aux intérêts économiques essentiels de la France». Mais ce texte reste très peu utilisé et les sanctions encourues sont faibles (18000 euros et six mois de prison) au regard du risque encouru par les entreprises de perdre tout accès au marché américain.