# Exhibit 10

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### MIAMI DIVISION

### CASE NO.:

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

vs.

**MICHAEL BRIAN COTTER, individually and**
  **d/b/a Tech Live Connect, Premium Techie Support,**
  **Global Digital Concierge Pte. Ltd., NE Labs Inc.,**
  **Sensei Ventures Inc., Kevisoft UK LTD, and**
  **Kevisoft LLC;**
**GLOBAL DIGITAL CONCIERGE PTE. LTD,**
  **also d/b/a Tech Live Connect and Saburi TLC**
  **Worldwide Services Pvt Ltd.;**
**NE LABS INC.;**
**SENSEI VENTURES INC.;**
**KEVISOFT UK LTD;**
**KEVISOFT LLC;**

      **Defendants.**

_____/

## UNITED STATES OF AMERICA'S COMPLAINT FOR
## TEMPORARY RESTRAINING ORDER, PRELIMINARY AND PERMANENT
## INJUNCTIONS

Plaintiff, the United States of America ("United States"), through its undersigned

counsel, hereby sues Defendants Michael Brian Cotter ("Cotter"), Global Digital Concierge Pte.

Ltd ("Global Digital Concierge"), NE Labs Inc., Sensei Ventures Inc., Kevisoft UK LTD, and

Kevisoft LLC (collectively referred to herein as "Defendants"), and alleges as follows:

### INTRODUCTION

1.      Starting as early as 2011 and continuing to the present, Defendants have used

interstate and foreign wire communications to further a predatory wire fraud scheme that

victimizes residents of the United States, including many elderly victims.

1

2.      Defendant Cotter, along with co-conspirators located in India, operates a technical support fraud scheme utilizing call centers based in India. That scheme operates by fraudulently inducing consumers to purchase unnecessary computer technical support services based on fraudulent misrepresentations, including false statements regarding viruses and threats on consumers' computers.

3.      Defendant Cotter and his co-conspirators have operated this fraudulent technical support scheme under many business names, including Tech Live Connect, Premium Techie Support, and the internet domains listed in Attachment A to this Complaint.

4.      Defendant Cotter has utilized all of the corporate defendants in this case to facilitate the fraudulent scheme, including establishing bank accounts and relationships with payment processors in the names of those entities.

5.      The United States seeks to prevent continuing and substantial injury to consumers by bringing this action for preliminary and permanent injunctions and other equitable relief under 18 U.S.C. § 1345 to enjoin the ongoing commission of wire fraud in violation of 18 U.S.C. § 1343.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction over this action under 18 U.S.C. § 1345 and 28 U.S.C. §§ 1331 and 1345.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(3).

## PARTIES

8.      Plaintiff is the United States.

9.      Defendant Cotter is a resident of Los Angeles County, California, and an officer, director, or managing member of Global Digital Concierge Pte. Ltd, NE Labs Inc. and Sensei

2

Ventures Inc.  Cotter also conducts business under the names Kevisoft UK Limited and Kevisoft

LLC, which are companies registered by nominees at Cotter's direction and over which Cotter

exercises operational authority and control.  Acting alone or in concert with others, he has

formulated, directed, controlled, had the authority to control, or participated in the acts and

practices set forth in this Complaint.  In connection with the matters alleged herein, Cotter

transacts or has transacted business in this district and throughout the United States.

10.     Defendant Global Digital Concierge is a Singapore registered company.  Global

Digital Concierge is a wholly owned subsidiary of Defendant NE Labs, Inc.  Cotter originally

registered Global Digital Concierge in 2012 under the name "Tech Live Connect Pte. Ltd."  In

connection with the matters alleged herein, Global Digital Concierge transacts or has transacted

business in this district and throughout the United States.

11.     Defendant NE Labs Inc. is a Nevada registered corporation.  NE Labs Inc. is the

sole shareholder of Defendant Global Digital Concierge.  Cotter is identified in corporate records

as the director and president of NE Labs Inc.  In connection with the matters alleged herein, NE

Labs Inc. transacts or has transacted business in this district and throughout the United States.

12.     Defendant Sensei Ventures Inc. ("Sensei") is a Nevada registered corporation.

Cotter is identified in corporate records as the president and director of Sensei.  In connection

with the matters alleged herein, Sensei transacts or has transacted business in this district and

throughout the United States.

13.     Defendant Kevisoft UK LTD is a United Kingdom registered corporation.

Defendant Cotter exercises management and control over the business operations of Defendant

Kevisoft UK LTD, which is registered under the names of nominee directors.  In connection with

the matters alleged herein, Kevisoft UK LTD transacts or has transacted business in this district and throughout the United States.

14.     Defendant Kevisoft LLC is a New York registered corporation.  Defendant Cotter exercises management and control over the business operations of Defendant Kevisoft LLC, which is registered in the names of nominee directors.  In connection with the matters alleged herein, Kevisoft LLC transacts or has transacted business in this district and throughout the United States.

## DEFENDANTS' ONGOING FRAUDULENT SCHEME

15.     Since at least as early as 2011, Defendant Cotter, along with other individuals and entities located in India, has conducted a large-scale technical support fraud scheme that targets consumers throughout the United States, including in the Southern District of Florida.

16.     As part of the scheme, telemarketers at call centers in India ("call center representatives"), working for Cotter and his Indian co-conspirators, utilize false claims to induce consumers in the United States to pay money for unnecessary technical support services.

17.     The scheme contacts consumers by using pop-up computer advertisements disguised as security alerts.  Typically, the pop-up messages claim that the consumer's computer is infected by viruses and at risk of irreversible damage.  The messages sometimes state that the computer should be scanned and/or cleaned to prevent further system damage and loss of personal information.

18.     The pop-up messages are often falsely styled to appear as messages from well-known technology companies, such as Microsoft or Apple.  The following is an example of a pop-up message used in the scheme:



19.     The pop-up messages often contain a button – sometimes labeled "Scan Now" or "Proceed" – that purports to allow the victims to initiate the scanning and/or cleaning.  After victims click the button, they receive additional notifications falsely claiming that multiple viruses were found on their computer and instructing the victims to download software to rectify the problem.  At some point, either a pop-up message or a downloaded software package provides a toll-free phone number the consumer can call to contact a live agent to fix the purported problems.  That phone number connects the consumer with one of the scheme's call centers in India.

20.     Upon receiving a consumer's call to a provided toll-free number, a representative at a call center in India requests permission to access the consumer's computer remotely to diagnose the purported problems with that computer.  The call center representative sometimes

5

poses as a representative of or as affiliated with a technology company such as Microsoft or Apple, among others. Once remotely connected, the call center representative falsely confirms the existence of a serious computer virus or other security threat to the consumer's computer. The call center representative also falsely emphasizes the need for immediate action to repair the computer to prevent harm from online threats or loss of private information. The call center representative then offers to solve the problems if the consumer agrees to purchase security software and/or a support plan costing hundreds of dollars.

21.     At times, the call center representative falsely tells the consumer that normal computer functions are in fact evidence of viruses or security threats in order to induce the consumer to make payments.

22.     At times, malware from websites controlled by the call center representative is downloaded onto the consumer's computer to create an illusion that the computer contains viruses or security threats, and the call center representative warns the consumer of the malware's presence in an attempt to induce the consumer to pay for unnecessary software or technical support services.

23.     To collect payments, the call center representative who is remotely connected to a consumer's computer directs the consumer to one of Defendants' websites to make payments via credit card. Defendants and their co-conspirators have created and utilize multiple websites to facilitate the technical support fraud scheme, including techliveconnect.com, premiumtechiesupport.com, saburitlc.com, and other website domains listed on Attachment A to this Complaint. These websites contain means for consumers to contact the scheme, including toll-free phone numbers, email addresses, and web forms, and some function as payments portals through which consumers make payments.

24.     At times during the scheme, consumers who have already paid Defendants once for technical support services have received follow-up phone calls from call center representatives working for the scheme.  During these follow-up calls, the call center representatives concoct new phony reasons why the consumer must purchase additional security software to avoid a new, serious alleged computer virus or other threat to the consumer's computer.

25.     Since 2011, consumers have filed over 500 complaints on Consumer Sentinel, a consumer complaint database maintained by the Federal Trade Commission ("FTC"), that reference Tech Live Connect, Premium Techie Support, softwaretruehelp.com, softwarehelponline.com, assistmysoftware.com, techforsoftware.com, softwarebesthelp.com, softwarehotshot.com, or helpmysoftware.com.

## DEFENDANTS' ROLE AND KNOWLEDGE OF FRAUD

26.     Since at least as early as 2011, Defendant Cotter has operated this scheme, along with other individuals and entities located in India, under multiple business names.  Cotter jointly operates the computer technical support scheme with a company registered in India, Saburi TLC Worldwide Services Pvt Ltd. ("Saburi TLC"), and its former and current directors.  Cotter and his co-conspirators have operated the scheme under the names Tech Live Connect, Premium Techie Support, Saburi TLC and the domains listed in Attachment A.

27.     All of the domains listed in Attachment A were registered either by Cotter himself or by a co-conspirator in India.  The contents and format of all of the websites are similar.  All of the websites offer technical support services and provide ways for consumers to contact the scheme.  Many of the websites are designed to serve as payment portals where consumers can enter credit card information to purchase technical support services or software.

28.     In 2018, Cotter directed the incorporation of New York registered company Kevisoft LLC and United Kingdom registered company Kevisoft UK Ltd. as part of the scheme, for purposes of establishing bank accounts and relationships with financial institutions to facilitate the collection of payments for technical support services.  While both companies are registered in the names of nominee directors, Cotter exercises ultimate authority and control over both entities.

29.     Cotter has also procured the services of critical infrastructure to support the operation of the scheme, including credit card merchant accounts and the services of payment processors, to facilitate the processing of credit card purchases by consumers.  In this role, Cotter has been notified multiple times by multiple different payment processors that accounts associated with his technical support operation had high levels of chargebacks, which is an indicator of fraud under industry standards.  Chargebacks refer to the reversal of the dollar value (in whole or in part) of a transaction, typically because a consumer has requested that their financial institution cancel or reverse the transaction.   At least one payment processor terminated an account controlled by Cotter in connection with the technical support fraud scheme due to high rates of chargebacks.

30.     In 2020, Cotter has managed credit card merchant accounts and relationships with payment processors in support of the scheme, doing business under the names Sensei Ventures Inc., Kevisoft UK Ltd, and Global Digital Concierge.

31.     Cotter has also reviewed and responded to consumer complaints relating to Tech Live Connect and Premium Techie Support made to the Better Business Bureau.  These complaints have included descriptions of the use of pop-up messages to contact consumers and

impersonation of well-known tech companies.  For example, in June 2017 a consumer filed the

following complaint regarding Tech Live Connect with the Better Business Bureau:

> After downloading a file from the website www.solvusoft.com, I was
> redirected to a page claiming that there were multiple viruses detected on
> my computer. There was a phone number for "Apple Protection Plan,"
> which I called. I was redirected to Tech Live Connect. They convinced me
> that I needed their services to fix my computer, and got me to pay $250 for
> "lifetime service." They promised to fix my problems. I remotely gave them
> access to my computer, and they installed several "Malware cleaners,"
> which my antivirus later picked up as Adware. Specifically, they installed
> Advanced Mac Cleaner and Mac Adware Cleaner. Neither of these
> programs solved my problems at all, so I requested my money back. On
> their website, at http://www.techliveconnect.com/en-us/index.php#our-
> guarantee, they claim a money back guarantee if the customer is unsatisfied
> with the service. However, they have refused multiple times to refund my
> money, and instead keep insisting that they need to get back into my
> computer to fix the problem. I had to cancel my credit card, because I then
> found out that they wanted to charge me an additional $38 fee for some
> software as well as $9.99 a month for continued service. This is obviously
> a scam company. Thank you for your time.

Cotter responded to this complaint on behalf of Tech Live Connect and promised the customer a

refund.

32.     Cotter has had significant involvement in coordinating the scheme's call center

operations.  In an email to the Better Business Bureau regarding Premium Techie Support, Cotter

stated, "[M]y business owns the center that operates that brand, which is in India."  Cotter has

also emailed with employees of Saburi TLC regarding the operation of the call center.

33.     Defendants have knowledge of the fraudulent misrepresentations through which

the scheme induces victims to purchase unnecessary computer technical support services,

including misrepresentations contained in pop-up messages and misrepresentations made over

the phone by call center representatives.  Defendants are aware of complaints made by

consumers to the Better Business Bureau, in which those consumers specifically complain about

pop-up messages referencing computer viruses and misrepresentations made by call center representatives acting on Defendants' behalf regarding threats present on consumers' computers.

**HARM TO CONSUMERS**

34.     Consumers suffer financial losses from the wire fraud scheme perpetrated and facilitated by the Defendants.  Those victimized by the scheme reside across the United States, including in the Southern District of Florida.

35.     The scheme disproportionately affects elderly consumers.  In particular, the majority of the consumers who reported their ages in FTC Consumer Sentinel complaints about Tech Live Connect and Premium Techie Support were 60 years of age or older.

36.     On information and belief, Defendants are continuing to facilitate the technical support fraud scheme and are likely to continue facilitating the technical support fraud scheme. Absent injunctive relief by this Court, Defendant's conduct will continue to cause injury to consumers across the United States.

**COUNT I**
**(U.S.C. § 1345 – Injunctive Relief)**

37.     The United States re-alleges and incorporates by reference Paragraphs 1 through 36 of this Complaint as though fully set forth herein.

38.     By reason of the conduct described herein, Defendants violated, are violating, and are about to violate 18 U.S.C. § 1343 by devising and executing a scheme and artifice to defraud and for obtaining money or property by means of false or fraudulent pretenses, representations, and promises with the intent to defraud, and, in so doing, use interstate and foreign wire communications.

39.     Upon a showing that Defendants are committing or are about to commit wire fraud, the United States is entitled, under 18 U.S.C. § 1345, to a preliminary injunction and a

permanent injunction restraining all future fraudulent conduct and any other action that this Court deems just in order to prevent a continuing and substantial injury to consumers.

40.     As a result of the foregoing, the Court should enjoin Defendant's conduct under 18 U.S.C. § 1345.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, United States of America, requests of the Court the following relief:

A.     That the Court issue a temporary restraining order, pursuant to 18 U.S.C. § 1345, ordering that Defendants, their agents, officers, and employees, and all other persons or entities in active concert or participation with them, are restrained from:

(1)     committing wire fraud;

(2)     maintaining or doing business through the use of www.techliveconnect.com, www.premiumtechiesupport.com, www.saburitlc.com, and the other domains listed in Attachment A;

(3)     impersonating any other technology company;

(4)     engaging in telemarketing activity related to the sale of any technical support service or software;

(5)     accepting consumer payments related to any purported technical support service or software; and

(6)     destroying records of any nature related to Defendant's business, financial, or accounting operations.

B.      That the Court issue an order requiring the registry, Verisign, Inc., and the registrar, GoDaddy Inc., for the domains listed in Attachment A to take all necessary steps to prevent further use of the websites in Defendant's fraudulent scheme.

C.      That the Court issue a preliminary injunction on the same basis and to the same effect.

D.      That the Court issue a permanent injunction on the same basis and to the same effect.

E.      That the Court order such other and further relief as the Court shall deem just and proper.

**Dated: October 14, 2020**

**JEFFREY BOSSERT CLARK**
**Acting Assistant Attorney General**
**Civil Division**
**United States Department of Justice**

**DANIEL J. FEITH**
**Deputy Assistant Attorney General**

**GUSTAV W. EYLER**
**Director**
**Consumer Protection Branch**

**JOHN W. BURKE**
**Assistant Director**

**Ann Entwistle**
**Trial Attorney**
Consumer Protection Branch
United States Department of Justice
P.O. Box 386
Washington, DC  20044

Tel.: 202-305-3630

Email: aentwist@civ.usdoj.gov

*Counsel for United States of America*

**Respectfully Submitted,**

**ARIANA FAJARDO ORSHAN**
**UNITED STATES ATTORNEY**

**James A. Weinkle**
Assistant United States Attorney
Florida Bar No.: 0710891
United States Attorney's Office
99 N.E. 4th Street, Suite 300
Miami, Florida 33132

Tel.: 305.961.9290

Email: James.Weinkle@usdoj.gov

*Counsel for United States of America*

# Attachment A

## to United States' Complaint for Temporary Restraining Order and Preliminary and Permanent Injunctions

# Attachment A

**Internet Domains by Which Defendants are Doing Business**

premiumtechiesupport.com
techliveconnect.com
saburitlc.com
assistmysoftware.com
gdconcierge.com
globaldigitalconcierge.com
helpforsoftware.com
helpmysoftware.com
myservicepeople.com
mysupportpeople.com
pcsupportninja.com
senseiware.com
softwarebesthelp.com
softwarehelponline.com
softwarehotshot.com
softwaremerchanthelp.com
softwaresellerhelp.com
softwaretruehelp.com
supportforsoftware.com

Case 1:20-cv-24216-XXXX Document 1-5 Entered on FLSD Docket 10/15/2020 Page 1 of 2

JS 44 (Rev. 06/17) FLSD Revised 06/01/2017

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)* <mark>NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.</mark>

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Attorneys *(If Known)*

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE ☐ HIGHLANDS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
     Plaintiff

☐ 3  Federal Question
     *(U.S. Government Not a Party)*

☐ 2  U.S. Government
     Defendant

☐ 4  Diversity
     *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729 (a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent – Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Mgmt. Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Med. Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 790 Other Labor Litigation | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | **Other:** | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee – Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed (See VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district *(specify)*  ☐ 6 Multidistrict Litigation Transfer  ☐ 7 Appeal to District Judge from Magistrate Judgment  ☐ 8 Multidistrict Litigation – Direct File  ☐ 9 Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)

(See instructions): a) Re-filed Case ☐ YES ☐ NO     b) Related Cases ☐ YES ☐ NO

JUDGE:                                    DOCKET NUMBER:

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23     DEMAND $ _____     CHECK YES only if demanded in complaint:

JURY DEMAND: ☐ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE
DATE                    SIGNATURE OF ATTORNEY OF RECORD     *s/ Ann Entwistle*

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT              IFP              JUDGE              MAG JUDGE

JS 44 (Rev. 06/17) FLSD Revised 06/01/2017

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**    (a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   (b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   (c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked. Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Nature of Suit. Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

**VI.**    **Related/Refiled Cases**. This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

**VII.**    **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity**. Example: U.S. Civil Statute: 47 USC 553
        Brief Description: Unauthorized reception of cable service

**VIII.**    **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
### for the

_____ District of _____

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Plaintiff(s)* | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
                                                      *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*
_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

# Exhibit

# 11

United States District Court
for the
Southern District of Florida

United States of America, Plaintiff,   )
   )
v.   )
   )   Civil Action No. 20-24216-Civ-Scola
   )
Michael Brian Cotter and others,   )
Defendant.   )

## Consent Decree And Final Judgment

This matter comes before the Court upon the Parties' Motion for Entry of Stipulated Consent Decree and Final Judgment ("Stipulation") of the Plaintiff, United States of America ("Plaintiff") and the Defendants Michael Brian Cotter, Global Digital Concierge Pte. Ltd, NE Labs Inc., Sensei Ventures Inc., and Kevisoft LLC ("Defendants") (Plaintiff and Defendants are collectively referred to as the "Parties"). The Court **grants** the Parties' motion. (**ECF No. 36**).

Plaintiff and Defendants wish to resolve Plaintiffs' allegations without further litigation and jointly request and consent to the entry of this Consent Decree and Final Judgment (the "Consent Decree"). Defendants do not admit any liability or wrongdoing with regard to the conduct alleged in the Complaint, nor do Defendants admit to having any direct knowledge of or involvement with such alleged conduct.

The Court having reviewed the Stipulation and finding that Plaintiff brought this action against Defendants pursuant to the Fraud Injunction Statute, 18 U.S.C. § 1345, alleging that Defendants were violating or were about to violate 18 U.S.C. § 1343 by executing a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent representations with the intent to defraud, using interstate wire communications, and being otherwise fully advised, it is **hereby adjudged, ordered and decreed as follows:**

1.    This Court has jurisdiction over this matter and the Parties pursuant to 18 U.S.C. § 1345 and 28 U.S.C. §§ 1331 and 1345. Venue is proper in this District under 28 U.S.C. § 1391(b) and (c).

2.    For purposes of this Consent Decree:

    a.  "Technical support service" refers to any purported technical or security support for a computer, mobile device, or computer or mobile device-related equipment.

    b.  "Technical support software" refers to any software that purports to provide technical support or security, including but

not limited to protection from viruses or malware, for any computer, mobile device, or computer or mobile device related equipment.

3. Upon entry of this Consent Decree, the Defendants, their agents, officers, and employees, and all other persons and entities in active concert or participation with them are restrained from the following:

    a. committing wire fraud, as defined by 18 U.S.C. § 1343;

    b. impersonating any other technology company;

    c. offering for sale via telemarketing or website any technical support service or technical support software;

    d. accepting consumer payments relating to any technical support service or technical support software;

    e. causing pop-up advertisements to appear on any computer or other electronic device;

    f. maintaining or doing business through the use of the website domains www.techliveconnect.com, www.premiumtechiesupport.com, www.saburitlc.com, and the other domains listed in Attachment A;

    g. destroying business records related to Defendants' business, financial, or accounting operations; and

    h. taking actions designed to interfere with any additional Court orders regarding the domains www.techliveconnect.com, www.premiumtechiesupport.com, www.saburitlc.com, and the other domains listed in Attachment A.

4. **It is further ordered** that all right, title and interest in the domains listed in Attachment A shall be surrendered and transferred to the United States.,

5. **It is further ordered** that, with respect to the domains listed in Attachment A, the Registry or Registrar identified below upon receiving notice of this Order shall take the following actions:

    a. VeriSign, Inc., the domain name registry for the domain names listed in Attachment A, within five (5) business days of receipt of this Order shall unlock and change the registrar of record for the domain names listed in attachment A to a registrar of Plaintiff's selection. ;

    b. GoDaddy.com, LLC, the domain name registrar for the domain names listed in Attachment A, within five (5) business days of receipt of this Order shall take any steps necessary to transfer the Domain Names to a registrar account of Plaintiff's selection.

    c. VeriSign, Inc. and GoDaddy.com, LLC shall remove and release any holds or locks of the domain names listed in Attachment A that were implemented pursuant to the Preliminary Injunction entered on November 13, 2020;

    d. VeriSign, Inc. and GoDaddy.com, LLC shall take all reasonable measure to propagate the necessary changes through the Domain Name System as quickly as practicable; and

    e. VeriSign, Inc. and GoDaddy.com, LLC shall provide reasonable assistance in implementing the terms of this Order and take no action to frustrate the implementation of this Order.

6.    Within five (5) days after entry of this Consent Decree, the Defendants are ordered to submit to U.S. Postal Inspector Thomas Ninan a written acknowledgment of receipt of this Consent Decree. Defendant shall submit the written acknowledgment by U.S. Mail to:

    Thomas Ninan
    United States Postal Inspection Service
    615 Chestnut Street
    Suite 770
    Philadelphia, PA – 19106

7.    The Consent Decree shall not be modified except in writing by Plaintiff and the Defendants, and subject to approval by the Court.

8.    This Consent Decree shall constitute a final judgment and order in this action.

9.    This Court retains jurisdiction of this action for the purpose of enforcing or modifying this Consent Decree and for the purpose of granting such additional relief as may be necessary or appropriate.

**Done and ordered** at Miami, Florida on December 23, 2020.

Robert N. Scola, Jr.
United States District Judge

# Attachment A

## Internet Domains by Which Defendants are Doing Business

premiumtechiesupport.com
techliveconnect.com
saburitlc.com
assistmysoftware.com
gdconcierge.com
globaldigitalconcierge.com
helpforsoftware.com
helpmysoftware.com
myservicepeople.com
mysupportpeople.com
pcsupportninja.com
senseiware.com
softwarebesthelp.com
softwarehelponline.com
softwarehotshot.com
softwaremerchanthelp.com
softwaresellerhelp.com
softwaretruehelp.com
supportforsoftware.com

# Exhibit

# 12

10/27/21, 11:22 AM                    District Court Enters Permanent Injunction Shutting Down Technical-Support Fraud Scheme | OPA | Department of Justice

Case 1:21-mc-00145-TNM  Document 15  Filed 11/17/21  Page 27 of 245

🇺🇸 An official website of the United States government  Here's how you know

## JUSTICE NEWS

**Department of Justice**

Office of Public Affairs

FOR IMMEDIATE RELEASE                                                    Tuesday, December 29, 2020

### District Court Enters Permanent Injunction Shutting Down Technical-Support Fraud Scheme

A federal court entered an order of permanent injunction against an individual and five companies in a case against a large-scale technical-support fraud scheme alleged to have defrauded hundreds of elderly and vulnerable U.S. victims, the Department of Justice announced today.

The order bars Michael Brian Cotter, 59, of Glendale, California, and four companies — Singapore registered Global Digital Concierge Pte. Ltd., formerly known as Tech Live Connect Pte. Ltd., Nevada registered companies Sensei Ventures Incorporated and NE Labs Inc., New York registered KeviSoft LLC — from selling technical-support services or software via telemarketing or websites.

"The department is committed to protecting vulnerable Americans, particularly America's seniors, from those who seek to steal their hard earned savings," said Acting Assistant Attorney General Jeffrey Bossert Clark for the Civil Division.  "The department is grateful for the cooperation of foreign law enforcement, including India's Central Bureau of Investigation, in investigating, disrupting, and prosecuting technical-support fraud schemes and other schemes originating abroad and directed at the American public."

"The Postal Inspection Service is committed to investigating all types of elder fraud," said Damon Wood, Inspector in Charge of the Philadelphia Division of the U.S. Postal Inspection Service.  "Fraudsters who scam the elderly and others online use fear and pressure tactics to prey on our most vulnerable Americans from the safety of a computer screen. The Inspection Service is proud of our domestic and international partners who extended the reach of our investigative efforts, shutting this scam down once and for all, and protecting American citizens."

The complaint filed in October 2020 alleged that Cotter worked with co-conspirators in India from at least 2011 to 2020 to operate a technical-support fraud scheme.  The scheme allegedly contacted U.S. consumers via internet pop-up messages that falsely appeared to be security alerts from Microsoft or another well-known company.  The pop-up messages fraudulently claimed that the consumer's computer was infected by a virus, purported to run a scan of the consumer's computer, falsely confirmed the presence of a virus and malware, and then provided a toll-free number to call for assistance.  When victims called the toll-free number, they were connected to India-based call centers participating in the fraud scheme.  Call center workers asked victims to give them remote access to their computers and told victims that they detected viruses or other malware on their computers.  Eventually, the call center workers would falsely diagnose non-existent problems and ask victims to pay hundreds of dollars for unnecessary services and software.

The complaint asserted that Cotter worked with co-conspirators in India to operate the scheme, including registering website domains, setting up shell companies, and entering into relationships with banks and payment processors to facilitate the collection of funds from victims of the scheme.  Individual victims payed hundreds to thousands of dollars to the scheme for unwanted and unnecessary technical-support services.

Under the terms of the consent decree of permanent injunction entered today, the defendants agreed to be permanently barred from, among other things, offering for sale via telemarketing or website any technical-support service or software and advertising via computer pop-up messages.  The consent decree also transfers ownership of 19 domain names alleged to have been used as part of the technical-support scheme to the United States, so that those domains can no longer be used as part of the fraud scheme.

The widespread fraud allegedly committed in this case was brought to the attention of the Transnational Elder Fraud Strike Force by Microsoft, which often is impersonated by those engaged in technical-support fraud schemes.

Acting Assistant Attorney General Clark thanked the Postal Inspection Service for its investigation of the case, and the FBI's Economic Crimes Unit and Legal Attaché's Office in Delhi, India, for their substantial coordination efforts.  He also expressed appreciation to Microsoft for apprising the Strike Force of the alleged offenses.  The U.S. case is being handled by Trial Attorney Ann Entwistle of the Civil Division's Consumer Protection Branch and Assistant U.S. Attorney James Weinkle of the U.S. Attorney's Office in the Southern District of Florida.

Since President Trump signed the bipartisan Elder Abuse Prevention and Prosecution Act (EAPPA) into law, the Department of Justice has participated in hundreds of enforcement actions in criminal and civil cases that targeted or disproportionately affected seniors.  In January 2020, the department designated "Preventing and Disrupting Transnational Elder Fraud" as an Agency Priority Goal, one of its top four priorities.  Later, in March 2020, the department announced the largest elder fraud enforcement action in American history, charging more than 400 defendants in a nationwide elder fraud sweep.  The department has likewise conducted hundreds of trainings and outreach sessions across the country since the passage of the act.

The department's extensive and broad-based efforts to combat elder fraud seek to halt the billions of dollars senior lose to fraud schemes, including those perpetrated by transnational criminal organizations.  The best method for prevention, however, is by sharing information about the various types of elder fraud schemes with relatives, friends, neighbors, and other seniors who can use that information to protect themselves.

If you or someone you know is age 60 or older and has been a victim of financial fraud, help is standing by at the National Elder Fraud Hotline: 1-833-FRAUD-11 (1-833-372-8311).  This U.S. Department of Justice hotline, managed by the Office for Victims of Crime, is staffed by experienced professionals who provide personalized support to callers by assessing the needs of the victim, and identifying relevant next steps.  Case managers will identify appropriate reporting agencies, provide information to callers to assist them in reporting, connect callers directly with appropriate agencies, and provide resources and referrals, on a case-by-case basis.  Reporting is the first step.  Reporting can help authorities identify those who commit fraud and reporting certain financial losses due to fraud as soon as possible can increase the likelihood of recovering losses.  The hotline is staffed 7 days a week from 6:00 a.m. to 11:00 p.m. eastern time.  English, Spanish and other languages are available.

**Component(s):**
<u>Civil Division</u>

**Press Release Number:**
20-1396

*Updated December 29, 2020*

# Exhibit 13

**Bantjes, Chad**

| | |
|---|---|
| **From:** | Bantjes, Chad |
| **Sent:** | Friday, November 02, 2018 10:36 AM |
| **To:** | Bradford, Cory M; Mollica, Andrew |
| **Cc:** | PayFacUnderwriting_RiskTeam |
| **Subject:** | RE: Global Collect - Nexway, Inc. |

I agree, it sounds like they have discontinued their processing of "Premium Technical Support" through Global Collect/Ingenico, leaving just their volume for Avast.  Given this, no further action is needed at this time.  If subsequent reviews of Nexway's processing activity reveals further high-risk characteristics, additional action may be required at that time.

Thank you for your assistance with this.

Best,

**Worldpay**

**Chad Bantjes**
Integrated Payments
PayFac Principal Risk Consultant
Cincinnati

T +1 513 900 4161
chad.bantjes@worldpay.com

worldpay.com

---

**From:** Bradford, Cory M
**Sent:** Friday, November 02, 2018 10:24 AM
**To:** Bantjes, Chad <Chad.Bantjes@worldpay.com>; Mollica, Andrew <Andrew.Mollica@worldpay.com>
**Cc:** PayFacUnderwriting_RiskTeam <PayFacUnderwriting_RiskTeam@vantiv.com>
**Subject:** RE: Global Collect - Nexway, Inc.

Hi Chad –

Please see response below, which is directly from Nexway:

"Regarding the BBB page on Nexway, we have enforced for customer care to answer all requests on a daily basis so as to improve customer satisfaction and manage complaints appropriately . We noticed that Tweakerbit was stated on the BBB page whereas we actually do not process tweakerbit sales with vantiv/Ingenico. Following the information you provided us, we have checked transactions in details and have identified that they are relating to different type of clients.

We process sales for Avast. Avast is a publicly listed company selling antivirus software with subscriptions. We have been selling Avast's products  for more than 5 years now and have complete trust in both the quality of their products and processes.

We have been processing premium technical support services  on merchant ids 7199871,  7612999,  7614574 and issues escalated investigating and requesting from them to identify where issues are stemming from.  As we currently

CONFIDENTIAL WORLDPAY - 001

==do not have sufficient seem to be resulting from these clients. We have relayed our concerns to them and they have confirmed that their services and processes have not changed. We keep reassurances though, we have decided to stop processing their traffic with Vantiv/ingenico.==

Please note that we have ensured as illustrated by the attachment that customers can, without delay request a refund of their order if they are not satisfied with the product.  Customers have a direct link on their order confirmations. They can also easily contact our customer care agents via email, a request form or by telephone to also ask for a refund if they are not satisfied. Additionally, we have published on our site a refund policy and the terms of sales to ensure complete transparency.  https://corporate.nexway.com/refund-policy/ "


To me it sounds like they're going to discontinue traffic from their providers offering "Premium Technical Support".

Would any other information be needed from Global Collect/Ingenico or Nexway?

Thank you,
-
**Worldpay**

**Cory Bradford**
PayFac™
Account Manager
Cincinnati

T +1 513 900 4217
Cory.Bradford@worldpay.com
worldpay.com

---

**From:** Bantjes, Chad
**Sent:** Wednesday, October 24, 2018 10:07 AM
**To:** Mollica, Andrew; Bradford, Cory M
**Cc:** PayFacUnderwriting_RiskTeam
**Subject:** RE: Global Collect - Nexway, Inc.

I am willing to accept a remediation plan from Global Collect on this issue, but it will need to provide well documented evidence that the issue(s) have been identified and addressed concerning the numerous customer complaints.  There is clearly something going on with the product offering and/or customer service.  I do not want canned responses in the remediation plan that they will implement a fraud tool or something similar that will not produce actual results in this instance.

Thank you,

**Worldpay**

**Chad Bantjes**
Integrated Payments
PayFac Principal Risk Consultant
Cincinnati

T +1 513 900 4161
chad.bantjes@worldpay.com

worldpay.com

CONFIDENTIAL WORLDPAY - 002

**From:** Mollica, Andrew
**Sent:** Tuesday, October 23, 2018 4:31 PM
**To:** Bantjes, Chad <Chad.Bantjes@worldpay.com>; Bradford, Cory M <Cory.Bradford@worldpay.com>
**Cc:** PayFacUnderwriting_RiskTeam <PayFacUnderwriting_RiskTeam@vantiv.com>
**Subject:** RE: Global Collect - Nexway, Inc.

Hi Chad,
I think Global Collect is going to do everything in their power to keep Nexway processing on our platform, and that starts with them and Nexway identifying the offending MID(s) and building a remediation plan.  Cory is trying to determine if that exercise is futile on their part.  If we leave it up to Global Collect, they would not take them off as a customer.  So.. if we will consider the remediation plan.. that's fine.. but if this is a no-win situation for Global Collect, we need to know that now.


**Andrew Mollica**
Leader, PayFac – Global eCommerce
Lowell, MA
m 978.476.6923

**Upcoming PTO and Business Travel:**
October 12 - PTO

---

**From:** Bantjes, Chad
**Sent:** Tuesday, October 23, 2018 4:24 PM
**To:** Bradford, Cory M <Cory.Bradford@worldpay.com>
**Cc:** Mollica, Andrew <Andrew.Mollica@worldpay.com>; PayFacUnderwriting_RiskTeam <PayFacUnderwriting_RiskTeam@vantiv.com>
**Subject:** RE: Global Collect - Nexway, Inc.

Generally, a remediation plan is appropriate for a merchant that was the victim of friendly fraud or operational issues that can be addressed.

In this instance there are serious allegations that the merchant is engaged in perpetuating fraud.  Does Global Collect believe that not to be the case despite the numerous consumer complaints?  These are concerning allegations:

"On Sept. 8, 2018 my computer froze and there was a message to call Microsoft. I called the number and was connected to Nexway. .Nexway took control of my computer and installed programs for a charge of $399. One credit card would not process so I used another. Later the first credit card company informed me that they didn't take the charge because it was illegitimate. I took my computer to Best Buy Geek Squad who said the computer had been compromised and they wiped it clean. Nexway compromised my computer and I want a full refund. Econo Support from Nexway was the business that mailed me an invoice."

**Worldpay**

**Chad Bantjes**
Integrated Payments
PayFac Principal Risk Consultant
Cincinnati

T +1 513 900 4161
chad.bantjes@worldpay.com

worldpay.com

---

**From:** Bradford, Cory M
**Sent:** Tuesday, October 23, 2018 4:02 PM

CONFIDENTIAL WORLDPAY - 003

**To:** Bantjes, Chad <Chad.Bantjes@worldpay.com>
**Cc:** Mollica, Andrew <Andrew.Mollica@worldpay.com>; PayFacUnderwriting_RiskTeam <PayFacUnderwriting_RiskTeam@vantiv.com>
**Subject:** RE: Global Collect - Nexway, Inc.

Hi Chad –

Would we entertain the request of having Global Collect/Ingenico complete a remediation plan for these merchants, or are we strictly looking for the deactivation of them?

Thank you,

-
**Worldpay**

**Cory Bradford**
PayFac™
Account Manager
Cincinnati

T +1 513 900 4217
Cory.Bradford@worldpay.com
worldpay.com

---

**From:** Bradford, Cory M
**Sent:** Tuesday, October 23, 2018 2:55 PM
**To:** Bantjes, Chad
**Cc:** Mollica, Andrew; PayFacUnderwriting_RiskTeam
**Subject:** RE: Global Collect - Nexway, Inc.

Hi Chad –

They haven't disabled the MIDs yet. They're addressing it with the merchant, and trying to pinpoint which sub-merchant specifically the issues are arising from.

I'll keep you updated as I hear from them.

Thank you,

-
**Worldpay**

**Cory Bradford**
PayFac™
Account Manager
Cincinnati

T +1 513 900 4217
Cory.Bradford@worldpay.com
worldpay.com

---

**From:** Bantjes, Chad
**Sent:** Tuesday, October 23, 2018 2:32 PM
**To:** Bradford, Cory M
**Cc:** Mollica, Andrew; PayFacUnderwriting_RiskTeam
**Subject:** RE: Global Collect - Nexway, Inc.

4

CONFIDENTIAL WORLDPAY - 004

Hi Cory,

Has Global Collect closed the identified MIDs for Nexway, Inc.?  Just looking for a status update.

Thanks,

**Worldpay**

**Chad Bantjes**
Integrated Payments
PayFac Principal Risk Consultant
Cincinnati

T +1 513 900 4161
chad.bantjes@worldpay.com

worldpay.com

---

**From:** Bantjes, Chad
**Sent:** Thursday, October 18, 2018 3:29 PM
**To:** Bradford, Cory M <Cory.Bradford@worldpay.com>
**Cc:** Mollica, Andrew <Andrew.Mollica@worldpay.com>; PayFacUnderwriting_RiskTeam
<PayFacUnderwriting_RiskTeam@vantiv.com>
**Subject:** RE: Global Collect - Nexway, Inc.

Hi Cory,

This was communicated during our monthly call with Mastercard, so nothing additional to share from that perspective.  I will note that it is very rare for Mastercard to call out a specific merchant, so this should be taken seriously.  I think the BBB complaints are fairly compelling and a quick Google search also revealed many other complaints online.

https://www.complaintsboard.com/complaints/nexway-software-i-dont-even-know-them-c696386.html#comments

https://complaintwire.org/complaint/bSN9dsaN-BI/premium-techie-support-nexway-com

https://www.scambook.com/company/view/98960/Nexway

Per the attached reporting, the Mastercard chargeback rate for Nexway is approaching 1% and is a further indicator of operational issues for that particular merchant.

Best,

**Worldpay**

**Chad Bantjes**
Integrated Payments
PayFac Principal Risk Consultant
Cincinnati

T +1 513 900 4161
chad.bantjes@worldpay.com

worldpay.com

CONFIDENTIAL WORLDPAY - 005

**From:** Bradford, Cory M
**Sent:** Thursday, October 18, 2018 9:35 AM
**To:** Bantjes, Chad <Chad.Bantjes@worldpay.com>
**Cc:** Mollica, Andrew <Andrew.Mollica@worldpay.com>; PayFacUnderwriting_RiskTeam
<PayFacUnderwriting_RiskTeam@vantiv.com>
**Subject:** RE: Global Collect - Nexway, Inc.

Hi Chad –

Global Collect/Ingenico is asking that we share the communication we received from MasterCard on this issue. I know you mentioned it was a phone call below, but do you happen to have anything I could provide to them?

Thank you,

-
**Worldpay**

**Cory Bradford**
PayFac™
Account Manager
Cincinnati

T +1 513 900 4217
Cory.Bradford@worldpay.com
worldpay.com

**From:** Bantjes, Chad
**Sent:** Wednesday, October 17, 2018 11:53 AM
**To:** Bradford, Cory M
**Cc:** Mollica, Andrew; PayFacUnderwriting_RiskTeam
**Subject:** Global Collect - Nexway, Inc.

Hi Cory,

Today there was a call with Mastercard and they specifically called out Nexwaysoftware.com as concerning because the site is likely a scam site with people being alerted that they have a virus after visiting this site.  They have also received complaints about people being charged when they didn't process anything.

These allegations seem to be corroborated by Nexway, Inc.'s "F" BBB Rating and multiple consumer complaints:
https://www.bbb.org/us/ca/san-francisco/profile/computer-cleaning-service/nexway-inc-1116-455441.

Please inform Global Collect that the following MIDs will need to be disabled and have them confirm back when they can be closed in IQ.

CONFIDENTIAL WORLDPAY - 006

| Merchant ID | Merchant Name | External Merchant ID (Merchant Ident String) |
|---|---|---|
| 7199871 | Nexwaysoftware.com | 07199871 |
| 7199872 | Nexway USA | 07199872 |
| 7548984 | Nexwaysoftware.com | 07548984 |
| 7548985 | Nexway Inc | 07548985 |
| 7612995 | Nexway Inc | 07612995 |
| 7612999 | Nexway Inc | 07612999 |
| 7613314 | Nexway Inc | 07613314 |
| 7614574 | Nexway Inc | 07614574 |

Thank you,

**Worldpay**

**Chad Bantjes**
Integrated Payments
PayFac Principal Risk Consultant
Cincinnati

T +1 513 900 4161
chad.bantjes@worldpay.com

worldpay.com

CONFIDENTIAL WORLDPAY - 007



# Better Business Bureau®

**Near**   Salem, NH      USA   ×      Search

## Nexway, Inc

Computer Cleaning Service

📍 236 8th St. Ste. C
San Francisco, CA 94103

📞 (415) 525-3613

| **Accredited** | **BBB Rating** | **Customer Reviews** | **Customer Complaints** |
|---|---|---|---|
| **This business is not BBB Accredited** | **F** <br> • 30 complaint(s) filed against | ★☆☆☆☆ <br><br> Average of 13 Customer Reviews | **30** complaints closed in last 3 years <br><br> **19** complaints closed in last 12 months |



# Business Details

**Location of This Business**
236 8th St. Ste. C, San Francisco, CA 94103

✉ Email this Business

**BBB File Opened:**      10/16/2013

CONFIDENTIAL WORLDPAY - 008

**BBB File Opened:**    10/16/2013

**Number of Employees:**    1

**Additional Contact Information**

Phone Numbers

(415) 371-0052

**Serving Area**

We service the following area(s): Alabama, Alaska, American Samoa, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Guam, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virgin Islands, Virginia, Washington, West Virginia, Wisconsin, Wyoming

**Business Categories**

Computer Cleaning Service

## Customer Complaints

30 Customer Complaints

**Most Recent Customer Complaint**

**Complaint Type:** Problems with Product/Service     **Status:** Resolved

10/04/2018



On Sept. 8, 2018 my computer froze and there was a message to call Microsoft. I called the number and was connected to Nexway. .Nexway took control of my computer and installed programs for a charge of $399. One credit card would not process so I used anothe...



**Nexway, Inc Response**

10/09/2018

To whom it may concern, Nexway is a service provider for different companies such as Avast, Kaspersky Econosoft among others, managing their billing process. Following up on the customer's request the order *********** ...

## Customer Reviews

13 Customer Reviews

CONFIDENTIAL WORLDPAY - 009

**Most Recent Customer Review**



Julie P.
★☆☆☆☆

07/31/2018

Nexway, Inc is also the same as Tweakerbit...be aware, and BEWARE. Do
not let these guys on your computer, you will be harassed to no end. I have
blocked them several times, and they spoof other numbers to get through
your phone. Don't know how I got a refund, but DO NOT GIVE OUT CC
INFORMATION...you will never hear the end of it. It is now to the point that I
will contact the FCC and the Attorney General because of harassment.
Would love to see them go down! Well, they will as I have contacted
authorities and they are investigating. I would give them no stars for rating,
but I must to submit a review.

## Business Categories

Computer Cleaning Service

## Local BBB

Golden Gate Better Business Bureau

More Info on Local BBB

BBB Business Profiles may not be reproduced for sales or promotional purposes.

BBB Business Profiles are provided solely to assist you in exercising your own best judgment. Information in
this BBB Business Profile is believed reliable, but not guaranteed as to accuracy.

When considering complaint information, please take into account the company's size and volume of
transactions, and understand that the nature of complaints and a firm's responses to them are often more
important than the number of complaints.

BBB Business Profiles generally cover a three-year reporting period. BBB Business Profiles are subject to
change at any time. If you choose to do business with this business, please let the business know that you
contacted BBB for a BBB Business Profile.

As a matter of policy, BBB does not endorse any product, service or business.

**For Consumers**

File a Complaint
BBB Scam Tracker
File an Auto Warranty Complaint
BBB Ad Truth

CONFIDENTIAL WORLDPAY - 010

BBB Ad Truth

**For Businesses**

Become Accredited
BBB EU Privacy Shield

**About BBB**

BBB Directory
Give.org
BBB Institute for Marketplace Trust
BBB Programs
Council of Better Business Bureaus
Contact
BBB Business Partner Code
Mission & Vision



Terms of Use   |  Privacy Policy   |  Your Ad Choices   |  Trademarks

© 2018, Council of Better Business Bureaus, Inc., separately incorporated Better Business Bureau organizations in the US, Canada and Mexico, and BBB Institute for Marketplace Trust. All Rights Reserved.

## BACKGROUND INQUIRY REGARDING
## NEXWAY, INCORPORATED
October 24, 2018

Prepared by:
Acquirer Risk Management Solutions, Inc.
arms@nc.rr.com
Prepared for Worldpay

Company Name: **NEXWAY, INCORPORATED**
Address: **1001 MARSHALL ST, REDWOOD CITY, CA 94063-2052, SAN MATEO COUNTY**
Address: **55 NEW MONTGOMERY ST STE 518 SAN FRANCISCO CA 94105-3431**
Address: **650 CHENERY ST SAN FRANCISCO CA 94131-3034**
Address: **236 8TH ST STE C SAN FRANCISCO CA 94103-3966**
Phone: **415-371-0052**
TIN: **27-4485721**

**Business Filings:**

**Industry Information:**
SIC Code: **4813**
SIC Description: **Telephone Communications, Exc. Radio**

SIC Code: **5045**
SIC Description: **Computers, Peripherals & Software**

SIC Code: **5271**
SIC Description: **Mobile Home Dealers**

SIC Code: **5734**
SIC Description: **Computer And Software Stores**

SIC Code: **7374**
SIC Description: **Data Processing And Preparation**

**Bankruptcies:**
[None Found]

**Liens & Judgments:**
[None Found]

1

**Corporation Filings:**
  **Corporation Filings # 1**

      **NEXWAY, INCORPORATED**
      Name Type: **LEGAL**
      Address: **236 8TH ST STE C, SAN FRANCISCO, CA 94103-3966**
      Address Type: **MAILING**
      Status: **ACTIVE**
      Business Type: **FOREIGN CORPORATION**
      Filing Number: **C3347727**
      Filing Date: **01/06/2011**
      Foreign Incorporation Date: **01/06/2011**
      Term: **PERPETUAL**
      Type: **STATEMENT & DESIGNATION BY FOREIGN CORPORATION**
      Registered Agent Address: **236 8TH ST STE C, SAN FRANCISCO, CA 94103-3966**
      State of Incorporation: **CA**
      Foreign State of Incorporation: **DELAWARE**

      Annual Report Filings:
        Comments: **STATEMENT OF OFFICERS INFORMATION**
        Filed Date: **01/31/2018**

**Registered Agents:**
  Name: **CHRISTIAN DESERT**
  Title: **REGISTERED AGENT**
  Address: **236 8TH ST STE C, SAN FRANCISCO, CA 94103-3966**
  Date Last Seen: **01/02/2018**

  Name: **WANDERLEY KALINE**
  Title: **REGISTERED AGENT**
  Address: **236 8TH ST STE C, SAN FRANCISCO, CA 94103-3966**
  Date Last Seen: **10/02/2018**

**Business Registration:**
  Name **NEXWAY INCORPORATED**
  Address: **1001 MARSHALL ST, REDWOOD CITY, CA 94063-2052**
  Filing Number: **03347727**
  Status: **Active**
  Corporation Code: **Secretary of State**
  Filing Date: **01/06/2011**

  Name: **NEXWAY INC**
  Address: **55 NEW MONTGOMERY ST STE 518, SAN FRANCISCO, CA 94105-3431**
  Filing Number: **102127095**
  Company Phone: **4153710052**
  Corporation Code: **Tax License**
  Filing Date: **11/01/2011**

2

CONFIDENTIAL WORLDPAY - 013

**UCC Filings for Business:**
    [None Found]


**Associated People:**

  **Business Contacts:**

      Name: **HERVI LAUMONIER**
      Contact Title - **AGENT**
      Address: **236 8TH ST STE C, SAN FRANCISCO, CA 94103-3966**


  **Executives:**

      Name: CHRISTIAN DESERT
      Contact Title - **PRESIDENT**
      Date Last Seen: **09/15/2018**

      Name: GILLES RIDEL
      Contact Title - **PRESIDENT**
      Date Last Seen: **09/15/2018**


**Assets:**

  **Properties:**

**Property Record # 1**

    Owner Name : **NEXWAY INCORPORATED**
    Owner Address: **55 NEW MONTGOMERY ST, SAN FRANCISCO, CA 94105-3412**
    Property Address: **55 NEW MONTGOMERY ST, SAN FRANCISCO, CA 94105-3412**

    Sales Information:

    Tax and Assessment Information:
      Land Usage: **PERSONAL PROPERTY-FIXTURES**
      Assessed Value: **$8,754**

    Property Characteristics:

**Property Record # 2**

    Owner Name 2: **DBA NEXWAY INC**
    Owner Address: **236 8TH ST, SAN FRANCISCO, CA 94103-3965**
    Property Address: **650 CHENERY ST, SAN FRANCISCO, CA 94131-3034**

    Sales Information:

3

Tax and Assessment Information:
    Land Usage: **PERSONAL PROPERTY-FIXTURES**
    Assessed Value: **$13,283**

Property Characteristics:


**Website:**
Domain Name: **nexway.com**
Registrant Name: Mammet Jean-Francois
Registrant Organization: Telechargement .fr
Registrant Street: 5, Bd des Bouvets
Registrant City: Nanterre
Registrant State/Province:
Registrant Postal Code: 92000
Registrant Country: FR
Registrant Phone: +33.155171587



**Better Business Bureau:**

Nexway, Inc
236 8th St. Ste. C San Francisco, CA 94103
(415) 525-3613

Business Categories
Computer Cleaning Service

BBB Rating

**F**

    31 complaint(s) filed against business.

**Samples of consumer complaints.**


**Complaint Type:** Problems with Product/Service

**Status:** Resolved

10/04/2018


On Sept. 8, 2018 my computer froze and there was a message to call Microsoft. I called the number and was connected to Nexway. .Nexway took control of my computer and installed programs for a charge of $399. One credit card would not process so I used another. Later the first credit card company informed me that they didn't

4

take the charge because it was illegitimate. I took my computer to Best Buy Geek Squad who said the computer had been compromised and they wiped it clean. Nexway compromised my computer and I want a full refund. Econo Support from Nexway was the business that mailed me an invoice.

**Expand Complaint Details**

**Complaint Type:** Problems with Product/Service

**Status:** Answered

09/05/2018

This company effectively shut down control of my computer, then instructed me to call a purported Microsoft number to resolve the problem. "Microsoft" then provided yet another number of a company supposedly in Sebring, FL, that resolved their computer lockups. All fake. After calling this last number, I was directed to send a total of $999.00 ($399.50 for service, $599.50 for new drivers, etc., for computer and lifelong prevention and protection security. After payment, all fine until they contacted me today via phone, requesting I go to a local Apple store and purchase gift cards. Balking at this, I contacted my bank and credit card companies. Tracing my $999.00 payment led to this business, and further research to the reviews, complaints and claims online. This company is totally fraudulent and needs to be shutdown.

**Expand Complaint Details**

**Complaint Type:** Billing/Collection Issues

**Status:** Answered

09/10/2018

Complaint Details Unavailable

**Complaint Type:** Problems with Product/Service

**Status:** Answered

09/05/2018

I received an issue with my computer and told me to call a number. I called them and they said my network is compromised and charged me $128.00 to fix it. I can't even turn my computer on anymore!

**Expand Complaint Details**

**Complaint Type:** Advertising/Sales Issues

**Status:** Answered

08/28/2018

5

I had a pop up on my laptop computer saying that it was Microsoft and that I had been hacked and had a virus or a worm etc. I was directed to call a phone number that was to be a Microsoft approved vendor to repair my problem. The company was Nextway Inc. This was on June 21st, 2018 and they charged me $599 for a one year service agreement that would cover all if my devices. I reluctantly let them into my computer and they did there work. Yeasterday I received another pop up saying the same thing, contacted them and they said my current service contract didn't cover this because the hackers got in another way and that it would cost me another $899 to fix it. I was in a big hurry and gave them my credit card to pay for it. I went back and checked my notes from June 21st and it said I was covered for everything. I called Nextway and wanted both of my payments returned and copies of my service agreements. Lots of fast talk and nothing. Then a IT friend sent me to the BBB link with the com...

**Expand Complaint Details**

**Complaint Type:** Problems with Product/Service

**Status:** Resolved

07/17/2018

On July 2, 2018, I received a pop-up screen on my computer stating that my computer had received a virus/worm etc and my computer was being blocked so I should contact Microsoft Support and gave a number. I called and was informed that their service/software would be $499.00 for the year. I accepted and someone went into my computer and installed (?) software. I received a invoice ******* by email from Nexway for $499.99, order number ********. On July 14, 2018, I received a phone call from an Indian sounding individual stating that they had overcharged me and wanted to provide a refund of $400 to me. Said I needed to log into my bank account and he would show me the money would go into my bank balance. Sure enough, the balance suddenly went up by $5,000 which he then said because it was going from their business account to my personal account, $5,000 was the lowest it would go so now I needed to refund $4,600 to them via gift cards from Apple. My local Verizon store doesn't do gift ca...

**Expand Complaint Details**

**Complaint Type:** Billing/Collection Issues

**Status:** Answered

07/09/2018

A pop-up window appeared on my 83 year old father's Apple Computer warning him of a virus and directing him to call a number appearing to be Apple on his screen. When he called, Nexway bamboozled him out of $598 to "fix" a fake problem that they created. This company is a scam company designed to rip off unsuspecting people out of lots of money. They should be put out of business immediately.

**Expand Complaint Details**

**Complaint Type:** Problems with Product/Service

**Status:** Answered

6

07/06/2018

Complaint Details Unavailable

**Complaint Type:** Problems with Product/Service

**Status:** Answered

04/28/2018

I AM CONTINUALLY RECEIVING CALLS FROM************ WHICH ARE ROBOCALLS. THEY CALL BOTH MY LANDLINE AND MY CELL. I WANT THE CALLS TO STOP. IT WAS A SCAM WITH REGARD TO MY COMPUTER AND CLAIMING AFFILIATION WITH MICROSOFT. MY CREDIT CARD COMPANY HAS INVESTIGATED THE CHARGES POSTED BY NEXWAY.

**Complaint Type:** Problems with Product/Service

**Status:** Answered

04/18/2018

Your company hacked into our computer system and said that we had been hacked and that they could fix it. The person's computer that they contacted had in fact not been hacked. We were being scammed by you. The person on the computer freaked out and gave you my credit card information. He was not authorized to do so . But then this is what you were hoping for...Right? This is how you make your money. this is not acceptable.

**Expand Complaint Details**

**Complaint Type:** Problems with Product/Service

**Status:** Answered

03/24/2018

My wife went to use her computer on 3/23/2018 and found a big green pop-up saying she had a virus that was going to destroy her computer. There was a phone number to call that said they were tech support with Microsoft. She was afraid and called the number thinking it was from the computer company. A man came online and told her she had been infected and his company would take care cleaning up her computer but to do so he would need remote access to see what all {the virus} had done. They would do this for just $399.99 she told them she would call them back in a few. Her plan was to call me or her son and say what was going on. The tech told her if she hung up and called back it would cost another $90 because of starting all over again. What a scam. About all my wife knows about computers is to check emails and play a game. So she gave them her debit card number and permission to go inside her computer. After 70 minutes she was told her computer was fixed and that they had installed a ...

**Expand Complaint Details**

7

**Complaint Type:** Advertising/Sales Issues

**Status:** Resolved

03/20/2018

On January 28, 2018, I received a pop-up on my Mac computer saying my computer was seriously infected and that I needed to call a phone number immediately to rectify it. The pop-up appeared to be from Apple, and I thought I was calling Apple. At that number I was transferred to a person who said he was an Apple and Microsoft specialist. He spoke with an Indian accent and was very difficult to understand. He then: 1. Told me my computer was infected with Malware 2. Took over my computer screen 3. Told me I didn't have any real time anti-virus installed 4. Used my passwords to move around on my computer 5. Told me my computer was infected with adware, "Zero bytes," and "Mackeeper." 6. Switched me from one "manager" and "financial assistant" to another until I had agreed to pay a. $599.99 for something called Premium Technical Support of SENSEI Inc b. $219.99 for something called****************** c. $49 from something called MacAds Cleaner d. $4.99 per month for on-going service Immediat...

**Expand Complaint Details**

**Complaint Type:** Problems with Product/Service

**Status:** Resolved

03/30/2018

I paid this company 229.95 and was told after explaining my computer problem that they could fix my computer. I was in contact with these so called computer techs in India who I allowed for them tom take remote control of my computer. After many hours of them asking Google for answers they where not able to fix the error I was getting when my computer needed to update Microsoft security essentials. I told them they where wasting my time and wanted a refund and they said they would not take my money if they could not fix it. They never corrected my problem but added other issues. Finally they said they could re install the computer, I told them I have no discs for that, They said no problem they could still do it, They said I would lose a lot of info I said no problem just as long as it is like a factory re set. They could not do that either, That's when I decided I got nothing for my money, The company was I bought my computer from was gracious enough to send me a new hard drive which ...

https://www.bloomberg.com/research/stocks/private/snapshot.asp?privcapid=20989975

NEXWAY, S.A.S. provides digital commerce-as-a-service solutions for games, applications, and software publishers and their online merchants. The company develops and operates a cross-device digital commerce platform that allows publishers and merchants to sell and service digital products through traditional Web interfaces, as well as within software and game interfaces; and offers account management, IT, digital catalog, digital agency, payment and fraud prevention, and customer support services. It also provides Publisher Webstore, a Webstore solution that allows users to boost customer acquisition, conversion, and retention.

8

Tour PB5

Floor 9

1 avenue du Général de Gaulle

La Défense CEDEX

Paris,  92074

France

Founded in **2002**

[corporate.nexway.com](corporate.nexway.com)

Key Executives for NEXWAY, S.A.S.

[Mr. Renaud Sibel](Mr. Renaud Sibel)
Chief Executive Officer

[Mr. Gilles Ridel](Mr. Gilles Ridel)
Founder & Chairman of Supervisory Board

[Mr. Vincent Breuil](Mr. Vincent Breuil)
Chief Operating Officer

[Mr. Christian Desert](Mr. Christian Desert)
Chief Executive Officer of Nexway Inc

[Mr. Jack Momose](Mr. Jack Momose)
Chief Executive Officer of Degica-Nexway Japan

**END**

9

CONFIDENTIAL WORLDPAY - 020

| RM Mastercard GMAP | Organization GMAP | Descriptor/ (if applicable) GMAP | Notes GMAP | Card Brand | Program | Report Date | GMAP Fraud Month | Tier | Fraud Amount | Fraud Count | Loss % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Heather Huddleston | Global Collect PayFac | 1 415-704-5586 NEXWAY | Informational | MasterCard | GMAP | 20-Apr | 19-Oct | Tier 2 | $9,943.84 | 26 | 6.27 |

| RM GMAP | Organization GMAP | Descriptor/ (if applicable) GMAP | | Card Brand | Program | GMAP Fraud Month | Tier | Fraud Amount | Fraud Count | Loss % |
|---|---|---|---|---|---|---|---|---|---|---|
| Heather Huddleston | Global Collect PayFac - Nexway | 1 415-704-7471 NEXWAY | | MasterCard | GMAP | 19-Apr | Tier 3 | $12,379.00 | 21 | 22.42 |

| RM GMAP | Organization GMAP | Descriptor/ (if applicable) GMAP | | Card Brand | Program | GMAP Fraud Month | Tier | Fraud Amount | Fraud Count | Loss % |
|---|---|---|---|---|---|---|---|---|---|---|
| Tamara Sharp | Nexway | 1 415-704-5586 NEXWAY | | MasterCard | GMAP | 19-Jul | Tier 2 | $10,381.00 | 19 | 7.03 |

| RM | Organization | Descriptor/ (if applicable) | | Card Brand | Program | GMAP Fraud Month | Tier | Fraud Amount | Fraud Count | Loss % |
|---|---|---|---|---|---|---|---|---|---|---|
| Cory Bradford- PayFac | Global Collect PayFac | 1 415-704-7471 NEXWAY | | MasterCard | GMAP | 18-Sep | 2 | $10,917.68 | 43 | 7.51 |

| RM | Organization | Descriptor/ (if applicable) | Notes | Card Brand | Program | Status | GMAP Data Month | se #/Tracking # | Due Date | Due to Vis | Projected Fine Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| PayFac - Andrew Mollica | Global Collect PayFac | 1 415-704-7471 NEXWAY | | MasterCard | GMAP | Tier 1 | 18-Jul | N/A | N/A | N/A | N/A |

| RM | Organization | Descriptor/ (if applicable) | Notes | Card Brand | Program | Status | GMAP Data Month | se #/Tracking # | Due Date | Due to Vis | Projected Fine Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Andrew Mollica - PayFac | Global Collect PayFac | NEXWAYSOFTWARE.COM | | MasterCard | GMAP | Tier 1 | 18-Feb | N/A | N/A | N/A | N/A |

**Mastercard ECP Program**    Jun-18

| RM | Organization | Descriptor/ (if applicable) | Notes | Card Brand | Program | Status | GMAP Data Month | se #/Tracking # | Due Date | Due to Vis | Projected Fine Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Andrew Mollica - PayFac | Global Collect PayFac | Nexwaysoftware.com | | MasterCard | ECP | ECM - Warning | N/A | 43747 | N/A | N/A | N/A |

**Visa Chargeback / Fraud Monitoring VCMP/VFMP**
   Early Warning does not count against Visa's trimline
   Jul-19

| RM VISA | Organization | Descriptor Visa | Card Brand | Program | Status | Case # | Plan Due Date | Projected Fine Amount | Visa Fraud Count | Visa Fraud Amount | Visa Sales Amount | Visa F/S Ratio | Visa Chargeback Count | Visa Sales Count | Visa C/S Ratio |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cory Bradford- PayFac | Global Collect PayFac | 1 415-704-7471 NEXWAY | Visa | VCMP | Early Warning | 45882 | N/A | N/A | 77 | ######## | $521,258.71 | 7.70% | 84 | 988 | 8.50% |

   Aug-18

| RM | Organization | Descriptor/ (if applicable) | Notes | Card Brand | Program | Status | GMAP Data Month | se #/Tracking # | Due Date | Due to Vis | Projected Fine Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Cory Bradford- PayFac | Global Collect PayFac | 1 415-704-7471 NEXWAY | | Visa | VCMP | Month 1 | N/A | 39571 | N/A | N/A | N/A |

   Jul-18

| RM | Organization | Descriptor/ (if applicable) | Notes | Card Brand | Program | Status | GMAP Data Month | se #/Tracking # | Due Date | Due to Vis | Projected Fine Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Andrew Mollica - PayFac | Global Collect PayFac | NEXWAYSOFTWARE.COM | | Visa | VCMP | Month 3 | N/A | 32237 | 7/16/2018 | Updated Pl | N/A |

   Jun-18

| RM | Organization | Descriptor/ (if applicable) | Notes | Card Brand | Program | Status | GMAP Data Month | se #/Tracking # | Due Date | Due to Vis | Projected Fine Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Andrew Mollica - PayFac | Global Collect PayFac | NEXWAYSOFTWARE.COM | | Visa | VCMP | Month 2 | N/A | 32237 | 6/14/2018 | CB Plan | N/A |
| Andrew Mollica - PayFac | Global Collect PayFac | NEXWAYSOFTWARE.COM | | Visa | VFMP | Month 1 | N/A | 32170 | N/A | N/A | N/A |

   May-18

| RM | Organization | Descriptor/ (if applicable) | Notes | Card Brand | Program | Status | GMAP Data Month | se #/Tracking # | Due Date | Due to Vis | Projected Fine Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Andrew Mollica - PayFac | Global Collect PayFac | NEXWAYSOFTWARE.COM | | Visa | VFMP | Early Warning | N/A | 32170 | N/A | N/A | N/A |

   Apr-18

| RM | Organization | Descriptor/ (if applicable) | Notes | Card Brand | Program | Status | GMAP Data Month | se #/Tracking # | Due Date | Due to Visa/MC | Projected Fine Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Andrew Mollica - PayFac | Global Collect PayFac | NEXWAYSOFTWARE.COM | | Visa | VCMP | Month 1 | N/A | 32237 | N/A | N/A | |
| Andrew Mollica - PayFac | Global Collect PayFac | NEXWAYSOFTWARE.COM | | Visa | VFMP | Early Warning | N/A | 32170 | N/A | N/A | |

CONFIDENTIAL WORLDPAY - 021

# Exhibit 14

20-603739



**Secretary of State**
**Statement of Information**
(California Stock, Agricultural
Cooperative and Foreign Corporations)

**SI-550**

VK **150**

FILED
Secretary of State
State of California

FEB 11 2020

**IMPORTANT — Read instructions before completing this form.**

**Fees (Filing plus Disclosure) – $25.00;**

**Copy Fees –** First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

31|NF|cc|25R-

**1. Corporation Name** (Enter the exact name of the corporation as it is recorded with the California Secretary of State. Note: If you registered in California using an assumed name, see instructions.)

This Space For Office Use Only  2-18-20

NEXWAY, INCORPORATED

**2. 7-Digit Secretary of State File Number**

C3347727

**3. Business Addresses**

| a. Street Address of Principal Executive Office - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 4804 Mission Street, Suite 208 | San Francisco | CA | 94112 |
| b. Mailing Address of Corporation, if different than Item 3a | City (no abbreviations) | State | Zip Code |
| c. Street Address of Principal California Office, if any and if different than Item 3a - Do not list a P.O. Box | City (no abbreviations) | State | Zip Code |
| 4804 Mission Street, Suite 208 | San Francisco | CA | 94112 |

**4. Officers**   The Corporation is required to list all three of the officers set forth below. An additional title for the Chief Executive Officer and Chief Financial Officer may be added; however, the preprinted titles on this form must not be altered.

| a. Chief Executive Officer/ | First Name | Middle Name | Last Name | | | Suffix |
|---|---|---|---|---|---|---|
| VICTOR | | | IEZUITOV | | | |
| Address | | | City (no abbreviations) | State | Zip Code | |
| 4804 Mission Street, Suite 208 | | | San Francisco | CA | 94112 | |
| b. Secretary | First Name | Middle Name | Last Name | | | Suffix |
| LAURETTE | | | BERIER | | | |
| Address | | | City (no abbreviations) | State | Zip Code | |
| 4804 Mission Street, Suite 208 | | | San Francisco | CA | 94112 | |
| c. Chief Financial Officer/ | First Name | Middle Name | Last Name | | | Suffix |
| LAURETTE | | | BERIER | | | |
| Address | | | City (no abbreviations) | State | Zip Code | |
| 4804 Mission Street, Suite 208 | | | San Francisco | CA | 94112 | |

**5. Director(s)**   California Stock and Agricultural Cooperative Corporations ONLY: Item 5a: At least one name and address must be listed. If the Corporation has additional directors, enter the name(s) and addresses on Form SI-550A (see instructions).

| a. First Name | | Middle Name | Last Name | | | Suffix |
|---|---|---|---|---|---|---|
| VICTOR | | | IEZUITOV | | | |
| Address | | | City (no abbreviations) | State | Zip Code | |
| 4804 Mission Street, Suite 208 | | | San Francisco | CA | 94112 | |
| b. Number of Vacancies on the Board of Directors, if any | | | | | | |

**6. Service of Process** (Must provide either Individual OR Corporation.)

INDIVIDUAL – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | | Middle Name | Last Name | | | Suffix |
|---|---|---|---|---|---|---|
| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | | City (no abbreviations) | | State | Zip Code | |
| | | | | CA | | |

CORPORATION – Complete Item 6c only. Only include the name of the registered agent Corporation.

| c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b |
|---|
| C T CORPORATION SYSTEM        (C0168406) |

**7. Type of Business**

| Describe the type of business or services of the Corporation |
|---|
| E-COMMERCE SOFTWARE PROVIDER |

**8. The information contained herein, including in any attachments, is true and correct.**

| 02/10/2020 | Julie Alimi-Londner | Representative | |
|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | | Signature |

Title SI-550 (REV 11/2019)

2019 California Secretary of State
bizfile.sos.ca.gov

# Statement and Designation
# by Foreign Corporation

**FILED**
In the office of the Secretary of State
of the State of California

**JAN 0 6 2011**

Nexway, Incorporated
(Name of Corporation)

_____, a corporation organized and existing under the

laws of _____ Delaware _____, makes the following statements and designation:
(State or Place of Incorporation)

1. The address of its principal executive office is _____

   1001 Marshall Street, Suite 300, Redwood City, CA 94063

2. The address of its principal office in the State of California is _____
   (If none, leave Item 2 blank.)

## Designation of Agent for Service of Process in the State of California
(Complete either Item 3 or Item 4.)

3. (Use this paragraph if the process **agent is a natural person**.)

   _____ Christian Désert _____, a natural person residing in the State of

   California, whose complete street address is _____ 1001 Marshall Street, Suite 300

   _____ Redwood City, CA 94063 _____, is designated as agent upon whom process directed to
   this corporation may be served within the State of California, in the manner provided by law.

4. (Use this paragraph if the process **agent is another corporation**.)

   _____

   a corporation organized and existing under the laws of _____
   is designated as agent upon whom process directed to this corporation may be served within the State
   of California, in the manner provided by law.

5. It irrevocably consents to service of process directed to it upon the agent designated above, and to
   service of process on the Secretary of State of the State of California if the agent so designated or the
   agent's successor is no longer authorized to act or cannot be found at the address given.

_____              Christian Désert, Chief Executive Officer
(Signature of Corporate Officer)              (Typed Name and Title of Officer Signing)

_If an individual is designated as the agent for service of process, include the agent's business or residential street address in California (a P.O. Box address is not acceptable). If another corporation is designated as the agent for service of process, do not include the address of the designated corporation. **Note:** Corporate agents must have complied with California Corporations Code section 1505 prior to designation, and a corporation cannot act as its own agent._

Secretary of State **Form**
S&DC-STOCK/NONPROFIT (REV 04/2010)

# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "NEXWAY, INCORPORATED" IS DULY
INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN
GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE
RECORDS OF THIS OFFICE SHOW, AS OF THE SIXTH DAY OF JANUARY,
A.D. 2011.

4912661   8300

110001867

You may verify this certificate online
at corp.delaware.gov/authver.shtml

Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 8475877

DATE: 01-06-11

# Exhibit

# 15

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept

Decline

TRUSTED BY THE WORLD'S LEADING ECOMMERCE BRANDS



700+
Customers

200M
€
Annual
transaction
revenue

76%
Retention on
subscription

140+
Countries
served

8
Offices
around the
world

___

# Where Payments Mean Business.

You've worked hard to innovate your products, build your website, optimize your customer journey, and create a "surprise and delight" brand.

To transform, grow, and scale your online business globally, you must have the right payment solutions and essential back-end operations in place to support it. This is critical for improving customer conversion and retention over time.

At Nexway, we promise to be an extension of your team, working with you every step of the way to simplify, streamline, and strengthen your online business's back-end operations.

We give you cutting-edge technology, a full suite of personalized microservices, and a hands-on team of industry experts to propel your business forward. We mean it when we say:

This can be the hardest and most complex part of running any online business, especially if you sell products and services in multiple countries: there are local currencies, tax laws, compliance requirements, data protection concerns, and a flurry of other headaches that must be taken into account. Overcoming these hurdles requires a team of experts on your side.

# Our Team, Your Success.

# The right technology and tools to grow & scale your online business.

## BREAK DOWN GROWTH-STUNTING BARRIERS

Today's ecommerce environment is more complex than ever. Keeping up with growing customer expectations is likely keeping you up at night. That's why we're here to help. Whether you tap into the




power of our frictionless payment solutions or any of our industry-leading ecommerce microservices, our team can help take your customer experience to the next level.

# Payment

- Launch sales in global markets
- Optimize payment conversion
- Detect and prevent fraud
- Manage chargebacks
- Secure transactions

# E-commerce

- Organize your product catalog
- Personalize your shopping cart
- Manage subscriptions and billing
- Leverage customer data and insights
- Provide enhanced customer service



# One platform powers all of your selling needs.

SUPERCHARGE YOUR ONLINE SALES POTENTIAL WITH MONETIZE

REQUEST A DEMO  □



Monetize is our proprietary ecommerce growth platform that fuels new revenue growth, improves the customer experience, boosts customer conversion and retention, and reduces operating costs.

MONETIZE IS BUILT ON TWO KEY PERFORMANCE PRINCIPLES

## HEADLESS COMMERCE

Scale and grow with ease. Our APIs and best-in-class microservices integrate seamlessly with the CMS, CRM, and ERP systems you already use. Monetize is an agile and scalable platform that can rapidly adapt to any business as it grows.

## AI-POWERED

Run a smart online business. Make informed decisions with artificial intelligence-powered reports and optimize the customer experience like never before using our full suite of smart tools, like A/B testing, customer segmentation and more.

EXPLORE

Case 1:21-mc-00145-TNM     Document 1-5     Filed 11/17/21     Page 62 of 245

WORK WITH US □

# Case studies.

CHECK OUT HOW WE'VE HELPED OUR
CUSTOMERS GROW THEIR ONLINE
BUSINESSES AND POWER THEIR GLOBAL
SALES

### Steinberg

Grew global reach and multiplied turnover by 5.

### Fnac

Retained customers and drove recurring revenue.

### Blizz by TeamViewer

Increased B2B conversion rate by 10% thanks to Nexway quote-to-order system.



# Give your online business a boost.

## JOIN 700+ BUSINESSES GROWING WITH NEXWAY

* These fields are required.

# Latest news.

# Blog.





## Grow Your Business with a Reseller Program

## What Does It Really Mean to Be a Merchant of Record?



## How Is COVID-19 Shaping the Future of E-Commerce?

Newsletter

### About us

- Company
- Careers
- Our offices
- Contact us

### Solutions

- Monetize
- Connect

### Legal & Privacy

- Legal notice
- Terms & Conditions
- Privacy Policy

- Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept    Decline



GET STARTED

## LEARN MORE ABOUT OUR MONETIZATION SOLUTIONS

Nexway helps you to monetize your business and connect you to the worldwide digital market!
We'd love to hear more about you.



First name*        Last name*

Your job*          Work Email*

Company name*      Website URL*

What type of products are you selling?*

Please Select

protected by reCAPTCHA
Privacy · Terms

\* These fields are required.



Newsletter

## About us

- Company
- Careers
- Our offices
- Contact us

## Solutions

- Monetize
- Connect

## Legal & Privacy

- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept     Decline

MONETIZE IS AN AGILE PAYMENT AND E-COMMERCE PLATFORM THAT MINIMIZES OPERATIONAL STRESS AND BOOSTS GLOBAL SALES POTENTIAL, FAST.





## Payments for any business model.

Our smart payment solutions get you to market quickly in 140 countries. From processing online and mobile payments to managing subscriptions and billing our payment platform does it all.

## Services tailored to your business.

We offer two levels of highly personalized, turnkey service that adapt to your online business's specific needs and evolve alongside your business as it grows.







# Platform.

## SMART ONLINE BUSINESS GROWTH STARTS HERE.

Growing and scaling your online business globally typically doesn't happen overnight.

Until you work with Nexway. Our fully customizable, API-driven e-commerce and payment solutions take online business growth to a whole new level.

**We can help you automate the sales process, manage subscriptions and billing, adhere to local market compliance, boost customer conversion and retention — and so much more.**

Because our platform is powered by artificial intelligence (AI) and real-time data, you will always have actionable insights at your fingertips to respond to customer needs quickly.

☐ Personalized shopping cart

- ☐ Product catalog
- ☐ Payment
- ☐ Subscription and billing
- ☐ Fulfillment
- ☐ Reseller module
- ☐ Customer insights

**BOOST CUSTOMER CONVERSION.**

Our **customizable shopping cart solutions** integrate seamlessly into your existing site to create a better checkout experience for customers.

**Key features include:**

Seamless API integration

Optimized for web, mobile, or in-app

One-click checkout functionality

Fully customizable to maintain a consistent brand experience

Dynamic content and URLs for cross-selling and upselling

Available in 8 languages

**FLEXIBLE PRODUCT AND PRICE CONFIGURATION.**

Whether you use Monetize to manage your product catalog or leverage it to strengthen your existing systems, our product and pricing configuration solutions can **simplify product catalog updates and maintenance** as your online business grows.

**Key features include:**

Centralized platform for managing product assets:

images, descriptions, specs, pricing, etc.

Easily create product bundles or apply discounts

Provides an advanced quoting system for sales agents

**OPEN YOUR BUSINESS TO THE WORLD.**

Grow your online business and boost customer conversion in 140 countries by tapping into the power of our **secure and highly localized payment solutions** that consistently over-perform market rates for payment efficiency.

What are the most popular payment methods by country?

**DOWNLOAD OUR BROCHURE**

**Key features include:**

PCI DSS compliance

Local market compliance and security:

PSD2, SCA, 3D Secure, SSL certificates

Optimized payment acceptance rate with smart routing

AI-powered fraud detection

Completely secure online payment platform.

   

How will PSD2 impact your customer experience
and online sales growth?

**LEARN MORE ABOUT PSD 2 TODAY!**

## BUILD VALUABLE RECURRING REVENUE STREAMS.

Our **powerful subscription engine and AI-powered churn prevention
program** empower you to sell and manage subscriptions, increase customer
lifetime value (CLTV), build long-term customer loyalty, and exceed customer
expectations like never before.

**Key features include:**

Recurring billing and auto-renewal functionality

Ability to provide freemiums and trials

Easily offer upgrades, promotions and add-ons

Advanced subscriber account management tools

AI-powered churn detection and customer retention program

Our subscription programs have grown CLTV by 13% year/year

**LEARN MORE**

## PERSONALIZED FULFILLMENT MANAGEMENT.

We ensure your customers get their **orders delivered as quickly, efficiently,
and accurately** as possible. We can also deliver digital goods directly from the
Monetize platform or via your existing delivery infrastructure.

**Key features include:**

Rapid delivery of activation codes or license keys (software download)

Two delivery methods: Real-Time or Batch Mode

## ENERGIZE YOUR RESELLER NETWORK.

We turn third-party distribution channels into **revenue-driving engines** to achieve significant sales growth and extend your product offering to a broader distribution network.

**Key features include:**
Customizable reseller portal offering simplified setup
Bulk ordering functionality
License fulfillment
Complex, multi-tiered payment remittance
Automated registration requests
Robust reporting and analytics:
purchase volume, discount level, margins
Centralized hub for accessing marketing materials

Looking for new ways to boost online sales and expand your distribution network?

DOWNLOAD OUR BROCHURE

**TRANSFORM YOUR BUSINESS WITH REAL-TIME INSIGHTS.**

Understand what your customers want, test data-fueled growth-hacking strategies, and **deliver exceptional customer experiences** via powerful analytics dashboards, forecast and simulation tools, and real-time customer insights.

**Key features include:**
Robust business dashboards:
sales, conversion, payment, subscriptions
Advanced reporting on customer health metrics
– Recurring revenue by month or year (MRR/ARR)
– Average revenue per user (ARPU)
– Customer lifetime value (CLV)
– Renewal rate
– Churn rate
Real-time customer notifications



# Services.

## FOCUS ON YOUR ONLINE BUSINESS.
## LET US TAKE CARE OF THE REST.

Stop worrying about the thousands of rules, regulations, compliance measures, and complicated updates that go into running a successful online business in today's increasingly complex global market.

We've got that covered. Our two primary service models can be easily tailored to fit your business needs, so you can spend your valuable time growing your business.



- ☐ TOTAL E-COMMERCE MANAGEMENT
- ☐ SMART PAYMENT SERVICES
- ☐ LOCALIZED CUSTOMER CARE
- ☐ DATA INTELLIGENCE

**REMOVE THE COMPLEXITY OF SELLING GLOBALLY.**

We take out the hassle of running a global online business for software and service brands. As your legal reseller, we manage local adaptations and regulations as well as mitigate the liabilities, and risks of your sales. Monetize is the most efficient and cost-effective solution for growing and scaling your online business, fast.

**Key features include:**

Access to nexway's payment solutions with multiple payment players

Advanced business reporting and reconciliation

Currency exchange management, including taxation and security

Local tax and VAT management

Proactive fraud prevention

Chargeback detection and negotiation

Customer data protection compliance (GDPR)

Simplified split payments and multi-party payouts

Find out how Nexway Monetize can help you manage your entire payment

journey

**LEARN MORE PLUS**

**AN EXTENSION OF YOUR PAYMENTS TEAM.**

If you are a retailer, manufacturer, or marketplace, there's a good chance you already understand many of the ins and outs of global payments. Let us simplify and streamline your payment operations even more. We'll take the reigns of your merchant account — navigating the complexity of the payment ecosystem — and manage invoicing, reconciliation, and settlements on your behalf, so you can focus squarely on your business.

**Key features include:**

Merchant account management

Proactive fraud prevention

Advanced business reporting and reconciliation

Multi-party transactions management for marketplaces, franchises, and resellers

Invoice and settlement management

Localized tax reporting

**MEET GROWING CUSTOMER EXPECTATIONS.**

Your number one priority should always be to keep your customers happy. That's why you should consider us as an extension of your customer support team. We can manage all issues related to payments, subscriptions, and products in the language your customers actually speak. Not only does this allow you to provide a higher level of customer service, but it also means you don't have to hire your own local language customer care specialists.

**Key features include:**

World-class Level 1 support via email, phone, and chat with 95% customer satisfaction

– 12 languages spoken

– 3 primary time zones served (EU, US, APAC)

Live chat and customer support ticketing capabilities

Refund management

Cross-selling and upselling services

More details on our Customer Care services.

**DOWNLOAD OUR PRODUCT SHEET**

**OPTIMIZE THE CUSTOMER EXPERIENCE.**

Our advanced algorithms allow you to convert and retain customers better than ever before. With Monetize, you can monitor, test, and adjust the customer journey in real-time while also creating a more dynamic e-commerce experience overall. Our team will help you stay competitive and top-of-mind with your customers by equipping you with actionable data and insights that empower you to surface the right products and services to your customers — at the right place and at the right moment when they're most likely to buy.

**Key features include:**
Smart segmentation tools
Smart delivery and sequencing of promotional emails
Multi-channel customer journeys
Customer conversion boosters
Retargeting and abandoned cart campaigns
A/B and multi-variate (MVT) testing
Cross-selling and upselling capabilities

# Enjoy faster time-to-market with less complexity.

Are you ready to enhance your customer experience and boost your global sales potential?

**GET STARTED**

## Newsletter

## About us
• Company
• Careers
• Our offices
• Contact us

## Solutions
• Monetize
• Connect

## Legal & Privacy
• Legal notice
• Terms & Conditions
• Privacy Policy
• Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept    Decline



Company.

PASSIONATE ABOUT E-COMMERCE AND PAYMENT SOLUTIONS. DRIVING CUSTOMER SUCCESS WITH A HANDS-ON APPROACH.

Founded in 1995, Nexway exists to expand the online footprint and sales potential of software, retail, and services companies across 140 countries around the world.

Technology has always been in our DNA. We are dedicated to innovation and are proud of our role as a global pioneer in API-driven headless commerce modular architecture: this

Company – Nexway

Nexway blends cutting-edge technology, a full range of industry-leading ecommerce and payment solutions, and a hands-on team of industry experts to help online businesses scale, grow, and thrive in today's global sales marketplace.

Our customers rely on Nexway to power their subscription models, manage local payment methods, prevent fraud, engage partners and resellers, deliver key customer insights, and beyond. Not only do we help grow their online businesses globally but we also create a frictionless customer experience that drives unparalleled conversion, retention, and loyalty.

Our software distribution origins run deep. From the very beginning, we have operated Nexway Connect, a global video game and software distribution network for leading media companies and online merchants. With ask|net academics, we now also serve as a single sourcing point for software e-procurement solutions and services for academic institutions worldwide.

is what both makes our solutions so agile and also allows our customers to scale and grow their online businesses faster than ever before.

In 2019, the company was acquired by ask|net AG, officially creating Nexway Group and bringing together two of Europe's biggest names in e-commerce and payment operations.

Operating solely under the Nexway brand, the company today generates 200M€ in annual revenues and employs 180 employees across its offices worldwide. Nexway is headquartered in both Karlsruhe (Germany) and Paris-La Défense (France), with offices in the US, Japan, Italy, Poland, and Switzerland.

# Mission.

TO PROPEL OUR CUSTOMERS INTO NEW BUSINESS MODELS THAT DRIVE RAPID GLOBAL SALES GROWTH.

# Executive Team.

Victor          Pierick          Casey          Frédéric

## Iezuitov          Coustumer          Potenzone          Ribau

Chief Executive Officer

Chief Operating Officer

Chief Strategy Officer

Chief Technology Officer



# Our offices.

## ☐ Karlsruhe

Vincenz-Priessnitz-Str. 3
76131 Karlsruhe
Germany

## ☐ Paris

1 avenue du Général de
Gaulle
92074 Paris, La Défense
France

How to get to our office

## ☐ Katowice

Józefa Szafranka 2
Katowice 40-025
Poland

## ☐ Nîmes

19 Avenue Feuchères
30000 Nîmes
France

## ☐ Milan

Via Copernico, 38 –
20125
Milano
Italy

## ☐ Uster

Turbinenweg 5
CH-8610 Uster
Switzerland

## ☐ Tokyo

METLIFE Kabutocho
Bldg. 3F
5-1 Nihonbashi
Kabutocho
Chuo-Ku, Tokyo 103-
0026
Japan

## ☐ San Francisco

4804 Mission Street,
Suite 208
San Francisco, CA 94112
United States of America

## Newsletter

## About us

- Company
- Careers
- Our offices
- Contact us

## Solutions

- Monetize
- Connect

## Legal & Privacy

- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.

☐  ☐  ☐        ☐

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept     Decline

## WHY JOIN NEXWAY?

Nexway offers a dynamic, startup-like work environment in a rapidly growing and ever-evolving industry. Our team is innovative, energetic, and strategic — we always strive to create new and better ways to propel our customers' online businesses forward.

We never see boundaries; we see opportunities. And we believe that technology, in all its forms, can make our and our customers' lives better.

Working at Nexway means you'll work with an international team of people who bring their unique experiences and local-market expertise to everything they do.

# Nexway is Hiring!

Our team is growing!
Check out our open positions in offices around the world.

FRANCE Paris La Défense  |  GERMANY Karlsruhe  |  POLAND Katowice

| SENIOR DEVOPS | SENIOR BACK END DEVELOPER | DEVELOPPEUR(EUSE) PHP |
| RESPONSABLE COMPTABLE | | |



# Interested in a position or an internship?

If you are enthusiastic and have a passion for innovation — especially if you already have some e-commerce experience under your belt (though, not required) — we want you to join our team!

Tell us in a few sentences why you are interested in learning alongside the Nexway team and why you would like to build and grow your career with us.

Name *           Email *

Linkedin Profile

The job you are applying for *

Who are you *



## Newsletter

## About us

- Company
- Careers
- Our offices
- Contact us

## Solutions

- Monetize
- Connect

## Legal & Privacy

- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept    Decline

A DISTRIBUTION NETWORK THAT CONNECTS SOFTWARE VENDORS & MERCHANTS TO **GENERATE REVENUES, AND EMPOWERS COMPANIES TO CONNECT THE WORLDWIDE DIGITAL MARKET!**

Nexway Connect is an ecosystem of merchants and software vendors for creating maximum revenue and optimal customer experience by selling software and video games everywhere, across all online distribution channels, all revenue models and all PC devices (Windows, Linux, MacOS).

CONNECT FOR MERCHANTS

CONNECT FOR PUBLISHERS

Connect for



# merchants.

## NEXWAY EMPOWERS MERCHANTS TO SELL THOUSANDS OF PREMIUM SOFTWARE, AAA VIDEO GAMES & ONLINE SERVICES WORLDWIDE.

With Connect, Nexway enables retailers, marketplaces, communication service providers and publishers to monetize their existing audience by diversifying their business.

Nexway Connect offers you an attractive plug-and-play catalog of premium software, video games and online services. You start selling, and we manage end-user fulfillment and support. With Connect, your business relationships with a wide network of publishers of software and games is streamlined into a single partner and platform. Powered by REST APIs, Connect is easy to integrate into your existing checkout process and e-commerce  operations.

| SELL SUBSCRIPTIONS | USER EXPERIENCE | MARKETING | WORLDWIDE | SINGLE SOURCING |
|---|---|---|---|---|
| Increase your revenue with the latest titles from the | Improve user experience with quality digital fulfilment, outstanding | Trade marketing, configuration of product feed & business analytics via | Consolidate value globally and locally with local languages and localized | Simplified contract management and revenue remittance |

world's leading publishers. With CONNECT you can manage your subscriptions.

customer support.

an intuitive online interface.

contents.

with hundreds of publishers from a single point of contact.

# Add, configure, manage & sell.

## PREMIUM SOFTWARE PRODUCTS

## AAA VIDEO GAMES

# Business model.

SET-UP FEE

PURCHASE PRICE

**API**
deployment and integration

Product pricelist for merchants

NO ADDITIONAL COSTS

All services are included (Customer Care, platform maintenance, access to new catalogs, etc.).

# Add the largest software & games to your store in a few days!

CONTACT US

___

# Connect for publishers.

NEXWAY ENABLES PUBLISHERS & SAAS PROVIDERS TO DRIVE ADDITIONAL REVENUE BY SELLING THEIR SOLUTIONS ON NEW CHANNELS WORLDWIDE.

WE CONNECT YOU TO A DISTRIBUTION NETWORK OF PRESTIGIOUS MERCHANTS THAT SELL YOUR PRODUCTS TO WIDE AUDIENCES







Speed up your time-to-market and get additional revenue! Nexway Connect enables you to start to rapidly sell your software, video games and online services on new channels around the world.

Filling the gap between content producers and digital consumers, Nexway CONNECT brings you a global digital business network that includes some of the world's top Communication Service Providers, Device Manufacturers, Content Portals, Clicks and-Mortars, Pure Play Online Merchants, Banks & Insurance companies.

With CONNECT and our range of APIs, you can maintain your brand integrity. You are just joining other premium brands such as BANDAI Namco Entertainment™ and Adobe™, publishers who already trust us with their digital distribution.

Nexway CONNECT empowers you to run any type of business model: one-time, perpetual or subscription. You incentivize your resellers and develop new product and service associations / bundles that increase your conversion and your revenue growth.

---

### VISIBILITY

Join other premium brands and access new channels using Nexway's global distribution network.

### RAPID IMPLEMENTATION

Provide Nexway with metadata or even just a Steam page. Get your titles sold on new channels worldwide thanks to a complete range of APIs

### HIGHER CONVERSION

Maintain your brand integrity, reach new regions, meet new customers and achieve new revenues.

### MARKETING

Easily communicate your trade marketing initiatives and incentivize your resellers.

# Merchant's typology.



ONLINE
RETAILERS



EDITORIAL
WEBSITES



TELCOS & ISP



BANKS &
INSURANCES

# Sell your product on

## TOP GAME DISTRIBUTION CHANNELS

## TOP SOFWARE DISTRIBUTION CHANNELS

# Business model.

### REVENUE SHARING & CONSIGNMENT

Market standard terms & conditions.

### UNIQUE OPPORTUNITIES

Pre-paid bulk (OEM, marketing campaigns) for indies developers only: one time purchase instead of consignment.

### PAYMENTS

Monthly reporting and remittance.

## Sell to new customers through popular partners website

GET STARTED NOW

Newsletter

About us

- Company
- Careers
- Our offices
- Contact us

Solutions

- Monetize
- Connect

Legal & Privacy

- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept     Decline





# Nexway SASU (Company Headquarters)

Tour PB5
1 avenue du Général de Gaulle
92074 Paris – La Défense
France
phone: +33(0)1 55 17 31 55

# Registration

Register Court:
RCS Nanterre – B 440 953 859
N° de TVA Intracommunautaire: FR33 440953859

# Legal representative

Victor Iezuitov



Newsletter

About us

• Company
• Careers
• Our offices
• Contact us

Solutions

• Monetize
• Connect

Legal & Privacy

• Legal notice
• Terms & Conditions
• Privacy Policy
• Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept    Decline

# & conditions.



| ENGLISH | French | German | Spanish | Portuguese | Italian | Korean |
| --- | --- | --- | --- | --- | --- | --- |
| Japanese | Chinese | Russian | Finnish | | | |

## INDEX

Recital
Article 1 : Definitions
Article 2: Scope and Purpose
Article 3: Contract Conclusion (offer, confirmation and acceptance)
Article 4: Customer commitments and Registration
Article 5: Availability of products
Article 6 : Order
Article 7: Backup Copy
Article 8: Subscription
Article 9: Title Retention
Article 10: Granted Rights
Article 11: Financial conditions
Article 12: Withdrawal Right
Article 13: Liability, legal warranty and liability/warranty limitations
Article 14: Personal Data Protection
Article 15: Miscellaneous
Article 16: Governing Law and Litigations

## RECITAL

NEXWAY SASU, having its head office at 1 avenue du Général de Gaulle, Tour PB5, 92074 Paris la Défense Cedex – FRANCE, company with a share capital of 1,814.985,00 €, registered under Number B 440953859 RCS Nanterre, and NEXWAY Inc., having its head office at 4804 Mission Street #208 – San Francisco, CA 94112, USA, each hereinafter referred to as « NEXWAY » or « We », are e-commerce companies acting on international

subject to these Terms and Conditions. Websites operated by Suppliers are expressly excluded from this definition.

1.2 The term "Customer" designates any person (whether natural or legal) with the legal capacity to order products and services from this website. Unless otherwise indicated, the term "Customer" means both consumers and businesses.

1.3 The term "Products" means any decryption or authorization code, serial or authorization number, download link or a similar code or device that provides access to the Customer for first use or continuation using of a software, a service, or any other product (even physical ones).

1.4 The term "Services" refers to all services sold by NEXWAY to the Customer through this Website.

1.5 The term "Software" refers to all computer programs marketed in any form or medium from this Website.

1.6 The term "Subscription" refers to Products and Services covered by recurring payment obligations pursuant to which payments are due at the agreed interval or intervals.

1.7 The term "Supplier" means any natural or legal entity that provides, produces, manufactures or delivers products and services to NEXWAY for resale to Customers.

# ARTICLE 2: SCOPE AND PURPOSE

These Terms and Conditions apply to all offers, acceptances, deployments and the provision of services and supplies, by NEXWAY or to the Customer, in connection with the sale of Products and Services from this Website, as previously defined.

Any conflicting terms or divergent conditions applied by a Customer or a third party needs prior written consent of NEXWAY to be included to these Terms and Conditions.

Only Customers already registered on the Website may place an order.

The registration on the Website is validated after filling the required information.

The Customer certifies that all the information he has given when placing the order (including, but not limited to, personal data and payment data) is current and accurate in all material respects.

The registration carried out for a purchase on this Website is reserved for adults. Any registration made by a minor person under the age of sixteen (16) years old requires the prior authorization of his/her legal representative.

The costs resulting from any inaccurate information submitted by the Customer, or data modified by the Customer after the order has been transmitted, will be borne by the Customer.

If the Customer has a Customer account with NEXWAY, he must manage and update his account information immediately to ensure the accuracy and completeness of such information.

NEXWAY reserves the right to immediately close the Customer's account in the event that information mentioned at the time of its opening proves to be false.

Once registered, the Customer has a login and a password allowing him to connect to his account.

Only the account holder is allowed to log in using the login and password corresponding to that account. The Customer agrees to keep his password strictly confidential.

As such, any connection via the Customer's account is deemed to have been made by the Customer himself or with his authorization, unless the Customer is able to prove otherwise.

The Customer can ask at any time the closure of his account via this form of contact.

done by clicking on the download link present either directly on the accepted payment return page or later on the confirmation email. The Customer automatically benefits from a period of 21 days from the date of receipt of the confirmation email to download the Product. At the end of these 21 days, the download is no longer available automatically and requires its release by customer service available via this contact form.

An invoice is also sent to the email address entered during the creation of the account or can be downloaded from the Website immediately after the order.

NEXWAY reserves the right to cancel or refuse any order from a Customer following a payment incident involving a previous order or where the information transmitted is manifestly incorrect.

Unless proven otherwise by the Customer, the data recorded by NEXWAY constitute proof of all transactions between him and NEXWAY.

# ARTICLE 7: BACKUP COPY

A DVD backup copy of some downloaded Products may be ordered by the Customer, when he has a postal address in Metropolitan France.

The sending of the backup copy is carried out by post way and the expenses engaged for this option depend on the selected article.

# ARTICLE 8: SUBSCRIPTION

If you have purchased a Subscription, at the end of the initial period, you agree that your Subscription is automatically renewed for an identical period (1 month or 1 year as the case may be) and at the preferential renewal price (applicable taxes not included). The period of validity of the subscription begins with the confirmation of the order. The price of renewal may change. Additional online offers and discounts may be available upon renewal, but will not apply to your subscription.

The use of Products and Services sold by NEXWAY may be dependent on Supplier-hosted online platforms, Supplier-processed data, and the Supplier's ability to perform its services. If the Supplier interrupts the offer of the online platform in whole or in part, ceases the data processing or stops performing the Services in question ("Interruption"), NEXWAY may cancel the Subscription as of the date of the Interruption. NEXWAY will reimburse the Customer pro rata for the remainder of the subscription period following the Interruption.

# ARTICLE 9. TITLE RETENTION

NEXWAY reserves the right to own any Product until full payment of all claims arising from the contract, including ancillary claims (for example foreign exchange fees, financing costs, interest, etc.).

# ARTICLE 10: GRANTED RIGHTS

The Products are protected by international copyright and intellectual property regulations and treaties. They are the exclusive property of their publishers.

By downloading a Product or purchasing the boxed version of a Product, the Customer acquires a user license directly from the publisher of the Product. The rights of the Customer on the Product are exclusively governed by the provisions mentioned in the aforementioned license agreement.

The Customer acknowledges that the license agreement does not imply the transfer of the rights of reproduction, representation and exploitation relating to the Product. The Product may not be copied, adapted, translated, made available, distributed, modified, disassembled, decompiled or used in combination with any other software, except with the express authorization of the publisher of such Product, unless otherwise required by law.

The Customer is warned that non-observance of the license agreement conditions may be sanctioned by the publisher of the Product and potentially exposes him to legal proceedings.

# ARTICLE 11: FINANCIAL CONDITIONS

The payment solutions available on this Website are managed by our partners, who provide a secure acquisition of payments over the Internet.

The integrity of the data exchanged is ensured by the procedure of exchange and sealing of the messages by the use of SSL and SET technologies.

# ARTICLE 12: WITHDRAWAL RIGHT

The Customer can exercise his right of withdrawal (*2) as follows:

> For Products sold on physical media (Backup DVD, CD Boxes), the Customer has a period of thirty (30) calendar days after receiving the Product to exercise his right of withdrawal. The Customer informs NEXWAY by email (customercare@nexway.com) or by post (Nexway Customer Support, 19 avenue Feuchères 30000 Nîmes FRANCE or Nexway Customer Support, 4804 Mission Street #208 – San Francisco, CA 94112, USA) of his decision of withdrawal by completing this withdrawal form (or any other document with equivalent indications) before the expiry of the aforementioned period.

The Customer will then receive, on the email address entered at the time of opening of his account, an acknowledgment of receipt of his request.

The Product must be returned in mint condition, complete and in its sealed original packaging within fourteen (14) calendar days following the sending of the withdrawal at the following address:

NEXWAY SASU, 1 avenue General de Gaulle, Tour PB5, 92 074 Paris Defense Cedex, FRANCE.

If the Customer returns the Product in a simple letter which is lost because of the carrier, the Product will be deemed not to have been returned.

NEXWAY will refund the Customer [all amounts paid/the purchase price of the Product], [including delivery charges], within fifteen (15) calendar days of NEXWAY's receipt of the relevant Product(s). However, NEXWAY is

# ARTICLE 13: LIABILITY, LEGAL WARRANTY AND LIABILITY/WARRANTY LIMITATIONS

13.1 Liability, Legal Warranty and Warranty/Liability limitation

NEXWAY is liable for any lack of conformity of the Product according to articles L. 211-4 et seq. of the French Consumer Code and for hidden defects according to articles 1641 et seq. Of the French Civil Code.

The Customer who acts upon legal warranty of conformity:

– has a period of two years from the date of download or delivery of the Product to act;

– may choose between repair or replacement of the Product, subject to the cost conditions provided for in Article L. 211-9 of the French Consumer Code;

– is exempted from showing proof of the lack of conformity of the good during twenty-four (24) months following the download or the delivery of the Product.

The legal warranty of conformity applies regardless of the commercial guarantee that may be granted.

In the event of the implementation of the guarantee on latent defects, the Customer can choose between the cancellation of the sale or a reduction of the selling price in accordance with Article 1644 of the French Civil Code.

NEXWAY shall not be held liable for the consequences resulting from the misuse of the Products sold on the Website.

If in doubt about the use of the Product, the Customer may contact at the following email address: customercare@nexway.com.

By no means shall NEXWAY be liable for non-performance or improper performance of its obligations resulting

proper operation of software and services provided by Suppliers for the specific needs of the Customer or for the compatibility of such software and services with the Customer's computer equipment and components.

If NEXWAY by negligence breaches an essential contractual obligation, NEXWAY's liability for damages shall be limited to the foreseeable damages normally expected under the circumstances. The essential contractual obligations are those the performance of which is required to achieve the objective of the contract.

If the Customer claims damages against NEXWAY for deliberate or gross negligence or the lack of a warranted feature, NEXWAY shall be liable within the statutory provisions.

NEXWAY's liability remains legally valid in the event of culpable harm to life, body and health.

If NEXWAY's liability is excluded or limited, so is the individual liability of NEXWAY's employees, representatives and agents.

13.3 Exclusion of Legal Warranty and Liability for Customers Ordering outside Europe
The publisher of the Product may offer certain warranties for its software, but NEXWAY does not offer warranties on software purchased from this Website. NEXWAY disclaims all warranties and will not be held liable for any statement, warranty and conditions regarding the Software, whether express or implied, including warranties regarding merchantable quality, fitness for a particular purpose, titles, non-infringement, integration of system, serenity of use, and precision.

By no means shall the Customer hold NEXWAY liable for any indirect, special, incidental, punitive or consequential damages, whether or not foreseeable, even if NEXWAY has been advised of the possibility of such damages, including any loss of income, customers, goodwill or profits, arising out of or in connection with these conditions, whether in contract, tort or other liability. The total and cumulative liability of NEXWAY set forth herein shall in no event exceed the purchase price of the particular Products and Services that gave rise to the rights claim. Submitting multiple claims does not increase this limit. This limitation of liability applies notwithstanding the

order processing, including processing your online payment and informing you of the status of your order;

charging and delivering for the ordered Products;

helping secure and improving the security of your order and transactions (for example by applying anti-fraud filters);

registering your purchase with the Supplier (for warranty, technical support, or other purposes);

the putting through to customer service and technical support;

informing you about Product upgrades, special offers, other products, services and information (including third parties), market research, or survey and evaluation fill-in (in the case, you opted to receive these communications);

improving the usability the Website

providing you with access to restricted areas of the Website;

complying with legal requirements;

implementing the terms and conditions, including the investigation of potential violations;

And for other lawful purposes.

Certain data, such as the types of services used and the number of users we receive each day, may be used by NEXWAY for statistical, marketing, promotional or other lawful purposes. This kind of information is collected in aggregated or statistical form, without identifying users individually.

If you have expressly accepted it during your registration on the Website, we may transmit your data to our business partners for information and prospecting purposes. If you accept, NEXWAY and its partners may send

The Customer's data are kept as long as his account is active as well as for a period of three months from the date of closing.

The data is then archived and returned exclusively in the context of litigation, during the period of the legal prescription.

The Customer has a right to access, modify, rectify, erase and, where applicable, to portability of his personal data (*6).

The right of access, modification, correction and deletion provided for in the preceding paragraph is exercised by either contacting the NEXWAY's customer service at the following email address: customercare@nexway.com, or by directly contacting NEXWAY's DPO: DPO@nexway.com.

If need be, the Customer is informed of his right to define guidelines for the storage, erasure and communication of his personal data after his death.

The Customer also has a right to portability on its data that has been processed using automated processes (*7).

The Customer expressly acknowledges that once he has shared content to a social network, an application or a third-party Internet site, NEXWAY is no longer responsible for the performance of its right to erase on these sites. If needed, the Customer should contact the publishers of the applications through which it shared the content in order to exercise its rights.

In case of difficulty related to the management of his personal data, the Customer has the right to lodge a complaint with the CNIL or with any other competent supervisory authority.

Cookies may be automatically installed on the browser software when accessing this Website. A cookie is an element that does not identify the visitor but is used to record information about its navigation. The browser settings may be used to refuse cookies according to the procedure described in the "Internet Option" tab of the

force must be expressly accepted by the Customer prior to each new order.

# ARTICLE 16: GOVERNING LAW AND LITIGATIONS

These Terms and Conditions are subject to French law. In the absence of a prior amicable resolution, the competent court is designated according to the rules of public policy applicable in the case of a contract concluded between a professional and a Consumer.

In the absence of a legal provision attributing the resolution of a possible dispute to the jurisdiction of the consumer's domicile, only the French courts will be competent.

In any event, the consumer is informed that an Online Dispute Resolution platform, established by EU regulation 524/2013, has been set up and is accessible at the following address: http: // ec.europa.eu/consumers/odr/.

In the event of failure of the mediation procedure, the client may seize the competent courts.

XXXXXXXXXXXXX

*1: according to the preliminary article of the French Consumer Code
*2: according to the terms of articles L121-20 and L221-28 of the French Consumer Code
*3: according to article L-221-28 paragraph 13 of the French Consumer Code
*4: according to the Law "Informatique et Libertés"
*5: according to article 37 of the General Data Protection Regulation
*6:  according to law relating to computers, files and the freedoms of January 6, 1978 in the version in force on the date hereof, and in accordance with the European Community regulations
*7: under the conditions set out in Article 20 of the General Data Protection Regulation

Newsletter

About us

Solutions

Legal & Privacy

- Company
- Careers
- Our offices
- Contact us

- Monetize
- Connect

- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept    Decline



# INTRODUCTION

For your information, this introduction presents the various points covered in the below "Privacy Policy" section in a simplified and accessible way, in order to ensure a good understanding of all our customers.

This introduction can not replace the reading of the below 'privacy policy' section, which is complete and detailed and is the only document to legally bind the company NEXWAY.

Information collected during the sale:

When selling a product via the Nexway shopping cart, we collect the minimum necessary information (your first name, last name, address, as well as your e-mail address) in order to establish the proof of purchase and to fulfill our obligation.

This information is transmitted to the publisher or vendor operating your online store, in order to provide you with the purchased product (usually in the form of a product activation key or download link). Nexway and its partner contractually undertake to treat your data with respect for your privacy in accordance with the European directive called "GDPR" (also called "General Data Protection Regulations"). If the basket offers you to subscribe to an optional marketing product, your consent is then transmitted to Nexway's partner. If the shopping cart does not offer an optional marketing product or if you have not chosen this option, then your e-mail will under no circumstances be used for marketing purposes (see below the marketing processing section).

These data can also be used in the context of aggregated and anonymous reporting on the activity of the online shop. This ratio is called "sales statistics" and allows for example to calculate the average basket of our customers (as for example: "The average basket of our customers is 49 euros or the average basket in Picardy Region is 53 euros"»). Your data will then have been used for the calculation of this statistic, but this counting does not imply any tracking on our part.

Development of 'PERSONA':

We use our customers' data to create 'persona'. The persona are fictional characters supposed to represent a part of our customers.

For example, if we know that 15% of our customers are women living in the city centre and 14% are single men living in peri-urban areas, our analysis teams will create two fictional characters: Julie and Valerian. These persona are work tools that allow product and marketing teams to develop product strategies accordingly. Your data can thus be used for the elaboration of such a persona but there is no specific identification of your person.

We inform you that you can at any time object to the processing of your data by writing to us at the following email address dpo@nexway.com or customercare@nexway.com.

Marketing Processing :

If you have chosen to receive personalized information and offers by ticking the box provided for this purpose, we carry out algorithmic processing using your data to enable us to propose exclusive offers likely to interest you. You can decide to unsubscribe at any time by clicking on the link in the related e-mail.

Geolocation for VAT or Cart language application purposes:

When you use the Nexway shopping cart, your IP address is used to geolocate you for VAT purposes. Geolocation only concerns the application of VAT.  Geolocation data is stored for less than 72 hours and is accessible only through Nexway's marketing algorithms. Unlike other treatments, it is not possible to oppose geolocation for VAT purposes because Nexway has the legal obligation to prevent fraud. The geolocation can also sometimes be carried out punctually during the connection in order to lead you towards the appropriate language.

In these two processes there is no storage of your geolocation information (except the VAT rate or the language used for your purchase). We do not store your position.

Collection of your data by third parties:

Nexway and the owner of the online store use third parties to analyze your navigation on the site on behalf of Nexway. The data collected and their processing by third parties are subject to the same rules of protection of your privacy as if they had been collected by Nexway directly. Third parties contractually commit to Nexway to respect the rules of protection of your data.

Personal Accounts :

Please note that in case Nexway provides you with access to a personal account, this can be synchronized with your personal account of the Partner

site.

Abandoned shopping cart :

For service reasons, Nexway may save your unfinished shopping cart to allow you to complete your purchase later and send you an email allowing you to resume your purchase.  The data thus collected is kept out of reach of any marketing process. It is kept for a maximum period of 72 hours after which it is destroyed.

Data retention :

The data collected is stored securely at Nexway. Data retention periods differ according to the nature of the processing. For example, the accounting or legal department must keep proof of purchase for a period of 10 years in order to comply with anti-fraud laws. In contrast, the data retention period for a marketing algorithm for which you have consented to personalized offers is set at three years after your last purchase.

Please find below a table summarizing the retention periods of your data:

| Type of treatment | Delay |
| --- | --- |
| Accounting or Legal | 10 years |
| Marketing | 3 years after last purchase |
| Geolocation | 72 hours |
| Sales Statistics | 5 years |
| Shopping Cart | 72 hours |

# PRIVACY POLICY

Any personal information provided or collected while visiting the Site or the Store or while ordering Nexway Products is controlled by Nexway SASU located at 1 avenue du Général de Gaulle, Tour PB5, 92 074 Paris La Défense Cedex, France or Nexway Inc. Located at 4804 Mission Street, Suite 208 – San Francisco, CA 94112 – United States of America, who act as data Controller (Hereinafter referred to as "Nexway").

Nexway has adopted global data practices to ensure that your Personal Information is adequately protected. Please note that Personal Information may be transferred, accessed and stored for the uses and disclosure described in this document.

Nexway's affiliates have entered into and signed agreements to transfer Personal Information in accordance with the European Union's standard clauses relating to the transfer of Personal Information to third countries.

## 1/ Personal Information

"Personal Information" is personally identifiable information such as names, addresses, e-mail addresses or telephone numbers and other non-public information associated with the above.

We collect the following Personal Information that you voluntarily submit to us:

- When you access our Site or our Store, certain additional information is automatically collected and saved on protocol files (known as usage data). This information includes your Internet Protocol (IP) address. We may use this information for internal purposes such as determining certain Shop settings (such as language and location), maintaining our operational capability, preventing fraudulent access to our ordering service or analyzing usage patterns.

- In order to purchase Products at the Store, you must provide (and we collect) your name, address, email address and any financial information necessary for billing (or any part thereof). The information required for billing depends on the payment method selected and may include the credit card number, card verification code, account number, billing postal code or any other information required in connection with the selected payment methods.We collect your postal code for fraud investigation, tax calculation, processing and after-sales service of your transaction. Under no circumstances do we transmit your postal code for advertising or other purposes unrelated to the transaction for Products and Services offered on our Site.In addition, we do not exchange your postal code in connection with other data, we do not link it to records outside the scope of the transaction and we do not use it ourselves for advertising purposes.

- On some sites, we give users the ability to provide us with account registration information. This information may include, but is not limited to, name, address, email address and password.

- If you complete any of the Site or Shop contact forms, we collect your name, company name (if necessary), country and email address, a description of your support request and any other information you choose to provide.

- When you contact us by e-mail or telephone or use any of the e-mail addresses or telephone numbers provided on the Site, we collect any personal information that you may voluntarily provide to us in connection with this communication.

- If you provide us with feedback, we may use and disclose it for any

purpose, provided that we do not associate it with your Personal Information. We collect all information contained in these comments and will treat Personal Information in accordance with this Privacy Policy.

- We will send you announcements strictly related to the service (such as, but not limited to, notices related to your purchase of Products, updates to our Terms and Conditions or our Privacy Policy) when we feel it is necessary to do so. You cannot unsubscribe from these communications, which are not promotional in nature.

- As part of Nexway's personalized services, your data, subject to your consent, will be used for advertising, market research and customization of electronic services. Unsubscribe instructions will accompany each newsletter.

## 2 / Automatic data collection and analytical information

We receive and store certain types of information each time you interact with us. This automatic data exchange between your browser and our server when you access our pages informs us of the browser you use, the date and time of your visit, the name of your Internet Service Provider (ISP), the website you use to visit us and which of our Websites you visit.

The information we automatically collect is referred to as "Analytical Information". Analytical Information is information that is not associated with or related to your Personal Information. Analytical Information therefore does not allow the individual identification of persons.

We may use this Analytical Information for internal purposes, such as maintaining our operational capacity, preventing fraudulent access to our Site or our Store or analyzing usage patterns, to improve our Site. We also reserve the right to use and disclose Analytical Information at our discretion, but we guarantee that you will remain anonymous as an individual.

We automatically collect information using various technologies such as those described below:

- Cookies and other tracking technologies

Nexway and its partners use cookies or similar technologies to analyze trends, administer the Site, track user navigation on the Site and collect demographic information about our users as a whole. You can control the use of cookies by adjusting your browser settings. However, if you disable cookies, your use of certain features of our Website or service may be restricted.

We use cookies for our shopping carts, and to enable our system to recognize your search engine and personal preferences or access codes (if any). However, the use of Nexway systems does not require cookies to be accepted. Most browsers automatically accept cookies. You can control the

use of cookies by adjusting your browser settings. See your browser instructions for more information on how to do this. In addition, you can delete cookies that have already been saved on your computer at any time. Although you can still use the Store and order Products, if you disable cookies in your browser, some parts of the Store may not function as efficiently and you may even experience limitations in the functionality of our services.

We have established partnerships with other companies to advertise either on the Store or on other sites. These partners may use technologies such as cookies to collect information about your activities in the online store and on other sites, in order to provide you with advertisements based on your research and interests. You have the option to disable cookies, if you do not want this information to be used for personalized advertising purposes. Please note that this will not prevent the reception of advertisements. You will continue to receive generic ads.

- Google Analytics

Our website uses Google Analytics, a web analytics service provided by Google Inc ("Google"). Google uses cookies to help the website analyze how users use the site. The information generated by the cookie about your use of the Site is sent to and stored on a Google server in the United States. Please note that your IP address will be truncated by our systems before sending the data to a Google server. As such, the information will not identify you through Google Analytics  rather, it will be integrated with collective user data.

Google will use this information to evaluate your use of the website, compile reports on website activity and provide other services relating to website activity and the Internet.

In addition, Google may also transfer this information to third parties if required to do so by law or if such third parties process the information on Google's behalf.

By using this website, you consent to the processing of data about you by Google in the manner and for the purposes set out above. You can find more information about Google Analytics here.

As Google uses cookies you can reset your browser to refuse all cookies or notify you when a cookie is being sent as described above.

- Personal information from other sources

We may receive Personal Information about you from other sources such as telephone or fax, or from third parties who provide services to us in connection with the Store/Sites. We may add this information to information we have already collected from you through the Store or the Site.

3/ Disclosure of personal information

Except as otherwise provided in this Privacy Policy, we do not use or share your Personal Information with third parties unless you request or authorize us to do so. We will not sell or rent your Personal Information to third parties for marketing purposes and will only share your Personal Information with third parties as described below.

- Supplier of Products from a Boutique

We will provide Personal Information to suppliers of Products offered by the Store to enable them to provide the Products to you and to register you as an authorized user, to provide you with support and updates and for similar purposes. Please note that providers use your Personal Information in accordance with their own privacy policies, which may differ from this Privacy Policy. If you want to know how providers collect, use, and disclose Personal Information, please visit their website and review their privacy policy.

- By Choice

We collect information on behalf of the supplier of the Products. If you are a customer of one of the Product suppliers and no longer wish to be contacted, please contact that supplier directly. If you are a customer and wish to update your account (if applicable) or transaction data, please contact us through our customer service. We will respond to your request within a reasonable time.

- Third-party suppliers and service providers

We may provide your Personal Information to third party suppliers and service providers who work on our behalf or with us to provide you with the Products and the related customer support, as well as to help us communicate with customers and operate the Site and the Shop. Examples of these services include communicating via email, processing payment transactions, shipping Products, verifying orders for fraudulent activity, maintaining compliance with applicable laws and providing customer service or performing services on our behalf. However, these suppliers and service providers do not have the right to use this information outside the aforementioned scope without our consent. Transmission to third parties is covered by the provisions of this Privacy Policy with respect to notification, choice and agreements with our third party suppliers and service providers and the supplier of the Products.

In order to avoid non-payment, we reserve the right to obtain creditworthiness information from third parties for certain payment methods (direct debits, purchase orders), e.g. on the basis of mathematical statistical processes. In this case, you will be explicitly informed during the ordering process.

In the event of non-payment of a direct debit transaction that is not due to cancellation by the account holder, we reserve the right to report your account information (account number, bank routing number) to a third party who will save these items in a blocking file and send them to other affiliates to the

direct debit procedure. The block will be removed after payment of the invoiced amount.

- <u>Government law enforcement authorities and agencies</u>

We may disclose information we have collected from and about you (including Personal Information) if we believe in good faith that such disclosure is necessary to:

1. Comply with applicable laws or respond to subpoenas or warrants;

2. Apply our Terms and Conditions and Privacy Policy ;

3. Protect and defend our rights or property, or those of visitors to the Store and Site and our customers, as well as third parties;

4. In some cases, we may be required to disclose personal data in response to a legitimate request from government, including to meet national security or law enforcement requirements. For tax-exempt orders from certain EU countries, your address may be forwarded to the relevant tax authorities to establish that your VAT identification number is correct.

- <u>Commercial change</u>

In the event Nexway experiences a business change through a merger, acquisition by another company, or sale of all or part of its assets, your Personal Information may be among the transferred assets. You acknowledge that such transfers may occur, and that the purchaser of Nexway or its assets may continue to use your Personal Information in the manner set forth in this Privacy Policy. You consent to Nexway sharing your Personal Information in these circumstances.

## 4/ Exporting and processing personal data outside the European Union Member States

We hereby declare that for the purposes of processing your order, your data may be transferred through us to our U.S.-based subsidiary or to Product suppliers that are established outside the European Union in countries that, to date, do not generally have a level of data confidentiality recognized as complying with European Union standards.

Please note that Nexway's affiliates have entered into and signed International Personal Information Transfer Agreements, which allow your data to be processed in accordance with European Union regulations regarding the transfer of Personal Information to third countries.

## 5/ Data security and confidentiality

In order to maintain the highest level of consumer and customer protection, we adhere to the rules in force in our industry. We maintain commercially

reasonable and appropriate physical, electronic and managerial measures and procedures to protect and secure your Personal Information during data collection, transmission and storage. Your data is only accessible to authorized persons who are familiar with Nexway's data privacy policy. Please note, however, that no company can completely exclude the security risks associated with Personal Information.

## 6/ Transport Layer Security Protocol

All access to the Nexway Store order pages is made using Transport Layer Security (TLS) technology, which encrypts the Personal Information you provide during the order process. Thus, confidential data is protected from interception by third parties and your Personal Information is transferred through this secure channel. To ensure this level of security, our systems use a certificate that conforms to standard e-commerce practices. This certificate is issued by a trusted security provider. All standard Internet browsers are compatible with this technology and automatically accept certificates from trusted providers. However, please note that no method of transmission over the Internet or electronic storage is 100% secure. Therefore, we cannot guarantee absolute security.

## 7/ Credit card data

Nexway is fully compliant with the Payment Card Industry Data Security Standard (PCI DSS) to enhance payment card data security and provide a secure e-commerce environment for our customers. The PCI DSS establishes requirements for network architecture, software development, security management and other proactive measures essential to ensure the security of payment card transactions. Each year, a qualified security expert thoroughly reviews Nexway's procedures to ensure our compliance with strict PCI regulations.

Thus, we only display the last four digits of your credit card number when confirming an order. Of course, we transmit the entire credit card number to the entity responsible for processing the payment concerned when processing the order. In accordance with PCI DSS requirements, this transfer is secured according to the TLS standard.

## 8/ Correction and consultation of personal data

If you wish to review, correct, block or delete your stored Personal Information, please send us a brief request in writing, by post or by e-mail (see below). Upon request, we can tell you whether or not we have your Personal Information. In the event that, despite our efforts to maintain correct and up-to-date data, incorrect information has been saved, we will amend it at your request. You will usually receive a response from us within thirty (30) days after receiving your request.

To learn more about the issue of storing Personal Information about you and the nature of such data or other matters surrounding data privacy, please contact our Data Privacy Officer in writing at following address:

**Nexway SASU Data Privacy Officer**

1 avenue du Général de Gaulle

Tour PB5

92 074 Paris La Défense Cedex

France

To communicate by email, you can write to the following email address:
DPO@nexway.com

9/ Data retention

Nexway will retain personal data that we process on behalf of our customers for as long as necessary to provide our services. Nexway will retain and use this Personal Information as necessary to fulfill legal obligations, resolve disputes and enforce our contracts.

Upon termination of your contractual relationship with Nexway and upon your request, your data (including Personal Information) will be permanently blocked in Nexway's internal systems and then deleted at the end of the legally required retention periods (see table summarizing retention periods in the foregoing introduction section).

Please note that any deletion of your Personal Information applies only to data about you as an individual. Nexway shall in no event be liable for any termination of your account or deletion related to the deletion of your Personal Information or personal data.

When we delete Personal Information we have collected from you, it will be deleted from our active databases, but may remain in our records. These are strictly confidential in order to prevent any unauthorized access or treatment.

10/ Links to other websites

The Site may contain links to other websites that are not owned or controlled by Nexway. The provision of these links is for information purposes only and does not constitute an endorsement of these websites, their location or their content. We do not control, access, or are responsible for the privacy policies or content posted on these other websites. The provisions of this Privacy Policy do not apply to external Internet sites.

11/ Protection of personal data of minors

In principle, persons under the age of eighteen (18) must not transfer Personal Information to us for marketing canvassing purposes. We do not intentionally request, collect or transfer Personal Information about minors. With the

exception of the particular case where a minor makes an online purchase from a bank account in his name and for which personal data is collected only for the purpose of proof of purchase.

In the event that the Nexway shopping cart does not collect the age of the person, the latter is deemed to be of legal age.

_Notice to Residents of the United States :_

We do not intentionally collect or retain information from visitors to the Site under the age of thirteen (13).

12/ Modification of this Privacy Policy

This Privacy Policy is an evolving document. As it is an integral part of our Terms and conditoins of sale, this Privacy Policy is subject to occasional modifications, in accordance with the aforementioned Terms and conditions of sale. In addition, we may update this Privacy Policy to reflect changes in our information management practices. We encourage you to visit this page regularly for the latest information on our privacy practices.

## Newsletter

## About us

- Company
- Careers
- Our offices
- Contact us

## Solutions

- Monetize
- Connect

## Legal & Privacy

- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept          Decline



GET STARTED

**ENGLISH**    French    German    Italian    Spanish    Portuguese    Korean

Russian    Japanese    Chinese

To place a refund, return or exchange request for the order that you placed with Nexway, you need to contact Nexway via email at <span style="color:red">customercare@nexway.com</span> or by post at the following addresses:

<span style="color:red">Nexway – Customer Support</span>

19 Avenue Feuchères

CS 70002 – 30020 Nîmes Cedex

FRANCE

or

<span style="color:red">Nexway – Customer Support</span>

4804 Mission Street, Suite 208

San Francisco, CA 94112

United States of America

no later than thirty (30) days after you placed the order to Nexway, and provide your order number and the reason for your request.

Nexway will review your request, and will notify you via email of the results generally within two (2) business days. Please note that Nexway, in its sole discretion, may grant you an extension of up to thirty (30) days to refund your order.

Please note that depending on the nature of your order, you may or may not be eligible for a refund, a return or an exchange as follow:

### <span style="color:red">WHEN YOU REQUEST A REFUND FOR A PRODUCT/SERVICE UNDER SUBSCRIPTION WITH OR WITHOUT AUTOMATIC RENEWAL.</span>

When you have subscribed to a product or service, Nexway systematically informs you prior to renewing your subscription. Unless otherwise specified in the related Terms and Conditions, you have thirty (30) calendar days, following the initial subscription or following the automatic renewal of the subscription, to cancel the subscription or the automatic renewal of the subscription.Any cancellation request received within the deadlines, gives you the right to a total refund of the sum paid.

### <span style="color:red">IF THE NATURE OF THE PRODUCT IS SUCH THAT A RETURN IS NOT FEASIBLE</span>

Certain products such as software activation keys do not allow for a return. In such cases, we are

and complete condition, not loosened and in its original packaging, at your expense, at the latest fourteen (14) days following your cancellation request to the below address:

Nexway SASU

1 avenue General de Gaulle, Tower PB5

92 074 Paris Defense Cedex

FRANCE

## Newsletter

## About us

- Company
- Careers
- Our offices
- Contact us

## Solutions

- Monetize
- Connect

## Legal & Privacy

- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept    Decline

A RECURRING REVENUE MODEL OFFERS SEVERAL BENEFITS,
FROM CREATING STRONGER, LONG-TERM CUSTOMER
RELATIONSHIPS
TO GAINING GREATER VISIBILITY ON INCOMING REVENUE.

It can take years for brands to perfect the art and science of subscription and renewals.

Why waste time building a recurring revenue model on your own when you can rely on a full-service subscription and billing solution to do all the heavy lifting for you?

Nexway Monetize can help drive even more value out of your e-commerce business. Our advanced solutions go beyond subscription and renewal management alone. We manage payment processing, fraud detection, tax collection and remittance, and so much more.

We not only simplify subscription billing but also streamline all aspects of subscription management by providing you with a central hub to manage upgrades, cancellations, pricing plans, trials, integrations, and more — with a specific focus on helping you promote subscriptions and reduce customer churn like never before.

# Nexway Monetize has helped brands achieve an increase in Customer Lifetime Value* by as much as 13% y/y

## *CUSTOMER LIFETIME VALUE (CLV)

is a measure that predicts the total amount any given customer will spend on your business's products or services throughout the full length of their relationship with your brand. This is influenced by annual loss rate and order value.

Fuel the success of your subscription business with the right metrics.

DOWNLOAD OUR DATASHEET

Learn more about Nexway's subscriptions and recurring billing solutions today.

# 1. Subscription

# models adapted to your business.



Get ready to build more long-term value with your loyal customers. Nexway Monetize makes it easy to implement subscription models and billing plans tailored specifically to your business's unique needs and requirements.

Our turn-key solutions make it possible to bill customers in multiple ways immediately and deploy special promotions in real-time that boost engagement and retention.

Key features include:

## PAYMENTS & BILLING

- Recurring payments processing and accounting
- Multiple billing and renewal terms (monthly, quarterly, annually)
- Multi-currency pricing
- Automated pre-billing notifications
- Simplified auto-renewal activation or deactivation
- On-demand renewals
- Lifecycle management
- Payment acceptance rate optimization
- Automated orders, invoicing, and billing

## CATALOG & PRICING

- Fixed-price monthly subscription packages
- Multiple pricing combination options (upfront fee, recurring)
- Offer freemiums and trials, including both setting and extending a trial offer period
- Offer coupons, promotions, and add-ons
- Integrate seamlessly with third-party apps
- Enhanced cross-selling functionality (i.e. suggesting relevant items to add to a shopping cart before checkout, based on a customer's

purchases.)
• Simply upgrade and downgrade subscriptions based on customer needs

MONITORING

• History of active subscriptions
• Record of subscription suspensions and cancellations

# 2. Seamless customer experience.

Building strong relationships with your customers is the key to your business's long-term success and also the best way to drive customer loyalty. To do that, you must create a consistent and engaging end-to-end customer experience that both offers transparency and encourages customers to take full control of their subscription.

Nexway Monetize provides the tools to boost customer loyalty and trust. Our built-in CRM platform allows you to create, schedule, and send regular email updates to keep customers informed on their subscription status. We can also help you launch a powerful subscription hub where customers can manage their subscriptions with ease, empowering them to upgrade, downgrade, or cancel their subscriptions, change payment methods, get answers to their questions, and so much more.

We help you create a seamless customer experience that quickly adapts to your customers' needs and maximizes your potential to grow CLTV over time. Key features include:

• Enhanced subscriber account management:

  ▪ Simplified auto-renewal activation or deactivation
  ▪ Easily upgrade or downgrade subscription services
  ▪ Multiple subscription renewal methods (i.e. automatic, monthly, quarterly, annually, etc.)

• Personalized nurture email campaigns
• Automated invoices, receipts, and renewal notices
• Automated subscription notifications: pre-billing, trial almost complete, billing

reminders, cancellation confirmation, and more.
• World-class Level 1 customer support in 12 languages



# 3. Track performance with AI-powered reporting dashboards.

Nexway Monetize gives you unlimited access to real-time insights that boost customer retention and reduce churn. Our AI-powered churn prediction and payment failure solutions make it possible for you anticipate customer needs by proactively identifying the customers most at risk of leaving your subscription program before they actually do.

Additionally, our powerful reporting dashboards equip you with an array of essential performance metrics, so you can harness the full potential of your subscription offering. This goes way beyond simple conversion metrics or global revenue tracking. While still important, those alone are not enough to paint a clear picture about the true health and ongoing success of your subscription business.

Our reporting dashboard includes the following performance metrics:

• Customer Lifetime Value (CLTV)

- Monthly recurring revenue
- Retention rate
- Churn rate
- Renewal rate
- Loss rate
- Total subscribers (on any given date)
- New subscribers
- Renewal pipeline
- Subscription changes (canceled, suspended, expired)

Learn why having access to the right metrics makes all the difference!

# Ready to build a subscription business?

A few thoughts on why every business should be a subscription business.

Learn which performance metrics to track to grow your subscription business.

Learn more about key payment trends and increase your subscriber base.







**READ BLOG ARTICLE**

**DOWNLOAD OUR**

**GET THE BROCHURE**

DATASHEET

# Nexway Monetize gives you the essential tools to build and grow a successful subscription business.

**CONTACT US TODAY!**

Newsletter

About us
- Company
- Careers
- Our offices
- Contact us

Solutions
- Monetize
- Connect

Legal & Privacy
- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept    Decline

Your name*

Your Email*

Your Company*

protected by reCAPTCHA
Privacy -  Terms

## NEXWAY MONETIZE HELPS YOU SCALE YOUR BUSINESS GLOBALLY WITHOUT RISK

Any merchant has legal obligations when he wants to sell his products and services, and this is more complex when you decide to develop a cross-border business.

The legal term for this obligation is Merchant of Record (or "MoR," for short). As an online business, you are legally obligated to act as your own MoR by default. This means you are required to tackle different administrative tasks on your own. Or you can look to a service provider to operate as MoR on your behalf! This partner will deal with the hassle of all of these compliance measures at the local, regional, and global levels on their own.

Nexway has years of experience serving as the Merchant of Record for online businesses of all sizes. We provide an all-in-one solution that saves you time, money, and effort — and keeps your business compliant with all local and global regulations — as you scale and grow your business to operate in multiple currencies, languages, and payment methods. And we do this by providing 100% transparency around the fees you pay for.

Nexway Monetize can manage your entire payment journey – from accepting payments, fraud prevention, currency conversion, taxation and security management, local tax and VAT management, chargeback detection and negotiation, customer data protection compliance (GDPR) to managing pay-outs to your suppliers around the world.

We maintain merchant accounts, giving you the ability to act locally in 140+ markets without the expense or trouble of maintaining a

# local entity.

## WHAT IS A MERCHANT OF RECORD?

A Merchant of Record (MoR) can be an entity that operates a webstore or platform to manage interactions with its customers, sellers (sub-merchants) or suppliers, providing due diligence and oversight over all commercial activity that happens on that platform, including:

- Maintaining financial liability for the goods sold
- Overseeing payment compliance while mitigating risk
- Managing transactions, refunds, cancellations, and disputes utes
- Handling chargebacks and fraud resolution
- Responsible for sales & import taxes
- Adhering to customer data compliance
- Avoiding the sale of illegal, prohibited, or counterfeit products or services
- Maintaining a direct relationship with payment service providers
- Providing billing-related customer support

## Why pay all these yourself?

Outsource your e-commerce payment operations, let us handle the complexities of international taxes, take care of fraud monitoring, invoicing, and global compliance.

# BUILD VS BUY



BUILD: TECHNOLOGIES + TEAMS REQUIRED TO DELIVER THE SAME VALUE

BUY WITH NEXWAY: OPTIMIZED TOTAL COST OF OWNERSHIP







GET OUR BUILD VS BUY BROCHURE

# Trust Nexway to be your Merchant of Record.

## 1/ GLOBAL TAX MANAGEMENT & COMPLIANCE

Each state has its own set of rules and regulations that may differ from other states. Maintaining tax and regulatory compliance around the globe can cause companies to struggle. Indeed, the increasing complexity and multiplication of sales taxes on products purchased online make the development of its international activity more and more complicated. As your dedicated provider of commerce services, it is Nexway's responsibility to stay up to date on worldwide financial and legal requirements to make sure you benefit from a seamless and fully compliant international buying and selling experience. Nexway, with its global expertise, manages sales taxes and VAT on your behalf, expertise reinforced by a network of expert consultancy partners who help us to be

compliant in more than 140 countries and thus advise and support you as best as possible according to the countries where you want to scale.

## 2/ MANAGING REFUNDS AND CHARGEBACKS SO YOUR TEAM DOESN'T HAVE TO

A refund is a return of funds to a shopper for the purchase of a product or service. Handling refund requests and chargebacks is one of the many services we offer at Nexway. In some geographical locations, like in the European Union, shoppers are entitled to a right of withdrawal (cooling-off period) for products and services that are sold online. This is a period allowed under the law during which the shopper can cancel and return purchases for any reason, without incurring any penalty, and obtain a full refund. If your shopper asks for a refund during the eligible period, Nexway returns the full transaction cost on your behalf.

Chargebacks were designed to protect shoppers from unauthorized transactions and dishonest merchants. They result in the return of funds to a shopper and the loss of sales for businesses. The difference, however, is that with chargebacks, instead of contacting you for a refund, the shopper contacts directly their bank to request a refund. If the bank approves the request, the business is "forced" to return the funds to the shopper. The chargeback can be initiated for several reasons which may include criminal fraud, chargeback fraud, and friendly fraud.

## 3/ FRAUD DETECTION

Nexway stops online fraud by providing you with the highest approval rates and the lowest false-positive rates in the industry. To help protect your business against fraud, Nexway Monetize leverages artificial intelligence to detect and help prevent fraud. Each order submitted through the Nexway payment service is subject to fraud detection algorithms that screening and scoring process. During the screening process, orders are assigned points and if the points exceed a certain limit, the orders are flagged as being potentially fraudulent.

There are a number of solutions that can help minimize the risk of fraud and chargeback fraud. This includes implementing 3D secure, fraud detection monitoring, address verification services, credit card verification code validation, and beyond. Nexway, as Merchant of Record, already has all of these solutions in place to help you run a more successful, efficient, and profitable e-commerce business.

## 4/ INTERNATIONAL COMPLIANCE



PCI-DSS
The Payment Card Industry Data Security Standard (PCI DSS) is a set of policies and guidelines that guarantee the security of debit, credit, and cash card transactions. They are intended to prevent the misuse of cardholders' personal information and protect businesses and shoppers from data theft and fraud. A major focus for PCI DSS is the technology used to collect, store and process card data. Some of the measures include

encryption, anti-malware software, extensive monitoring, risk analysis and more. To comply with PCI DSS protocol Nexway Monetize ensures a secure electronic transfer by providing secure connection, encrypted payment data, adherence to data privacy regulations. By outsourcing your payment services to us, we are essentially taking all the risks for you.



PSD2

As a merchant taking responsibility for selling your digital goods online, we guarantee full compliance with the new PSD2 regulation. Working with us gives your business an edge in this new regulatory environment: Immediate SCA implementation on your cart and checkout – when required. Real-time AI-powered fraud detection. Conversion rate optimization through highly qualitative fraud management and strong authorization rates. Considered as a trusted merchant by our network of leading payment services providers partners.



GDPR

The General Data Protection Regulation (GDPR) is the primary legislation adopted by the European Union (EU) to regulate how companies protect EU citizens' data. The GDPR affects any organization or company that does online business with European residents and processes (accesses, collects, receives, stores) the personal data of individuals residing in the EU, regardless of the company's location. These companies are required to take the necessary steps to comply with the regulations.

Nexway Monetize is a GDPR-compliant solution, that ensures that you are on the right side of the law. At Nexway we have implemented some strategies to align with this condition and ensure that consent is properly handled such as: appointment of a designated Data Protection Officer (DPO) to ensure that all regulations are followed and the shoppers/EU residents' rights are upheld ; integration of clear and actionable consent management tools for your end-user into all points throughout the customer journey (cart, end-user portal, emails, etc.) ; creation of a consent management service to help you manage your shoppers' consent through APIs if needed ; integration of an "Unsubscribe" link in all emails, including marketing campaigns (customizable to fit customers' brand).

## 5/ CUSTOMER CARE

The end-user experience is the cornerstone of your online sales success. Maintaining a high level of experience isn't easy when you start to multiply your

sales points. Nexway Monetize solves this by managing your end-user relationships with a localized customer care service. Nexway is World-class level 1 end-user support via email, live chat, and telephone in 12 languages over 3 time zones (EU, US, APAC). We support your customers for all issues related to payment, subscription and access to the product.

# Ready to outsource a total e-commerce

Learn how to stop chargebacks and online payment fraud today.

What Does It Really Mean to Be a Merchant of Record?

Build vs Buy: should you outsource your online payment operations?







**READ BLOG ARTICLE**

**READ BLOG ARTICLE**

**DOWNLOAD THIS BROCHURE**

# Nexway Monetize is here to help

you manage your entire payment journey – from accepting payments to preventing fraud to maintaining security and data compliance to adhering to local sales tax regulations, and so much more!

**CONTACT US TODAY!**

## Newsletter

## About us

- Company
- Careers
- Our offices
- Contact us

## Solutions

- Monetize
- Connect

## Legal & Privacy

- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.



# Access map.

**Nexway**, tour PB 5
# 1 avenue du Général de Gaulle
# 92800 Puteaux

## By car

**1.** If you take the BOULEVARD CIRCULAIRE (ring road) around LA DÉFENSE, exit at LA DÉFENSE 8.

**2.** After the PONT DE NEUILLY bridge, take the tunnel in direction of RUEIL/ST-GERMAIN-EN-LAYE and keep to the left lane. After the tunnel, turn left at the first light in direction of PUTEAUX-CENTRE. Then turn left at the second light and take the second street. The PB5 building entrance is about 100 meters on the right. Parking Facilities : Wilson Car Park - Exit LES QUATRES TEMPS shopping mall.

**3.** If you arrive by taxi, he will drop you off in the backyard of the PB5 Tower. Take this courtyard, then turn right to take the public elevators.
Go up to the 1st-floor level «4 temps & Castorama», then turn to your right and just before the entrance «Porte Puteaux» you will find on your right the reception of the PB5 Tower.

NEXWAY: Access Map

# By public transport

**1.** **Regional express from Paris (RER)** : look for trains to POISSY or STGERMAIN-EN-LAYE.
Alight at GRANDE ARCHE DE LA DÉFENSE. Warning : special fares apply (Zone 3).

**2.** **Subway (Métro)** : Line 1, direction LA DÉFENSE (get off at GRANDE ARCHE).

**3.** **T2 (tramway)** : direction LA DÉFENSE. Alight at LA DÉFENSE/GRANDE ARCHE.

**4.** **Bus** : From central Paris : Line 73 (Concorde, Champs-Elysées, Etoile, Porte Maillot, La Défense).

**5.** **From suburbs** : several bus and train lines terminate at LA DÉFENSE.

## From the main RER - Métro - Bus concourse at La Défense, you may either :

**Exit at Parvis D**, turn right, past the MIRÓ sculpture (blue, yellow and red), into the Les Quatre Temps shopping mall via the Boieldieu entrance, walk about 40 meters, walk up a few steps and through the green glass doors.
The entrance to the PB5 building is immediatly on the left in covered walkway.

**Exit K,** take the escalator into the Les Quatre Temps shopping mall (up 2 levels). Turn left, the way to the PB5 building is signposted inside the shopping mall.



This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept    Decline

## WHY JOIN NEXWAY?

Nexway offers a dynamic, startup-like work environment in a rapidly growing and ever-evolving industry. Our team is innovative, energetic, and strategic — we always strive to create new and better ways to propel our customers' online businesses forward.

We never see boundaries; we see opportunities. And we believe that technology, in all its forms, can make our and our customers' lives better.

Working at Nexway means you'll work with an international team of people who bring their unique experiences and local-market expertise to everything they do.

# Nexway is Hiring!

Our team is growing!
Check out our open positions in offices around the world.

FRANCE Paris La Défense  |  GERMANY Karlsruhe  |  POLAND Katowice

SACHBEARBEITER (M/W/D)* VERTRIEB



# Interested in a position or an internship?

If you are enthusiastic and have a passion for innovation — especially if you already have some e-commerce experience under your belt (though, not required) — we want you to join our team!

Tell us in a few sentences why you are interested in learning alongside the Nexway team and why you would like to build and grow your career with us.

Name *

Email *

The job you are applying for *

Linkedin Profile

Nexway is hiring!

Who are you *



## Newsletter

## About us

• Company
• Careers
• Our offices
• Contact us

## Solutions

• Monetize
• Connect

## Legal & Privacy

• Legal notice
• Terms & Conditions
• Privacy Policy
• Refund Policy

© 2020 Nexway. All Rights Reserved.

☐ ☐ ☐    ☐

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept    Decline

## WHY JOIN NEXWAY?

Nexway offers a dynamic, startup-like work environment in a rapidly growing and ever-evolving industry. Our team is innovative, energetic, and strategic — we always strive to create new and better ways to propel our customers' online businesses forward.

We never see boundaries; we see opportunities. And we believe that technology, in all its forms, can make our and our customers' lives better.

Working at Nexway means you'll work with an international team of people who bring their unique experiences and local-market expertise to everything they do.

# Nexway is Hiring!

Our team is growing!
Check out our open positions in offices around the world.

FRANCE Paris La Défense  |  GERMANY Karlsruhe  |  POLAND Katowice

**FRONT-END DEVELOPER**



# Interested in a position or an internship?

If you are enthusiastic and have a passion for innovation — especially if you already have some e-commerce experience under your belt (though, not required) — we want you to join our team!

Tell us in a few sentences why you are interested in learning alongside the Nexway team and why you would like to build and grow your career with us.

Name *

Email *

The job you are applying for *

Linkedin Profile

Nexway is hiring!

Who are you *



## Newsletter

## About us

- Company
- Careers
- Our offices
- Contact us

## Solutions

- Monetize
- Connect

## Legal & Privacy

- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.

This website stores cookies on your computer. These cookies are used to collect information about how you interact with our website and allow us to remember you. We use this information in order to improve and customize your browsing experience and for analytics and metrics about our visitors both on this website and other media. To find out more about the cookies we use, see our Privacy Policy.

If you decline, your information won't be tracked when you visit this website. A single cookie will be used in your browser to remember your preference not to be tracked.

Accept     Decline

# Monetize.

 GET STARTED

🔍

### INTRODUCTION ›

### PURCHASE EXPERIENCE PERSONALIZATION

### PAYMENT

### WORLDWIDE SCALING

### SUBSCRIPTION

### RESELLER MODULE

### BUSINESS MONITORING

### TOTAL E-COMMERCE MANAGEMENT

### DATA AND PRIVACY

## Nexway Monetize a full-service offer!

Monetize is a turn-key solution, **composed of an e-commerce and payment platform and advanced services,** that **enables you to sell digital content and services online.**

Our solution provides you with a **modern shopping cart**, operates your **payments**, makes your business smart with **insights powered by artificial intelligence**, yields you with services to **improve the purchase experience**, **increasing your conversion rate and customer lifetime value**, while **managing on your behalf all the complexities related to international sales**, legal compliance, fraud, security, and data protection.

## <span style="color:red">MONETIZE OFFER</span>

Platform ➕ Services



ROLES
MANAGEMENT

**Easily integrated and plugged into your ERP or CMS**, Nexway Monetize allows you **two types of configuration and management**: you can use our **SaaS user interface "Nexway Center"** or directly develop your store through **API** if you have IT resources available internally.

Through our Nexway Center interface, you will be able to get a 360-degree view of your e-store's performance and to access all orders in real-time, thanks to key capabilities such as:

- Product catalog management
- Pricing & discounts management
- Design & emails customization
- Orders monitoring
- Buyers & resellers management
- Users rights management
- Business analysis & reporting
- Notifications…

Monetize makes integration and online payments simple. Our standard REST API is designed on a micro-services architecture which allows you to benefit from more flexibility, making your digital commerce agile. It is easy to maintain, fast to evolve and highly scalable.

In addition to its micro-service architecture platform, Nexway takes responsibility on your behalf for the security of each transaction, the receipt of funds and the transfer to your bank accounts. Our platform enables access to the services necessary to collect payments and manage taxes in hundreds of local markets. Nexway carries out on your behalf  all worldwide sales responsibilities including:

- Processing payments and invoicing
- Customer care
- Local tax compliance
- Local privacy and personal data law compliance
- Fraud detection and prevention
- Security of sales transactions (including PCI DSS)
- Product shipment and service activation
- Refund requests
- Chargeback detection and negotiation

Lastly, as one of our new customer, you are going to easily start to use Nexway Monetize in a few clicks, thanks to our Customer Service Managers Team which is going to carry out your welcome aboard and help you grow your business.



**NEX** WAY

☐    🇺🇸 ☐    **GET STARTED**

# Every Business Should Be a Subscription Business

☐ February 13, 2020



## A SUBSCRIPTION-BASED REVENUE MODEL IS YOUR TICKET TO INCREASED REVENUES

So many businesses today—especially within the digital goods space—are fueled by subscription-based revenue models. And for good reason: it's a proven strategy for extracting the greatest amount of value out of your customer relationship (i.e. customer lifetime value).

>While it may seem like subscriptions, more generally speaking, have been a growing trend over the years, the entire concept of subscriptions isn't really new. From newspapers and magazines to gym memberships to health insurance—and practically everything in between—much of how consumers have traditionally transacted has followed a tried-and-true subscription method.

The only difference today is that all of this is now

happening online, driven by ecommerce-like experiences. Netflix, Spotify, Amazon Prime, food delivery services, personalized vitamins, cloud-based software, beauty and grooming products, shaving supplies, and the list goes on. There are even a number of instances where subscription-based business models have saved businesses from financial demise.

The truth is, consumers are already used to subscription-based models. So, if you don't already offer a subscription option, making the decision to offer one shouldn't be too jarring. In fact, many of your customers will actually appreciate it because, in the long run, it'll most likely make their lives easier, while giving you the added perk of dependable recurring revenue.

Therefore, if you're looking to give your bottom line a much needed boost, there's no better time than now to think about how you can transform your business into a subscription business.



# The benefits of running a subscription business

We've hinted at some of the basic benefits of subscription-based revenue models above, but here's a quick overview to help you understand that true upside of it all, from both the perspective of your business *and* your customers.

## WHY SUBSCRIPTIONS ARE GOOD FOR YOUR BUSINESS

Generating a steady stream of recurring revenue is, hands down, the biggest and conceivably the most important benefit of building a successful subscription model for your business. But there are two important offshots of this:

- Customer loyalty and
- Driving new customer leads.

By offering a frictionless experience to your customers, one that makes it really easy for them to enjoy, use, and gain real benefit from your products and services, you give them more reasons to stay customers for the long haul. This is the key to customer engagement and loyalty.

This also creates a cyclical effect, especially when you factor in positive word-of-mouth further amplified via social media channels, that encourages other potential customers to take advantage of what your business offers. To that end, eliminating the barriers between your (potential) customers and your products and services, all while creating a seamless end-to-end customer experience, becomes the fuel that drives your subscription business forward.

## WHY SUBSCRIPTIONS ARE GOOD FOR YOUR CUSTOMERS

Today's consumers have high expectations. They want everything on their own terms and, whenever possible, they want complete control over their entire purchase journey. Fortunately, this is one of the biggest advantages of subscription-based business models.

Not only do they provide your customers with a greater level of convenience as well as a better way to manage their own expenses, but they also give them the tools to tailor their purchase journey with your business based on

their wants, needs, and expectations. Simple tasks like upgrading, downgrading, pausing, or canceling a subscription—all without any fees or penalties—no longer require the intervention of customer support staff. It can be managed entirely by your customers themselves, all in real-time. This is a huge win for the customer experience and a really easy way to boost long-term customer loyalty.

Again, it's all about giving your customers the control to manage their journey with your business. Anything you can do to make it simpler and easier for them will give them fewer reasons to look elsewhere—much less to your nearest competitor.

## POTENTIAL CHALLENGES ASSOCIATED WITH A SUBSCRIPTION BUSINESS

For all the benefits that a subscription-based revenue model can drive for your business, there are a few potential downsides that need to be kept in mind before you get too far along in building your subscription business.

- Invest now, grow revenue later. Changing your business model requires an investment to do so, which typically means you'll have to temporarily drive up costs to get your subscription business humming *before* you start to drive exponential revenue growth. In other words, you can't go into it thinking that your revenue situation will dramatically transform overnight.

  There are a lot of factors, both internal (i.e. creating new platforms, investing in new technologies, building new capabilities) and external (i.e. marketing and communications, lead generation, enhanced customer service), that go into overhauling your revenue model. However, the benefit of a subscription-based revenue model is that as it becomes more and more automated over time, a shift towards rapid revenue growth can (and will likely) make good on all upfront implementation costs.

- Churn is an ugly word
  No one likes to talk about churn, but it's nonetheless a reality of any

business. When you offer a subscription option, however, there's no guarantee that customers will stick around for life. Some get on board simply to take advantage of a sign-up discount—and then cancel their subscription before the next payment in the cycle needs to be made— while others will let it cycle on repeat in the background until something causes them to push the breaks. Whatever the case may be, you must expect that customers will come and go. Your priority, then, is to give your customers *every reason not to.*

As mentioned above, creating a better end-to-end customer experience is a good place to start. Ensuring the consistent quality of your products and services is the cherry on top, so that, should you ever have to raise prices, even if ever so slightly, the benefits of what you offer outweigh the marginal increase in price. But managing churn is often a fine balance. Some customers will stay, while others will go; it's up to you to build a constant pipeline of new customers to keep your subscription business growing.

- A quick note on privacy
  There are more and more regulations being created every day—in the vein of GDPR in Europe—to protect consumers from their data being misused. When you create a subscription business, as with virtually any other online transaction, you ask customers to provide information so that you can, in turn, provide them with a more relevant and personalized service and experience.

  But what happens when a customer cancels their subscription? What do you do with their data? There are a number of things you need to be prepared to deal with before you get too far along. Customer privacy is a serious matter. You need to have a plan in place for how you use and eventually eliminate that data, all while ensuring that your strategy adheres to strict local regulations.

## IS YOUR BUSINESS READY TO BE A SUBSCRIPTION BUSINESS?

The easy answer is yes!

If you run an ecommerce business or operate, in any capacity, in the world of digital goods sales, you've got virtually nothing to lose by implementing a subscription-revenue model.

However, talking about the benefits of a subscription business *and* actually transforming your business into a

subscription business are two separate things. Fortunately, we're here to help make that as smooth and seamless of a transition as possible.

With Nexway Monetize, we will not only help you build a successful subscription program that drives long-term business value, but we'll also work with you hands-on to ensure that your subscription business creates deeper, more loyal relationships with your customers over time.

There is no better time than now to give your revenues the boost they deserve. Contact us today to learn more.

---

Share ☐ ☐ ☐ ☐

---

RELATED POSTS

July 03, 2020

### Grow Your Business with a Reseller Program

☐ READ MORE

June 10, 2020

### What Does It Really Mean to Be a Merchant of Record?

☐ READ MORE

May 26, 2020

### How Is COVID-19 Shaping the Future of E-Commerce?

☐ READ MORE

---

## Newsletter

## About us

• Company

## Solutions

• Monetize

## Legal & Privacy

- Careers
- Our offices
- Contact us

- Connect
- ask|net academics

- Legal notice
-
Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.



Your name*

Your Email*

Your Company*

GET STARTED

protected by reCAPTCHA
Privacy  -  Terms

# Download brochure: Subscription payment trends for 2020

## TAKE A PLUNGE IN THE KEY TRENDS TO KNOW AND THE STRATEGIES TO IMPLEMENT FOR INCREASING YOUR

Fill in the form to download Nexway Subscription Payment Trends for



2020
Brochure

# SUBSCRIBER BASE IN 2020.

This brochure outlines the important trends and insights that will impact your recurring payments in 2020.

Discover the opportunities and obstacles you may be confronted, and what will impact your ability to get paid by your members and subscribers in 2020.

This brochure also provides recommendations for expanding your subscription business to online shoppers around the world. You will learn how streamlined recurring payment management will help your subscription business to be successful, driving new leads while also minimizing churn and fraud.

**Nexway Monetize gives you the essential tools to build and grow a successful subscription business!**

## What's inside the brochure:

  Key trends to improve your subscribers' experience.
  Key stats in subscription payment processing.
  Fintech: How subscription businesses can adapt to new ways of doing business.
  Opportunities and challenges of cross-border e-commerce.
  How to face constantly evolving fraud.

* These fields are required.

## Newsletter

## About us

- Company
- Careers
- Our offices
- Contact us

## Solutions

- Monetize
- Connect

## Legal & Privacy

- Legal notice
- Terms & Conditions
- Privacy Policy
- Refund Policy

© 2020 Nexway. All Rights Reserved.

# Exhibit

# 16



NEXWAY AG, KARLSRUHE (Germany) | (formerly asknet AG)

# Half-year results 2019

# Half-year results
# for the six months period
# ending June 30, 2019

Ticker symbol : NWAY



# Management report on the situation of the group for the first half of 2019

## GENERAL INFORMATION ABOUT THE GROUP
### Corporate structure and business model

Nexway AG (formerly asknet AG) is a leading ecommerce and payment service provider. Combining technology and managed services, the Nexway Group offers solutions to software, video games, services, digital marketplaces and retail companies to run and maximize their online sales worldwide, serving companies across 180 countries around the world.

By using state-of-the-art technology, a full range of industry-leading ecommerce and payment solutions and a hands-on team of industry experts, Nexway is servicing online businesses to scale, grow and thrive in today's global sales marketplace.

More specifically, Nexway clients leverage subscription models, local payment methods, fraud prevention, partner & reseller management and customer insights to transform their purchasing experience and grow their business. The company also provides software procurement and distribution services to European academic institutions, students and alumni. The company is based in Karlsruhe and Paris La Défense, with offices in the US, Japan, Italy, Poland and Switzerland. Nexway AG shares are listed and traded on the Frankfurt Stock Exchange.

The identity of Nexway is based on technology and top-quality customer service. The group is dedicated to innovation and is proud of its role as a global pioneer of API-driven, headless commerce architectures. The benefits of Nexway's technical innovation is what both makes the solutions agile and allows our customers to scale and grow their online businesses fast.

At the end of January 2019, Nexway AG (formerly asknet AG), acquired 100% ownership interest in Nexway Group AG and its 100% owned subsidiary Nexway SAS, thus bringing together two of Europe's biggest names in ecommerce and payment operations.

On September 24, 2019 Facebank Group, Inc., a US-listed company, became the new majority shareholder of Nexway AG through its French subsidiary StockAccess Holdings SAS. Facebank Group is a leading developer of hyper-realistic digital humans for entertainment, virtual reality, augmented reality and artificial intelligence, and this investment potentially opens the global digital content market served by Facebank to Nexway AG's payment and ecommerce services.

## ECONOMIC REPORT
### Macroeconomic and industry environment

In its latest forecast (October 2019), the International Monetary Fund (IMF) projects the global economy to expand at a rate of 3.0% during the full year of 2019. While the emerging and developing nations are expected to grow by 3.9%, a rate of 1.7% is anticipated for the industrialized economies, with the US economy expanding by 2.4%. According to the IMF



economists, the Eurozone economy will grow at a rate of 1.2%. For the German economy a rather weak increase of 0.5% is forecast.

The industries that are relevant for the Nexway Group include the international ecommerce markets and the global IT markets (software and IT services). The business activities of Nexway Academics Business Unit focus primarily on the university sector in Germany, Austria and Switzerland (DACH area).

Global ecommerce markets, driven by the general trend towards digitization, are continuing to grow dynamically. For the year 2019, the analyst firm eMarketer expects a 20.7% increase in sales in online retailing worldwide to 3.5 trillion US dollars.

Global B2B e-commerce, which had lagged significantly behind the trend on the retail side in past years, is also expected to grow strongly. Forrester Research projects investments of approximately 2.4 billion US dollars in B2B commerce platforms until 2021.

Concerning our business unit Academics, the positive trend in the higher education markets throughout the German-speaking region (Germany, Austria, Switzerland) remains intact. According to the German statistical office, the country's universities recorded a rise in the number of enrolled students by 2.1% from approximately 2,807,000 in the winter term 2016/2017 to 2,868,000 in the winter term 2018/19.

## Impact of the general market conditions on Nexway Group

As a global supplier of software solutions and IT services for the online distribution of digital and physical goods, Nexway continues to benefit from the shift in retail sales to the internet and the changing user and payment behavior. New opportunities for growth will be created by the ongoing internationalization of the Group, the launch and expansion of international partnerships including add-on acquisitions, the entry into new highly synergetic business areas and the development of innovative products.

**Nexway eCommerce Solutions Business Unit** (ECS) generally has a good position based on its proven solutions and continuous investment in technology. However, the market segment for full-service solutions, which allow manufacturers to outsource the international online distribution of their products, is at an advanced stage of development and Nexway is caught in fierce competition for market share with other ecommerce suppliers, resulting in price wars. Nevertheless, with increased investments in sales activities and introduction of new sales platforms, Nexway has been able to secure a large number of new clients in previously less serviced geographies and is planning to continue to build up its sales force. Synergies in areas such as technology and sales will further be pursued following the acquisition and integration of Nexway Group AG and its 100% owned subsidiary Nexway SAS. Furthermore, the capability to also sell physical products helps Nexway to stand out from the competition.

**Nexway Academics Business Unit** has an outstanding market coverage and high profile in software reselling at universities and research institutions in the German-speaking region and



benefits from the continued increase in student numbers in these countries. But margins for the sale of software licenses are continuously decreasing. Nexway therefore aims to use the good customer relationships also in this unit in order to place new products, further comprehensive services and to increase its vertical integration as well as its geographic footprint.



## Business performance of Nexway Group in HY1 2019

### High customer demand in both business units
In the first half of 2019 the Nexway group recorded high customer demand and a strong performance in the online shops it operates. As compared to the figures of the consolidated accounts of former asknet AG in 2018, the sales figures more than doubled following the acquisition of Nexway Group AG and its 100% owned subsidiary Nexway SAS. Due to this major change in consolidation scope, prior year figures for financial year 2018 are not comparable to those of 2019.

However, in the notes, the Company has presented restated pro forma figures for financial year 2018 allowing a comparison of 2019 figures as if Nexway Group AG and its 100% owned subsidiary Nexway SAS had already been consolidated in 2018. In the following, we also refer to those figures.

In the eCommerce Solutions Business Unit, Nexway recorded positive developments with regards to existing clients. Promising negotiations are currently being carried out with existing and other potential new clients but were not finalized at the balance sheet date. Furthermore, customizing projects were implemented for several new customers, helping to further intensify Nexway's customer relationships. Finally, new unified platforms with state-of-the-art technology are being introduced in the market (for example, the Nexway Monetize platform, developed by Nexway SAS, provides integrated payment and ecommerce services).

In the Academics Business Unit, Nexway increased sales with existing customers (increase of about 12% as compared with HY 2018) through increased sales of Microsoft license agreements, also due to closer customer support provided by the Company. Academics unit was also able to significantly increase service revenue, besides licensing revenue, of an important software editor.

Other important operational developments in the Academics Business Unit include projects together with an important hardware producer to create a dedicated partner portal, as well as the intensive preparation of a public tender on the national level in Germany to supply statistic software.

### Strengthening Corporate Governance structures
On June 28, 2019, Nexway AG held its Annual general meeting, where the shareholders approved – with 99.9% of the vote – the annual report and several governance changes, all in line with Nexway's ongoing focus on realization of synergies and building a unified market presence.

Aston Fallen, the former Chief Executive Officer (CEO) of Nexway AG, was elected to the Supervisory Board of the company, serving as its Chairman, together with Thomas Garrahan serving as vice-Chairman and Matthew Bale. All three are the newly elected members of the Supervisory Board.



Immediately following the Annual shareholder meeting, the Supervisory Board appointed Victor Iezuitov as CEO of Nexway AG and member of the management board, together with Norman Hansen as COO.

Furthermore, in September this year, the Company has implemented an integrated governance structure for second level of management: The Executive Committee. Members of this committee include Victor Iezuitov to act as Chairman of the Management Board (CEO), together with Norman Hansen as COO, and other management board members to include Casey Potenzone (Chief Strategy Officer), Délphine Weiskopf (SVP Product and Marketing), Frédéric Ribau (Chief Technology Officer), and Christian Herkel (SVP Global Accounts).

SALES REVENUES AND EARNINGS
For the first half year 2019, sales amounted to 86.1 million euros, an increase of more than 100% when compared to the first half year of 2018 (41.4 million euros). This huge increase is mainly the consequence of the consolidation of Nexway Group AG (including Nexway SAS) following the acquisition of those companies by Nexway AG on January 31, 2019.

On a like-for-like comparison of 2019 sales with restated 2018 pro-forma accounts (i.e. figures for 2018 restated as if the acquisition had taken place already on January 31, 2018 – please see corresponding figures in the note "Pro Forma accounts 2018"), sales decreased by -12.8 million euros, representing a decrease of -12.9%. Despite the general positive development of existing customers in both business units, this decrease of total turnover is mainly due to the decision of group management to streamline parts of the client portfolio of ECS, especially existing engagements with compliance-heavy Asian clients, and shifting focus and group's resources to servicing higher margin long term customers, both existing and new ones. Furthermore, due to the first-time consolidation of the Nexway Group as of January 31, 2019, consolidated Nexway SAS revenues for January 2019 are not included. Before deduction of January 2019 revenues of Nexway SAS, Nexway AG reported gross revenues of 95.1 million euros for the first six months period.

SALES REVENUES SHARE BY REGION
in %, January 1 until June 30

| SALES REVENUES BY REGION | 2019 | 2018 |
|---|---|---|
| Europe | 61 | 52 |
| USA | 21 | 23 |
| Asia | 10 | 19 |
| Other countries | 7 | 7 |

The acquisition of Nexway Group increased the relative importance of Europe as sales region for our company, since particularly Nexway Group's 100% owned subsidiary Nexway SAS has a



strong presence in France. Correspondingly, the importance of Germany in overall sales has diminished as compared to the previous year.

GROSS PROFIT, HALF-YEAR
In € million

|  | 1-12/2016 | 1-12/2017 | 1-12/2018 | 1-6/2018 | 1-6/2019 |
|---|---|---|---|---|---|
| 1st half year | 4.5 | 4.3 | 4.3 | 4.3 | 6.1 |
| 2nd half year | 4.4 | 4.2 | 5.3 | n.a. | n.a. |
| **Total Gross profit** | **8.9** | **8.5** | **9.6** | **4.3** | **6.1** |
| Total Sales | 68.7 | 66.1 | 85.8 | 41.4 | 86.1 |
| **Gross profit margin** | **13.0%** | **12.9%** | **11.2%** | **10.4%** | **7.1%** |

Gross profit is defined as sales minus cost of goods/merchandise sold and cost of services. For the first half year 2019 as compared to the same period of the previous year increased from 4.3 million euros to 6.1 million euros. Before deduction of January 2019 gross profit of Nexway SAS Group, the consolidated Nexway AG gross profit amounted to 6.7 million euros.

GROSS MARGIN BY BUSINESS UNIT
in € million, January 1 until June 30

|  | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|
| Gross margin Academics | 1.6 | 1.6 | 1.1 | 1.9 |
| Gross margin eCommerce Solutions | 2.9 | 2.7 | 3.2 | 7.2 |
| Total | 4.5 | 4.3 | 4.3 | 9.2 |

Gross margin is defined as sales minus cost of goods/merchandise purchased. In both business units, gross margin increased as compared to the same period of the previous year, especially for ECS due to the integration of Nexway Group AG and its 100% owned subsidiary Nexway SAS.



REVENUE AND GROSS MARGIN BY BUSINESS UNIT IN HY 2019
in € thousand

|  | ECS | ACA | Total |
|---|---|---|---|
| Total Revenue | 71,3 | 14,8 | 86,1 |
| Total Cost of purchased merchandise | -64,0 | -12,9 | -76,9 |
| **TOTAL GROUP GROSS MARGIN** | **7,3** | **1,9** | **9,2** |
| **Gross profit margin in relation to revenue** | **10.2%** | **12.8** | **10.7%** |

Gross profit margin in relation to sales amounts to 12.8% in academics and 10.2% in ECS.

Capitalized own work amounted to 0.531 million euros, mainly on the level of Nexway SAS.

At 5.673 million euros, the Nexway AG's consolidated personnel expenses more than doubled as compared to the previous period due to similar increase of the headcount driven by acquisition of Nexway Group. In relation to sales, personnel costs accounted for 62.7% of gross profit, a slight increase as compared to the previous period (61% of gross profit).

Depreciation and amortization increased significantly from 0.334 million euros to 2.987 million euros in the reporting period. This is essentially due to the amortization of the consolidation goodwill following the acquisition of Nexway Group AG on a pro rata temporis base.

As expected, on an EBITDA basis, Nexway AG remained at loss with -1.5 million euros. Main factors for this were several one-time charges for the integration of Nexway Group acquisition as well as certain restructuring costs. The net result for the period was -5.1 million euros.


NET ASSETS AND FINANCIAL POSITION
Nexway Group's consolidated balance sheet increased from 11.0 million euros to 46.4 million euros, reflecting the first consolidation of Nexway Group AG and its 100% owned subsidiary Nexway SAS.

On the asset side, an important factor is the recognition of the consolidation goodwill amounting to 18.1 million euros at balance sheet date following the first consolidation of Nexway Group AG and its 100% owned subsidiary Nexway SAS. Nexway Group AG's subsidiary Nexway SAS also had higher self-created intangible assets from capitalized development costs, increasing from 1.4 million euros to 7.2 million euros. Overall, fixed assets increased from 2.3 million euros to 26.2 million euros as at June 30, 2019.

Current assets also increased, especially with regards to trade receivables and other assets. Cash at bank slightly increased from 3.8 million euros to 4.1 million euros.



Equity decreased from 1.318 million euros to -0.845 million euros as a consequence of the negative consolidated balance sheet result amounting to 5.053 million euros.
Due to the consolidation of Nexway Group AG, the consolidated accounts show for the first-time provisions for pensions and similar liabilities, amounting to 0.167 million euros, due to the legal obligation for certain post-employment benefits in France.

Other provisions, mainly invoices not yet received and other accruals, decreased from 2.213 million euros to 1.059 million euros.

Loans received from third parties increased also strongly due to the consolidation of an external bond of Nexway SAS in the consolidated balance sheet. This bond, the main external debt of Nexway Group, amounts to 7.5 million euros and is a long-term loan instrument (the bond has to be repaid in 2023). The annual interest is 6.5%. In addition, in relation to this loan, Nexway Group has the option to request further credit lines in the amount of 4.5 million euros, thus giving access to further liquidity if needed.

Finally, other liabilities also increased following the consolidation of Nexway SAS.

EMPLOYEES
During the first half-year 2019, Nexway group employed an average number of 181 employees (previous year: 87 employees).
These employees are mainly based in Germany (84) and France (78). Other countries include:
- USA:      8 employees
- Japan:    5 employees
- Poland:   4 employees
- Italy:    2 employees.

OPPORTUNITY AND RISK REPORT
Given that Nexway Group's risk position has not significantly changed compared to the assessment at the time of the preparation of the 2018 financial statements, please refer to the detailed description of the group's opportunities and risks in the 2018 consolidated annual report.



# Forecast

## Anticipated development of the industry environment

As mentioned above, the global ecommerce market will continue to grow in the coming years. The global IT markets will also remain on the growth track. The market research specialists from Gartner expect an increase of approximately 0.4% to 3.7 billion US dollars in 2019, with – as in previous years – above-average spending on software (+8.8%) and services (+3.7%).
The university market in the German-speaking region will show a positive trend in the coming years.

## Company forecast

Following the acquisition of Nexway Group AG and its 100% owned subsidiary Nexway SAS at the end of January 2019, the first six months of 2019 were mainly shaped by unifying and streamlining the operations of both companies, Nexway SAS and Nexway AG (formerly asknet AG). The overall aim was to realize synergies, harmonize the operations and work on a common global market positioning. Among other initiatives and as a first step towards global integration and repositioning, the Company has carried out a global rebranding thus brining the operations of both companies under Nexway Group, together with a new logo and a new website.

Against the background of the expected business development in the last quarter of 2019, Nexway AG lowered its guidance for the full year on October 31, 2019. Nexway AG continues to expect an improvement of consolidated EBITDA for the second half of 2019. Contrary to previous expectations, however, the improvement will not be sufficient to achieve the slightly positive EBITDA previously forecast on a full-year basis. The company now expects an EBITDA between -2.0 million euros and -2.8 million euros for 2019. Regarding the top line, Nexway AG now expects consolidated sales revenues between 180 and 200 million euros and a gross profit between 14 and 18 million euros, both before deduction of January 2019 figures of Nexway Group AG and its 100-% subsidiary Nexway SAS, given that it had been consolidated as of January 31, 2019. Originally the company had forecast consolidated sales revenues of over 200 million euros and a gross profit of more than 20 million euros (including capitalized development cost and also both before deduction of January 2019 figures of Nexway Group AG and its 100-% subsidiary Nexway SAS).

Karlsruhe, October 31, 2019
Nexway AG – The Executive Board –

Victor Iezuitov
Chief Executive Officer

Norman Hansen
Chief Operating Officer



NEXWAY AG, KARLSRUHE (formerly asknet AG)
CONSOLIDATED FINANCIAL STATEMENTS HY 2019 (unaudited)

## 1.    Consolidated Balance sheet*

as of June 30

in €

| | June 30, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| | | |
| **A.  Fixed Assets** | | |
| I.   Intangible fixed assets GW | 18,132,623.00 | |
| 1.  Self-created industrial property rights and similar rights | 7,351,859.00 | 1,402,195.98 |
| 2.  Acquired industrial property rights and similar rights | 746,383.80 | 919,220.80 |
| | **26,230,865.80** | **2,321,416.78** |
| II. Tangible fixed assets | | |
| Other equipment, operating and office equipment | 247,197.00 | 150,904.63 |
| III. Financial assets | | |
| Advance payments on shares in affiliated companies | 0.00 | 500,000.00 |
| **B.  Current Assets** | | |
| I.   Inventories | | |
| Merchandise | 57,642.00 | 45,593.18 |
| II. Receivables and other assets | | |
| 1.  Trade receivables | 7,268,413.49 | 3,681,212.27 |
| 2.  Other assets | 8,337,344.29 | 340,344.98 |
| | **15,605,757.78** | **4,021,557.25** |
| III. Cash-in-hand, bank balances, cheques | 4,178,119.00 | 3,873,977.11 |
| C.  Prepaid Expenses | **99,567.00** | **135,560.38** |
| | **46,419,148.58** | **11,049,009.33** |
| | | |
| | | |
| | June 30, 2019 | December 31,2018 |
| **EQUITY AND LIABILITIES** | | |
| | | |
| **A.  Equity** | | |
| I.   Subscribed capital (Contingent capital € thousand 1 500 (previous year thousand 1 500) | 653,765.00 | 653,765.00 |
| II.  Capital reserve | 6,766,230.58 | 2,257,694.77 |
| III. Currency translation differences | -3,211,643.00 | 76,379.36 |
| IV. Consolidated balance sheet result | -5,053,098.00 | -1,669,579.51 |
| | **-844,745.42** | **1,318,259.62** |
| **B.  Provisions** | | |
| Provisions for pensions and similar obligations | 176,056.00 | 0.00 |
| Other provisions | 1,059,095.00 | **2,213,309.62** |
| **C.  Liabilities** | | |
| I.   Loans | 7,500,000.00 | 0.00 |
| of which of more than one year € 7,500,000 | | |
| I.   Liabilities to banks | 0.00 | 67.05 |
| II.  Trade payables | 34,117,166.00 | 5,203,640.23 |
| III. Other liabilities | | |
| of which taxes € 1,861,317.64 (previous year € 1,014,161.56) | 4,175,386.00 | 1,901,484.81 |
| | **45,792,552.00** | **7,105,192.09** |
| **D.  Deferred Income** | | **0.00** |
| **E.  Deferred Tax Liabilities** | **412,248.00** | **412,248.00** |
| | **46,419,149.58** | **11,049,009.33** |

\* The comparative figures for financial year 2018 are the consolidated accounts of the legal entity Nexway AG (formerly asknet AG) as at December 31, 2018, i.e. excluding Nexway Group AG and its 100% owned subsidiary Nexway SAS. Please refer to the note "Pro Forma Information for Financial Year 2018" for further information.



## 2.    Consolidated Income statement*

| January 1 until June 30 | | | | | | | |
| in € | | | | | | | |
| | | | | | | June 2019 | June 2018 |
| **1. Sales revenues** | | | | | | 86,128,514.00 | 41,412,536.30 |
| 2. Capitalized development activities | | | | | | 531,216.00 | 825,985.56 |
| 3. Other operating income | | | | | | 156,481.00 | 155,413.64 |
| | | | | | | **86,816,211.00** | **42,393,935.50** |
| **4. Cost of materials** | | | | | | | |
| a) Cost of purchased merchandise | | | | | | -77,660,538.00 | -32,205,867.72 |
| b) Cost of purchased services | | | | | | -2,454,823.00 | -4,952,993.87 |
| 5. Personnel expenses | | | | | | | |
| a) Wages and salaries | | | | | | -4,501,037.00 | -2,271,662.70 |
| b) Social security, post-employment and other employee benefit costs | | | | | | -1,172,743.00 | -357,168.50 |
| 6. Amortization and write-downs of intangible fixed assets and depreciation | | | | | | | |
| and write-downs of tangible fixed assets | | | | | | -2,987,552.00 | -334,452.24 |
| 7. Other operating expenses | | | | | | -2,834,956.36 | -2,509,955.03 |
| | | | | | | **-91,611,649.36** | **-42,632,100.06** |
| 8. Interest and similar income | | | | | | 5,916.00 | 0.00 |
| 9. Interest and similar expenses | | | | | | -336,415.64 | -2,928.70 |
| 10. Taxes on income and earnings | | | | | | 4,928.00 | -227,769.70 |
| | | | | | | **-325,571.64** | **-230,698.40** |
| **11. Earnings after taxes** | | | | | | **-5,121,010.00** | **-468,862.96** |
| 12. Other taxes | | | | | | 67912 | -733.58 |
| **13. Consolidated net result** | | | | | | **-5,053,098.00** | **-469,596.54** |
| 14. Balance carried forward | | | | | | | 157,985.65 |
| 15. Consolidated balance sheet result | | | | | | **-5,053,098.00** | **-311,610.89** |

* The comparative figures for financial year 2018 are the consolidated accounts of the legal entity Nexway AG (formerly asknet AG) as at December 31, 2018, i.e. excluding Nexway Group AG and its 100% owned subsidiary Nexway SAS. Please refer to the note "Pro Forma Information for Financial Year 2018" for further information. Due to the first-time consolidation of the Nexway Group as of January 31, 2019, consolidated Nexway SAS revenues for January 2019 are not included in the sales revenues for the first six months 2019.



NOTES
For the period ended June 30, 2019

ACCOUNTING PRINCIPLES
General Information
The consolidated financial statements of Nexway AG (formerly asknet AG), headquartered in Karlsruhe (Amtsgericht Mannheim, HRB 108713), were prepared in accordance with section 290 et sequ. of the German Commercial Code (Handelsgesetzbuch, HGB).

The additional disclosures required for individual items are included in the notes.
The fiscal year is the calendar year.

The consolidated income statement was prepared using the total cost accounting method.


Companies of Nexway Group
Following the acquisition of Nexway Group AG, its 100% owned subsidiary Nexway SAS and its subsidiaries at the end of January 2019, the consolidated financial statements include the parent company Nexway AG, Karlsruhe, Germany, as well as the wholly owned subsidiaries as outlined in the following table:

| Company | Country | Consolidation Method | Ownership interest | Voting rights |
|---|---|---|---|---|
| BOONTY ASIA | SG | Full | 100,00 | 100,00 |
| BOONTY JAPAN | JP | Full | 100,00 | 100,00 |
| NEXWAY COMERCIO ELECTRONICO LTDA | BR | Full | 99,99 | 99,99 |
| NEXWAY FRANCE | FR | Full | 100,00 | 100,00 |
| NEXWAY ITALIE | IT | Full | 100,00 | 100,00 |
| NEXWAY POLOGNE | PO | Full | 100,00 | 100,00 |
| NEXWAY USA Inc. | US | Full | 100,00 | 100,00 |
| NEXWAY GROUP AG | CH | Full | 100,00 | 100,00 |
| NEXWAY AG (parent company) | DE | Full | n.a. | n.a. |
| asknet Inc. | US | Full | 100,00 | 100,00 |
| asknet KK | JP | Full | 100,00 | 100,00 |
| asknet GmbH | CH | Full | 100,00 | 100,00 |
| NEXWAY MAROC | MA | Full | 100,00 | 100,00 |

The financial statements of the companies included in the parent company's consolidated financial statements were prepared using uniform accounting and reporting policies.



## Accounting and reporting policies

Internally generated intangible assets, mainly development costs for new software, are capitalized in the balance sheet as well as recognized in the income statement.

Internally generated commercial property rights and similar rights and assets are capitalized at cost (development cost) provided that there is at least a high probability on the balance sheet date an asset will actually be created. The cost of production comprises the individually attributable cost from the consumption of goods and the utilization of services. Internally generated commercial property rights and similar rights and assets are written off systematically over their expected useful lives on a pro rata temporis basis using the straight-line method.

Acquired intangible fixed assets are carried at cost and, if they have a finite useful life, are amortized in accordance with the term of their useful lives

Tangible fixed assets are carried at their acquisition or production cost and are subject to scheduled depreciation (straight-line method) in accordance with their expected useful life.

Since January 1, 2010, low value assets have been fully written off in the year of acquisition.

All other additions to tangible fixed assets are written down on a pro rata temporis basis.

Advance payments made shown under financial assets are stated at their face value.

Inventory is carried at the lower of cost or market. Appropriate write-down has been recognized for all identifiable inventory risks that result from reduced marketability and lower replacement costs.

With the exception of customary retention of title, inventories are free from third-party rights.

Receivables and other assets are carried at their face value. Adequate specific provisions are allowed for all items that carry risk.

Cash in hand and bank balances are recognized at their face value at the balance sheet date.

Payment made before the reporting date are recognized as prepaid expenses if they constitute expenses for a certain period after this date.

The subscribed capital and the capital reserve are carried at their face value. The capital reserve was formed in accordance with section 272 paragraph 2 no. 4 HGB.

Provisions for pensions and similar liabilities account for obligations of the company, mainly in France, to pay for post-employment benefits.

Other provisions account for all contingent liabilities and impending losses from pending transactions. They are recognized at their settlement values required according to prudent commercial judgment (in other words taking into consideration future cost and price increases).

Liabilities are carried at their settlement values.

Deferred taxes resulting from differences between the commercial balance sheet and the tax balance sheet are recognized if they are expected to be reduced in later fiscal years. Deferred



tax assets and liabilities are offset. If deferred tax assets exceed deferred tax liabilities as of the balance sheet date, no use is made of the capitalization option provided by section 274 paragraph 1 sentence 2 HGB.

All foreign currency assets and liabilities were translated into euros on the reporting date using the respective mean exchange rate. If these had remaining terms of more than one year, the realization principle (section 298 paragraph 1 in conjunction with section 252 paragraph 1 no 4 half sentence 2 HGB) and the historical cost principle (section 298 paragraph 1 sentence 1 HGB) were complied with. Current foreign currency receivables (remaining term of up to one year) as well as cash and cash equivalent or other current foreign currency assets are translated at the mean exchange rate on the balance sheet date in accordance with section 256 a HGB.

All assets and liabilities of annual financial statements prepared in foreign currencies were translated into euros at the respective mean exchange rate prevailing on the financial statement date, with the exception of equity (subscribed capital, provisions, profit/loss carry forward at historical exchanges rates). Income statement items are translated into euros at the average exchange rate. The resulting translation differences are recognized in Group equity, below provisions in the items "Currency translation differences".

**Consolidation principles**
The capital consolidation for initial consolidations prior to 2010 was carried out using the book value method at the time of the initial consolidation. The capital consolidation for initial consolidation as of 2010 was carried out using the revaluation method.

Receivables and liabilities, as well as income and expenses between Group compagnies were eliminated. No eliminations of inter-company profits losses were necessary.

Goodwill arising from acquisition of majority interests of companies is identified according to section 301 paragraph 3 HGB. Following its recognition, goodwill is amortized in according with its expected useful life.


PRO FORMA INFORMATION FOR 2018 FOLLOWING THE ACQUISITION OF NEXWAY SAS
The acquisition of 100% of the shares of Nexway Group AG and its 100% owned subsidiary Nexway SAS at the end of January 2019 represents a major change in the scope of consolidation of Nexway AG and therefore its consolidated accounts. Hence balance sheet and profit and loss figures in 2019 are not comparable with the figures of the consolidated accounts of Nexway AG (formerly asknet AG) for financial year 2018.
In accordance with section 294 paragraph 2 HGB, the following tables show the restated pro forma accounts for the period before January 1, 2019:



Pro forma balance sheet:

| CONSOLIDATED BALANCE SHEET | | |
|---|---|---|
| as of June 30 | | |
| in € | | PRO FORMA |
| | June 30, 2019 | December 31, 2018 |
| **ASSETS** | | |
| | | |
| **A. Fixed Assets** | | |
| I.  Intangible fixed assets GW | 18,132,623.00 | 0.00 |
| 1.  Self-created industrial property rights and similar rights | 7,351,859.00 | 11,224,168.00 |
| 2.  Acquired industrial property rights and similar rights | 746,383.80 | 919,220.80 |
| | **26,230,865.80** | **12,143,388.80** |
| II. Tangible fixed assets | | |
| Other equipment, operating and office equipment | 247,197.00 | 352,186.00 |
| III. Financial assets | | |
| Advance payments on shares in affiliated companies | 0.00 | 785,957.00 |
| **B.  Current Assets** | | |
| I.  Inventories | | |
| Merchandise | 57,642.00 | 204,715.00 |
| II. Receivables and other assets | | |
| 1.  Trade receivables | 7,268,413.49 | 7,220,674.89 |
| 2.  Other assets | 8,337,344.29 | 2,337,615.02 |
| | **15,605,757.78** | **9,558,289.91** |
| III. Cash-in-hand, bank balances, cheques | 4,178,119.00 | 5,015,418.00 |
| C.  Prepaid Expenses | **99,567.00** | **71,334.00** |
| | **46,419,148.58** | **28,131,288.71** |
| | | |
| | | |
| | June 30, 2019 | December 31,2018 |
| **EQUITY AND LIABILITIES** | | |
| | | |
| **A.  Equity** | | |
| I.  Subscribed capital (Contingent capital € thousand 1 500 (previous year thousand 1 500) | 653,765.00 | 653,765.00 |
| II. Capital reserve | 6,766,230.58 | -5,582,244.47 |
| III. Currency translation differences | -3,211,643.00 | -421,836.00 |
| IV. Consolidated balance sheet result | -5,053,098.00 | -2,575,071.52 |
| | **-844,745.42** | **-7,925,387.00** |
| **B.  Provisions** | | |
| Provisions for pensions and similar obligations | 176,056.00 | 201,352.00 |
| Other provisions | 1,059,095.00 | **1,121,893.00** |
| **C.  Liabilities** | | |
| I.  Loans | 7,500,000.00 | 0.00 |
| of which of more than one year € 7,500,000 | | |
| I.  Liabilities to banks | 0.00 | 0.00 |
| II. Trade payables | 34,117,166.00 | 29,219,006.96 |
| III. Other liabilities | | |
| of which taxes € 1,861,317.64 (previous year € 1,014,161.56) | 4,175,386.00 | 5,022,851.75 |
| | **45,792,552.00** | **34,241,858.71** |
| **D.  Deferred Income** | | **0.00** |
| **E.  Deferred Tax Liabilities** | 412,248.00 | **692,924.00** |
| | **46,419,149.58** | **28,131,288.72** |



## Pro forma Profit and Loss account:

| CONSOLIDATED INCOME STATEMENT | | | | | June 2019 | PRO FORMA June 2018 |
|---|---|---|---|---|---|---|
| January 1 until June 30 | | | | | | |
| in € | | | | | | |
| 1. Sales revenues | | | | | 86,128,514.00 | 98,910,929.00 |
| 2. Capitalized development activities | | | | | 531,216.00 | 1,267,010.00 |
| 3. Other operating income | | | | | 156,481.00 | |
| | | | | | 86,816,211.00 | 100,177,939.00 |
| 4. Cost of materials | | | | | | |
| a) Cost of purchased merchandise | | | | | -77,660,538.00 | -89,824,213.00 |
| b) Cost of purchased services | | | | | -2,454,823.00 | -1,570,040.00 |
| 5. Personnel expenses | | | | | | |
| a) Wages and salaries | | | | | -4,501,037.00 | -5,143,216.00 |
| b) Social security, post-employment and other employee benefit costs | | | | | -1,172,743.00 | -1,448,754.00 |
| 6. Amortization and write-downs of intangible fixed assets and depreciation and write-downs of tangible fixed assets | | | | | -2,987,552.00 | -1,583,189.00 |
| 7. Other operating expenses | | | | | -2,834,956.36 | -3,389,646.00 |
| | | | | | -91,611,649.36 | -102,959,058.00 |
| 8. Interest and similar income | | | | | 5,916.00 | 377.00 |
| 9. Interest and similar expenses | | | | | -336,415.64 | 13,795.00 |
| 10. Taxes on income and earnings | | | | | 4,928.00 | 14,483.00 |
| | | | | | -325,571.64 | 28,655.00 |
| 11. Earnings after taxes | | | | | -5,121,010.00 | -2,752,464.00 |
| 12. Other taxes | | | | | 67912 | 22207 |
| 13. Consolidated net result | | | | | -5,053,098.00 | -2,730,257.00 |
| 14. Balance carried forward | | | | | | |
| 15. Consolidated balance sheet result | | | | | -5,053,098.00 | -2,730,257.00 |

\* Due to the first-time consolidation of the Nexway Group as of January 31, 2019, consolidated Nexway SAS revenues for January 2019 are not included in the sales revenues for the first six months 2019. The figures for 2018 were restated as if the acquisition had taken place already on January 31, 2018.

Please refer to the outline of the pro forma figures in the management report.

## EXPLANATORY NOTES TO THE BALANCE SHEET

### Goodwill

The goodwill shown in the balance sheet as at June 30, 2019 stems from the acquisition and first consolidation of Nexway Group AG, its 100% owned subsidiary Nexway SAS and its subsidiaries applying the revaluation method.

Goodwill is amortized over its useful life, which is estimated to 5 years, which the company considers a reasonable period in the IT-sector.

Amortization is included in the income statement on a pro rata temporis base since the acquisition of Nexway SAS.

### Receivables and other assets

As in the previous year, receivables and other assets have a remaining maturity of up to one year, with the exception of the "Solidarbürgschaft" (joint security) of the Swiss Tax Authority (21.5 thousand euros).



### Bank balances

Of our bank balances, 150 thousand euros are reserved as collateral for aval commitments.

### Equity

Subscribed capital amounts to 653,765 euros and consists of registered no par value shares (common stock). Each no-par value share represents one vote. The subscribed capital was fully paid up.

### Authorized capital

At the ordinary annual general meeting of June 18, 2015, the executive board was authorized, with the approval of the supervisory board, to increase the share capital on one or more occasions by up to 2,375,663 euros by June 17, 2020 against cash or non-cash contribution by using new registered shares. Shareholders' subscription rights may be excluded under certain conditions.

Based on the authorization granted by the annual general meeting of July 18, 2015, the company's executive board, decided on September 26, 2018, with the consent of the supervisory board, to use part of the authorized capital and to increase the company's share capital from 560,370 euros to 653,765 euros by issuing 93,395 new shares against cash contribution at an issue price of 10.50 euros per share in a rights issue (indirect pre-emptive right). The lowest issue price is 1.00 euros per share. The excess amount of 887,252.50 euros was allocated to the capital reserve.

### Contingent capital

At the extraordinary general meeting on August 23, 2016, the executive board, with the approval of the supervisory board, was given authorization, extending until August 22, 2021, to issue on one or more occasions bearer or registered warrant bonds, convertible bonds, profit participation rights and/or income bonds or a combination thereof (collectively referred to as "bonds") in a total nominal amount of up to 3,000,000 euros with a maximum term of 10 years and to grant to or impose on the bearers or creditors of warrant bonds or warrant participation rights or warrant income bonds option rights or duties or to grant to or impose on the bearers or creditors of convertible bonds or convertible participation rights or convertible income bonds conversion rights or duties to up to 1,500,000 new registered shares of Nexway AG with a pro-rata amount of the share capital totalling 1,500,000 euros in accordance with the conditions of these bonds. In addition, the bonds may also be issued in the legal currency of an OECD country limited to the corresponding value in euros. They may also be issued by a subordinated Group company of Nexway AG; in this case, the executive board is authorized, with the approval of the supervisory board, to issue a guarantee on behalf of Nexway AG for the bonds and to issue to or impose on the bearers or creditors warrant and convertible rights or duties to registered shares of Nexway AG.

### Provision for pensions and similar obligation

These provisions consist of amounts to cover the legal obligation in France to make on-time payment for employees entering retirement.



## Other provisions

Other provisions primarily consisted of debt collection claims, leave entitlement and special bonuses, contributions to professional associations, year-end accounting cost, and tax accountant fees, as well as outstanding vendor invoices.

## Liabilities

All liabilities have a remaining maturity of up to one year and are not collateralized.

## Deferred taxes

After netting of deferred tax assets and deferred tax liabilities (comprehensive balance sheet method), there was a deferred tax liability of 412 thousand euros as of the balance sheet date of June 30, 2019. The differences between the commercial balance sheet and the tax balance sheet, which resulted in deferred tax liabilities, are primarily the result of the prohibition to capitalize internally generated intangible assets in the tax balance sheet. Deferred tax assets resulted from the recognition of different values for other provisions.

EXPLANATORY NOTES TO THE CONSOLIDATED INCOME STATEMENT
SALES REVENUES*
January 1 until June 30
In € thousand

|  | June 2019 | June 2018 |
|---|---|---|
| **SALES REVENUES BY BUSINESS UNIT** | | |
| eCommerce Solutions | 71,415 | 30,725 |
| Academics | 14,866 | 10,668 |
| | **86,281** | **41,393** |
| **SALES REVENUES BY REGION** | | |
| Europe | 52,995 | 21,328 |
| USA | 18,324 | 9,318 |
| Asia | 8,866 | 7,951 |
| Other countries | 6,096 | 2,816 |
| | **86,281** | **41,393** |

*Due to the first-time consolidation of the Nexway Group as of January 31, 2019, consolidated Nexway SAS revenues for January 2019 are not included in the sales revenues for the first six months 2019.

## Other operating income

Other operating income included mainly the tax credit for research and development activities in France (credit d'impôt-recherche).

## Other operating expenses

Other operating expenses mainly included license and update charges, as well as office rent and accounting fees.



OTHER DISCLOSURES

**Research and development costs**

Research and development costs in the first half of 2019 totaled 531 thousand euros of which an amount of 531 thousand euros relates to internally generated intangible assets.

**Other financial obligations**

Nexway has other financial obligations in the form of rental agreements and leases in the amount of 1,182 thousand euros.

TOTAL FINANCIAL OBLIGATIONS OF THE GROUP
In €

|  | Rent | Leasing | Total |
|---|---|---|---|
| Due within one year | 432,685.97 | 73,086.49 | 505,772.46 |
| Due in one to five years | 556,641.17 | 119,518.39 | 676,159.56 |
| Due after five years | 0.00 | 0.00 | 0.00 |
| Total | 989,327.14 | 192,604.88 | 1,181,932.02 |

Property lease is related to the company's head office in Germany (Karlsruhe) and in France (La Défense and Nîmes), the branch office in Switzerland as well as to the customer service locations in Japan and the USA. The leasing agreements are operating leases, under which the properties are not accounted for by the company. The advantage of these agreements is that less capital is tied up compared to the acquisition of the properties and that the realization risk is eliminated. Risks may arise from the duration of the agreement if the properties can no longer be fully used, of which there are no signs, however.

**Employees**

During the first half-year 2019, Nexway Group employed an overage number of 181 employees (previous year: 87 employees).

These employees are mainly based in Germany (84) and France (78). Other countries include:
-    USA:          8 employees
-    Japan:        5 employees
-    Poland:       4 employees
-    Italy:         2 employees

**Corporate bodies**

Executive Board

In the first six month of 2019, the executive board was composed of:
-    Aston Anthony Fallen, MBPA, Frankfurt (until June 28, 2019)
-    Victor Iezuitov (CEO), Lausanne/CH (since June 28, 2019)
-    Norman Hansen (COO), Paris (since June 28, 2019)



Supervisory Board

The following members served on the supervisory board in the fiscal year until June 28, 2019:

- Jörn Matuszewski, attorney of the partnership Heuking Kühn Lüer Wojtek (Düsseldorf/Germany), domiciled in Meerbusch/Germany
- Gilles Ridel, founder and former shareholder of Nexway SAS (France)
- Osman Khan, Chairman of the Board of directors of The Native SA (Switzerland), until April 17, 2019
- Victor Iezuitov, CFO of The Native SA (Switzerland)

On June 28, 2019, a new supervisory board was appointed during the Annual general assembly of Nexway AG. It consists of the following members:

- Aston Anthony Fallen, MBPA, Frankfurt, Chairman
- Thomas Garrahan, Deputy Chairman, Executive Director of AlphaQ Ltd., Gingins, Switzerland
- Matthew Baile, CEO of DirectSource Asia, Hong Kong.


POST BALANCE SHEET EVENTS

### Change in majority shareholder of Nexway AG

On September 24, 2019 Facebank Group, Inc., a US-listed company, became the new majority shareholder of Nexway AG through its French subsidiary StockAccess Holdings SAS – Facebank Group is a leading developer of hyper-realistic digital humans for entertainment, virtual reality, augmented reality and artificial intelligence, and this investment potentially opens to Nexway AG access to the large market of payment and ecommerce services for the global digital content market served by Facebank.


### Lowered guidance

On October 31, 2019, Nexway AG lowered its guidance for the full year 2019 against the background of the expected business development in the last quarter of 2019. Nexway AG continues to expect an improvement of consolidated EBITDA for the second half of 2019. Contrary to previous expectations, however, the improvement will not be sufficient to achieve the slightly positive EBITDA previously forecast on a full-year basis. The company now expects an EBITDA between -2.0 million euros and -2.8 million euros for 2019. Regarding the top line, Nexway AG now expects consolidated sales revenues between 180 and 200 million euros and a gross profit between 14 and 18 million euros, both before deduction of January 2019 figures of Nexway Group AG and its 100-% subsidiary Nexway SAS, given that it had been consolidated as of January 31, 2019. Originally the company had forecast consolidated sales revenues of over 200 million euros and a gross profit of more than 20 million euros (also both before deduction of January 2019 figures of Nexway Group AG and its 100-% subsidiary Nexway SAS).



Except for the above, there were no other significant events after the half-year balance sheet date that had a material effect on the net asset financial position, and operating result of Nexway Group.

Karlsruhe, October 31, 2019
Nexway AG - The Executive Board -

Victor Iezuitov
Chief Executive Officer

Norman Hansen
Chief Operating Officer

# Exhibit

# 17

9/21/21, 8:49 AM
Nexway SAS becomes a more agile e-commerce and payment solutions provider
Case 1:21-mc-00145-TNM   Document 5   Filed 11/17/21   Page 180 of 245



SIGN IN



# Nexway SAS becomes a more agile e-commerce and payment solutions provider

June 18, 2020 09:43 ET | Source: Nexway SASU

🌐 English ⌄

E-COMMERCE AND PAYMENT LEADER NEXWAY ANNOUNCES THE SEPARATION OF ITS GLOBAL BUSINESS HEADQUARTERED IN FRANCE FROM ITS GERMAN ENTITY.

Paris, June 9, 2020 - Nexway SAS, a leading e-commerce services provider of solutions for monetizing digital business models and connecting companies to the global e-commerce market, announces its separation from Nexway AG (formerly asknet AG), supplier of e-business technologies and academic software distribution solutions, following a transfer of 100% ownership dated April 15, 2020.

During the period of transformation of the past 18 months, Nexway SAS applied its access to increased capital into updating its technology stack and streamlining internal processes to build a strong customer-centric operation with a global geographic footprint. The newly independent Nexway SAS will remain focused on its core businesses of e-commerce and payments, enabling companies to provide exceptional purchase experiences.

> *"Today marks the beginning of a new chapter in the exciting story of Nexway SAS and these developments set our company on a trajectory of growth and profitability", said CEO Victor Iezuitov. "Nexway SAS is a strong company with passionate employees who are dedicated to servicing customers and enabling their businesses to accelerate sales. With a new single shareholder, we are focused and better positioned to compete in the ever-evolving e-commerce marketplace."*








**Nexway SAS becomes a more agile e-commerce and p...**      SIGN IN

Officer Casey Potenzone, and Chief Technology Officer Frederic Ribau.

The company will continue to offer the industry's most comprehensive product and service suite in the subscription, billing and e-commerce space, with its core solutions Nexway Monetize and Nexway Connect. Nexway SAS services more than 400 clients around the globe to sell their products in up to 180 countries.

Nexway AG, under a new brand name, will operate as a separate independent entity under its current ownership structure. The two companies will continue to collaborate as partners on synergistic initiatives.

**Media Contact**

Alexandra Naintré

anaintre@nexway.com

**About Nexway**

Nexway SAS is a leading e-commerce and payment player. Combining technology and managed services, Nexway helps online businesses scale, grow, and thrive. Nexway's expertise in subscriptions, local payments, fraud prevention and reseller management enables customers to transform their purchasing experience and accelerate sales. Founded in 2002 and headquartered in Paris–La Défense, France, Nexway has subsidiaries in the USA, Brazil, Italy, Spain, Poland, and Japan. Companies who rely on Nexway include FNAC-Darty™, Amazon™, Kaspersky™, Adobe™, Avast™, TeamViewer™, Bit Defender™, TakeTwo, and hundreds more.

---

**Tags**

Nexway    ecommerce    payment    Germany    France    Merchant

Monetize    Software IT

**Related Links**

- Nexway SAS Home

# Explore

Case 1:21-mc-00145-TNM   Nexway SAS becomes a more agile e-commerce and paym...   Filed 11/17/21   Page 182 of 245



NEXWAY   **Nexway SAS becomes a more agile e-commerce and p...**   SIGN IN ☰






Unlimited launch million Initiati...

**ValueSelling Associates Welcomes Lisa Schnare...**

September 21, 2021 08:41 ET

September 21, 2021 08:33 ET



## About Us

GlobeNewswire is one of the world's largest newswire distribution networks, specializing in the delivery of corporate press releases, financial disclosures and multimedia content to media, investors, and consumers worldwide.

Follow us on social media:  in  🐦

**Newswire Distribution Network & Management**

- Home
- RSS Feeds
- Newsroom
- Legal

GlobeNewswire is a newswire distribution network. Articles and other content published by GlobeNewswire are the legal responsibility of the author and GlobeNewswire accepts no liability for the content of such material. GlobeNewswire publishes content for informational purposes and makes no representations regarding, recommendation or invitation to engage in, any form of financial or investment activity, and does not endorse the content of any material published.

© 2021 GlobeNewswire, Inc. All Rights Reserved.

# Exhibit

# 18



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Office of the Secretary

JAN 2 8 2020

<u>Via U.S. Mail</u>

Nexway, Incorporated
236 8th Street, Suite C
San Francisco, California 94104

FTC Matter No. 1923239

Dear Sir or Madam:

The Federal Trade Commission ("FTC") has issued the attached Civil Investigative Demand ("CID") asking for information as part of a non-public investigation. Our purpose is to determine whether you or other persons or entities have engaged in deceptive and unfair practices in violation of the FTC Act, 15 USC § 45 by credit card laundering, assisting or facilitating violations of the Telemarketing Sales Rule, 16 C.F.R. Part 310, or by making a false or misleading statement to induce any person to pay for goods or services and whether Commission action to obtain monetary relief would be in the public interest. Please read the attached documents carefully. Here are a few important points we would like to highlight:

1. **Contact FTC counsel Russell Deitch, 202-326-2585, rdeitch@ftc.gov as soon as possible to schedule an initial meeting to be held within 14 days.** You can meet in person or by phone to discuss any questions you have, including whether there are changes to how you comply with the CID that would reduce your cost or burden while still giving the FTC the information it needs. Please read the attached documents for more information about that meeting.

2. **Please keep this request, and the FTC's investigation, confidential.** The attached CID is part of an ongoing, nonpublic investigation. Disclosing it could interfere with our law-enforcement efforts. Please contact FTC counsel before taking any action (such as suspending services) that could alert the target(s) to the investigation.

3. **You must immediately stop any routine procedures for electronic or paper document destruction, and you must preserve all paper or electronic documents** that are in any way relevant to this investigation, even if you believe the documents are protected from discovery by privilege or some other reason.

4. **The FTC will use information you provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces.** We will not disclose the information under the Freedom of Information Act, 5 U.S.C. § 552. We may disclose the information in response to a valid request from Congress, or other civil or criminal federal, state, local, or foreign law enforcement agencies for their

official law enforcement purposes. The FTC or other agencies may use and disclose your response in any federal, state, or foreign civil or criminal proceeding, or if required to do so by law. However, we will not publicly disclose your information without giving you prior notice.

5. **Please read the attached documents closely.** They contain important information about how you should provide your response.

Please contact FTC counsel as soon as possible to set up an initial meeting. We appreciate your cooperation.

Very truly yours,

April J. Tabor
Acting Secretary of the Commission

United States of America
**Federal Trade Commission**

# CIVIL INVESTIGATIVE DEMAND

| 1. TO  Nexway, Incorporated | 1a. MATTER NUMBER |
|---|---|
| 236 8th Street, Suite C<br>San Francisco, California<br>94103 | 1923239 |

This demand is issued pursuant to Section 20 of the Federal Trade Commission Act, 15 U.S.C. § 57b-1, in the course of an investigation to determine whether there is, has been, or may be a violation of any laws administered by the Federal Trade Commission by conduct, activities or proposed action as described in Item 3.

2. ACTION REQUIRED

☐ You are required to appear and testify.

| LOCATION OF HEARING | YOUR APPEARANCE WILL BE BEFORE |
|---|---|
| | DATE AND TIME OF HEARING OR DEPOSITION |

☒ You are required to produce all documents described in the attached schedule that are in your possession, custody, or control, and to make them available at your address indicated above for inspection and copying or reproduction at the date and time specified below.

☒ You are required to answer the interrogatories or provide the written report described on the attached schedule. Answer each interrogatory or report separately and fully in writing. Submit your answers or report to the Records Custodian named in Item 4 on or before the date specified below.

☐ You are required to produce the tangible things described on the attached schedule.  Produce such things to the Records Custodian named in Item 4 on or before the date specified below.

DATE AND TIME THE DOCUMENTS, ANSWERS TO INTERROGATORIES, REPORTS, AND/OR TANGIBLE THINGS MUST BE AVAILABLE

**FEB 2 8 2020**   by 5:00pm

3. SUBJECT OF INVESTIGATION

See attached Schedule and attached resolution.

| 4. RECORDS CUSTODIAN/DEPUTY RECORDS CUSTODIAN | 5. COMMISSION COUNSEL |
|---|---|
| Lois Greisman/Reeve Tyndall<br>Federal Trade Commission<br>600 Pennsylvania Ave., N.W. Mail Stop CC-8528<br>Washington DC 20580 | Russell Deitch, 202-326-2255, rdeitch@ftc.gov<br>Federal Trade Commission<br>600 Pennsylvania Ave., N.W. Mail Stop CC-8528<br>Washington, DC 20580 |

| DATE ISSUED | COMMISSIONER'S SIGNATURE |
|---|---|
| 1/28/20 | |

### INSTRUCTIONS AND NOTICES

The delivery of this demand to you by any method prescribed by the Commission's Rules of Practice is legal service and may subject you to a penalty imposed by law for failure to comply. The production of documents or the submission of answers and report in response to this demand must be made under a sworn certificate, in the form printed on the second page of this demand, by the person to whom this demand is directed or, if not a natural person, by a person or persons having knowledge of the facts and circumstances of such production or responsible for answering each interrogatory or report question. This demand does not require approval by OMB under the Paperwork Reduction Act of 1980.

### PETITION TO LIMIT OR QUASH

The Commission's Rules of Practice require that any petition to limit or quash this demand be filed within 20 days after service, or, if the return date is less than 20 days after service, prior to the return date. The original and twelve copies of the petition must be filed with the Secretary of the Federal Trade Commission, and one copy should be sent to the Commission Counsel named in Item 5.

### YOUR RIGHTS TO REGULATORY ENFORCEMENT FAIRNESS

The FTC has a longstanding commitment to a fair regulatory enforcement environment. If you are a small business (under Small Business Administration standards), you have a right to contact the Small Business Administration's National Ombudsman at 1-888-REGFAIR (1-888-734-3247) or www.sba.gov/ombudsman regarding the fairness of the compliance and enforcement activities of the agency. You should understand, however, that the National Ombudsman cannot change, stop, or delay a federal agency enforcement action.

The FTC strictly forbids retaliatory acts by its employees, and you will not be penalized for expressing a concern about these activities.

### TRAVEL EXPENSES

Use the enclosed travel voucher to claim compensation to which you are entitled as a witness for the Commission. The completed travel voucher and this demand should be presented to Commission Counsel for payment. If you are permanently or temporarily living somewhere other than the address on this demand and it would require excessive travel for you to appear, you must get prior approval from Commission Counsel.

A copy of the Commission's Rules of Practice is available online at http://bit.ly/FTCSRulesofPractice. Paper copies are available upon request.

## Form of Certificate of Compliance*

I/We do certify that all of the documents, information and tangible things required by the attached Civil Investigative Demand which are in the possession, custody, control, or knowledge of the person to whom the demand is directed have been submitted to a custodian named herein.

If a document or tangible thing responsive to this Civil Investigative Demand has not been submitted, the objections to its submission and the reasons for the objection have been stated.

If an interrogatory or a portion of the request has not been fully answered or a portion of the report has not been completed, the objections to its submission and the reasons for the objections have been stated.

Signature _____

Title _____

Sworn to before me this day

_____    _____

_____
Notary Public

_____

*In the event that more than one person is responsible for complying with this demand, the certificate shall identify the documents for which each certifying individual was responsible.  In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

EDERAL TRADE COMMISSION ("FTC")
CIVIL INVESTIGATIVE DEMAND ("CID") SCHEDULE
FTC File No. 1923239

**Meet and Confer:** You must contact **FTC counsel, Russell Deitch, 202-326-2585, rdeitch@ftc.gov** as soon as possible to schedule a meeting (telephonic or in person) to be held within fourteen (14) days after You receive this CID. At the meeting, You must discuss with FTC counsel any questions You have regarding this CID or any possible CID modifications that could reduce Your cost, burden, or response time yet still provide the FTC with the information it needs to pursue its investigation. The meeting also will address how to assert any claims of protected status (e.g., privilege, work-product, etc.) and the production of electronically stored information. You must make available at the meeting personnel knowledgeable about Your information or records management systems, Your systems for electronically stored information, custodians likely to have information responsive to this CID, and any other issues relevant to compliance with this CID.

**Document Retention**: You must retain all documentary materials used in preparing responses to this CID. The FTC may require the submission of additional Documents later during this investigation. **Accordingly, You must suspend any routine procedures for Document destruction and take other measures to prevent the destruction of Documents in Your possession, custody, or control** that are in any way relevant to this investigation, even if those Documents are being retained by a third-party or You believe those Documents are protected from discovery. *See* 15 U.S.C. § 50; *see also* 18 U.S.C. §§ 1505, 1519.

**Sharing of Information:** The FTC will use information You provide in response to the CID for the purpose of investigating violations of the laws the FTC enforces. We will not disclose such information under the Freedom of Information Act, 5 U.S.C. § 552. We also will not disclose such information, except as allowed under the FTC Act (15 U.S.C. § 57b-2), the Commission's Rules of Practice (16 C.F.R. §§ 4.10 & 4.11), or if required by a legal obligation. Under the FTC Act, we may provide Your information in response to a request from Congress or a proper request from another law enforcement agency. However, we will not publicly disclose such information without giving You prior notice.

**Manner of Production**: You may produce documentary material or tangible things by making them available for inspection and copying at Your principal place of business. Alternatively, You may send all responsive Documents and tangible things to **Reeve Tyndall, Federal Trade Commission, 600 Pennsylvania Ave., N.W., Mail Stop CC-8528, Washington DC, 20580**. If You are sending the materials, use a courier service such as Federal Express or UPS because heightened security measures delay postal delivery to the FTC. You must inform FTC counsel by email or telephone of how You intend to produce materials responsive to this CID at least five days before the return date.

**Certification of Compliance**: You or any person with knowledge of the facts and circumstances relating to the responses to this CID must certify that such responses are complete by signing the "Certificate of Compliance" attached to this CID.

**Certification of Records of Regularly Conducted Activity**: Attached is a Certification of Records of Regularly Conducted Activity. Please execute and return this Certification with Your response. Completing this certification may reduce the need to subpoena You to testify at future proceedings to establish the admissibility of Documents produced in response to this CID.

**Definitions and Instructions**: Please review carefully the Definitions and Instructions that appear after the Specifications and provide important information regarding compliance with this CID.

## SUBJECT OF INVESTIGATION

Whether you or other persons or entities have engaged in deceptive and unfair practices in violation of the FTC Act, 15 USC § 45 by credit card laundering, assisting or facilitating violations of the Telemarketing Sales Rule, 16 C.F.R. Part 310, or by making a false or misleading statement to induce any person to pay for goods or services and whether Commission action to obtain monetary relief would be in the public interest. See also attached resolution.

## SPECIFICATIONS

**Applicable Time Period:** Unless otherwise directed, the applicable time period for the requests set forth below is from January 1, 2017 until the date of full and complete compliance with this CID.

## DOCUMENT REQUESTS

**Produce copies of the following Documents:**

1. The Company's and Nexway AG's articles of incorporation, and by laws.

2. An organizational chart of the Company and Nexway AG.

3. Documents sufficient to show all parents, subsidiaries and affiliates of the Company and their addresses.

4. All Documents related to the Tech Support Merchants that the Company or Nexway AG has in its possession, custody or control, including the following:

   A. Contracts;

   B. Consumer complaints;

   C. Lawsuits by the Federal Trade Commission or State Attorneys Generals;

   D. Advertising, pop ups, or telephone, sales or marketing scripts;

   E. Policies, procedures, and scripts of responses to consumers who contest or complain about charges, or seek refunds;

   F. Chargebacks, Chargeback Rates, Refunds and Refund Rates;

   G. Due diligence review, investigation, monitoring or any warning or disciplinary action;

H. Communications, including letters or emails from Visa, MasterCard, Pay Pal, any bank, and any payment processor;

I. Recordings of test calls made by the Company, Nexway AG, or any other Person, transcripts of recordings of test calls, and reports documenting the results of the test calls; and

J. Recordings of telephone conversations between consumers and any of the Tech Support Merchants.

5. All Documents related to the company and Nexway AG's compliance with federal or state consumer protection laws and regulations, including the Telemarketing Sales Rule, 16 CFR Part 310.

6. Documents sufficient to show the Company's and Nexway AG's gross revenue, net revenue and expenses for each of the Tech Support Merchants.

7. All Merchant Agreements between the Company or Nexway AG and banks, financial institutions, Independent Service Organizations, or Payment Processors.

8. All applications for Merchant Accounts the Company or Nexway AG provided to banks, financial institutions, Independent Service Organizations, or Payment Processors.

9. All agreements with PayPal and the Company or Nexway AG, and any applications for any account by the Company or Nexway AG with PayPal.

10. All agreements with Adyen or Evo Payments, Inc., or Evo Payments, International, LLC with the Company or Nexway AG, and any applications for accounts by the Company or Nexway AG with Adyen or Evo Payments, Inc., or Evo Payments, International, LLC.

11. All communications, including letters and emails that the Company or Nexway received from Visa, MasterCard, PayPal, any bank, or any Payment Processor relating to Chargebacks or Refunds.

12. All documents the Company or Nexway AG reviewed, relied upon or that relate to the Company's or Nexway AG's Visa chargeback monitoring program remediation plan dated on or about January 16, 2018, or any other remediation plan.

13. All agendas, meeting minutes, memoranda, or other documents relating to meetings about the Company's or Nexway AG's Visa chargeback monitoring program remediation plan dated on or about January 16, 2018, or or any other remediation plan.

14. All documents, including emails, related to the February 8, 2019 letter sent to the Company from the Golden Gate Better Business Bureau.

15. All Documents Identified in, referenced in, or relating to Your answers to the Interrogatories.

## INTERROGATORIES

**Provide answers to the requests below in writing and under oath.**

1. Describe all monitoring the Company or Nexway AG performed on any of the Tech Support Merchants.

2. Describe any formal or informal disciplinary action the Company or Nexway AG took against any of the Tech Support Merchants.

3. Identify all banks or other financial institutions where the Company or Nexway AG has a Merchant Account or Merchant Agreement.

4. List and describe all disciplinary actions taken by any payment processor, acquiring bank, or credit card association against the Company, Nexway AG, or any of the Tech Support Merchants.

5. The number and dollar amounts of Chargebacks on a monthly basis, the number and dollar amount of sales on a monthly basis, and the Chargeback Rate on a monthly basis for each of the Tech Support Merchants.

6. The number and dollar amounts of Refunds on a monthly basis, and the Refund Rate on a monthly basis for each of the Tech Support Merchants.

7. Describe how the Company and Nexway AG's "Merchant of Record" model complies with the Visa and MasterCard rules regarding processing payments for third parties. If it is the Company's position that the Company and Nexway AG are the merchants responsible for any credit card sales draft or charge relating to any of the Tech Support Merchants, describe the Company's position.

8. Describe all goods or services provided by the Company or Nexway AG to the Tech Support Merchants, including Payment Processing, complaint handling, receipt or placing of telephone calls, script writing, website assistance, billing page writing or design, or pop up writing or design.

9. Identify each bank, Payment Processor or other entity the Company or Nexway AG contracted with in order to provide Payment Processing to each Tech Support Merchant, and describe the services the bank, Payment Processor or other entity provided.

10. Identify all officers, directors, owners, or managers of the Company or Nexway AG who received the February 8, 2019 letter from the Golden Gate Better Business Bureau

11. Identity all officers, directors, owners, or managers of the Company or Nexway AG who received or were involved with drafting, providing information for, or reviewing the Company's or Nexway AG's Visa chargeback monitoring program remediation plan dated on or about January 16, 2018.

12. Describe the changes the Company or Nexway AG made to its business practices after receiving the February 8, 2019 letter from the Golden Gate Better Business Bureau.

13. Describe the changes the Company or Nexway AG made to its business practices after signing its Visa chargeback remediation plan on or about January 16, 2018.

14. Describe how the Company shares databases with Nexway AG, and obtains documents from Nexway AG when it requests them.

15. State whether Nexway, Incorporated is a wholly owned subsidiary of Nexway AG.

16. Identify all officers and employees who work for or are affiliated with both Nexway, Incorporated and Nexway AG and describe their roles and responsibilities.

## DEFINITIONS

The following definitions apply to this CID:

D-1.    "**Acquirer**" means a business organization, financial institution, or an agent of a business organization or financial institution that has authority from an organization that operates or licenses a credit card system (e.g. VISA, MasterCard, American Express, and Discover) to authorize Merchants to accept, transmit, or process payments by credit card through the credit card system for money, goods or services, or anything else of value.

D-2.    "**Advertisement**" or "**Advertising**" or "**Ad**" means any written or verbal statement, illustration, or depiction that promotes the sale of a good or service or is designed to increase consumer interest in a brand, good, or service. Advertising media includes, but is not limited to: packaging and labeling; promotional materials; print; television; radio; and Internet, social media, and other digital content.

D-3.    "**Cardholder**" means any consumer who uses a credit card, debit card, or prepaid debit card to purchase goods or services.

D-4.    "**Chargeback**" means a transaction that a card issuer returns as a financial liability to an acquiring or merchant bank, usually because of a disputed transaction. The Acquirer may then return or "charge back" the transaction to the merchant.

D-5.    "**Chargeback Rate**" means the proportion (expressed as a percentage) of chargebacks out of the total number of attempted credit or debit card sales transactions.

D-6.    "**Company**," "**You**," or "**Your**" means Nexway, Incorporated its wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all directors, officers, members, employees, agents, consultants, and other persons working for or on behalf of the foregoing.

D-7.    "**Document**" means the complete original, all drafts, and any non-identical copy, whether different from the original because of notations on the copy, different metadata, or otherwise, of any item covered by 15 U.S.C. § 57b-1(a)(5), 16 C.F.R. § 2.7(a)(2), or Federal Rule of Civil Procedure 34(a)(1)(A).

D-8.    "**Identify**" or "**the Identity of**" requires identification of (a) natural persons by name, title, present business affiliation, present business address, telephone number, and email address or, if a present business affiliation or present business address is not known, the last known business and home addresses; and (b) businesses or other organizations by name, address, and the identities of Your contact persons at the business or organization.

D-9.   **"Independent Sales Organization"** or **"ISO"** means any person or entity that markets Payment Processing services, refers merchants for Payment Processing services, or otherwise assists merchants in obtaining Payment Processing services.

D-10.   **"Merchant"** means a person who is authorized under a written contract with an Acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

D-11.   **"Merchant Account"** means any account with an Acquirer or other financial institution, service provider, payment processor, Independent Service Organization, payment facilitator, or other entity that enables an individual, a business, or other organization to accept payments of any kind.

D-12.   **"Merchant Agreement"** means a written contract between a Merchant and an Acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution.

D-13.   **"Payment Processing"** means the performance of any function of collecting, formatting, charging, transmitting, or processing, whether directly or indirectly, a Cardholder's payment for goods or services.  Payment Processing includes:  providing a merchant, financial institution, person, or entity, directly or indirectly, with the access or means to charge or debit a Cardholder's account; monitoring, tracking, and reconciling payments, returns, Refunds, and Chargebacks; providing Refund services to a merchant; and disbursing funds and receipts to merchants.

D-14.   **"Payment Processor"** means a company that engages in Payment Processing.

D-15.   **"Refund"** means a merchant's credit or reversal of a charge the merchant previously processed to a Cardholder's account.  A merchant may provide a Refund after a consumer has cancelled a transaction or returned the goods purchased.  For purposes of this CID, the term "Refund" includes any request for Refunds or credits other than a Chargeback.

D-16.   **"Refund Rates"** means the proportion (expressed as a percentage) of Refunds out of the total number of credit or debit card sales transactions.

D-17.   **"Tech Support Merchants"** means Econosoft, PCLogics Soft Store, AMPC Support, Tweakerbit, WebPC Experts, Avast, Tech Live Connect, Tech Live Connect PTE LTD, any company or entity associated with the toll free number 1-877-958-7560 or the Merchant Name NEXWAY +1-877-958-7560 TL, Global Digital Concierge PTE LTD, Smart Tech Help, Smartnetcare, Easy Net Experts, Premium Techie Support, Saburi TLC, PC Visor Pte Ltd., Safelabs, and Infotech.

# INSTRUCTIONS

I-1.    **Petitions to Limit or Quash**: You must file any petition to limit or quash this CID with the Secretary of the FTC no later than twenty (20) days after service of the CID, or, if the return date is less than twenty (20) days after service, prior to the return date. Such petition must set forth all assertions of protected status or other factual and legal objections to the CID and comply with the requirements set forth in 16 C.F.R. § 2.10(a)(1) – (2). **The FTC will not consider petitions to quash or limit if You have not previously met and conferred with FTC staff and, absent extraordinary circumstances, will consider only issues raised during the meet and confer process.** 16 C.F.R. § 2.7(k); *see also* § 2.11(b). **If You file a petition to limit or quash, You must still timely respond to all requests that You do not seek to modify or set aside in Your petition.** 15 U.S.C. § 57b-1(f); 16 C.F.R. § 2.10(b).

I-2.    **Withholding Requested Material / Privilege Claims**: For specifications requesting production of Documents, if You withhold from production any material responsive to this CID based on a claim of privilege, work product protection, statutory exemption, or any similar claim, You must assert the claim no later than the return date of this CID, and You must submit a detailed log, in a searchable electronic format, of the items withheld that identifies the basis for withholding the material and meets all the requirements set forth in 16 C.F.R. § 2.11(a) – (c). The information in the log must be of sufficient detail to enable FTC staff to assess the validity of the claim for each Document, including attachments, without disclosing the protected information. If only some portion of any responsive material is privileged, You must submit all non-privileged portions of the material. Otherwise, produce all responsive information and material without redaction. 16 C.F.R. § 2.11(c). The failure to provide information sufficient to support a claim of protected status may result in denial of the claim. 16 C.F.R. § 2.11(a)(1).

I-3.    **Modification of Specifications**: The Bureau Director, a Deputy Bureau Director, Associate Director, Regional Director, or Assistant Regional Director must agree in writing to any modifications of this CID. 16 C.F.R. § 2.7(l).

I-4.    **Scope of Search**: This CID covers Documents and information in Your possession or under Your actual or constructive custody or control, including Documents and information in the possession, custody, or control of Your attorneys, accountants, directors, officers, employees, service providers, and other agents and consultants, whether or not such Documents or information were received from or disseminated to any person or entity.

I-5.    **Identification of Responsive Documents**: For specifications requesting production of Documents, You must identify in writing the Documents that are responsive to the specification. Documents that may be responsive to more than one specification of this CID need not be produced more than once. If any Documents responsive to this CID have been previously supplied to the FTC, You may identify the Documents previously provided and the date of submission.

I-6.    **Maintain Document Order**: For specifications requesting production of Documents, You must produce Documents in the order in which they appear in Your files or as electronically stored. If Documents are removed from their original folders, binders, covers, containers, or

electronic source, You must specify the folder, binder, cover, container, or electronic media or file paths from which such Documents came.

I-7.    **Numbering of Documents**:  For specifications requesting production of Documents, You must number all Documents in Your submission with a unique identifier such as a Bates number or a Document ID.

I-8.    **Production of Copies**:  For specifications requesting production of Documents, unless otherwise stated, You may submit copies in lieu of original Documents if they are true, correct, and complete copies of the originals and You preserve and retain the originals in their same state as of the time You received this CID.  Submission of copies constitutes a waiver of any claim as to the authenticity of the copies should the FTC introduce such copies as evidence in any legal proceeding.

I-9.    **Production in Color**:  For specifications requesting production of Documents, You must produce copies of Advertisements in color, and You must produce copies of other materials in color if necessary to interpret them or render them intelligible.

I-10.   **Production in English**:  You should produce English translations for any document that is in German or any other language other than English.

I-11.   **Electronically Stored Information**:  For specifications requesting production of Documents, see the attached FTC Bureau of Consumer Protection Production Requirements ("Production Requirements"), which detail all requirements for the production of electronically stored information to the FTC.  You must discuss issues relating to the production of electronically stored information with FTC staff **prior to** production.

I-12.   **Sensitive Personally Identifiable Information ("Sensitive PII") or Sensitive Health Information ("SHI")**:  For specifications requesting production of Documents or answers to any written interrogatories, if any materials responsive to this CID contain Sensitive PII or SHI, please contact FTC counsel before producing those materials to discuss whether there are steps You can take to minimize the amount of Sensitive PII or SHI You produce, and how to securely transmit such information to the FTC.

Sensitive PII includes an individual's Social Security number; an individual's biometric data (such as fingerprints or retina scans, but not photographs); and an individual's name, address, or phone number in combination with one or more of the following:  date of birth, Social Security number, driver's license or state identification number (or foreign country equivalent), passport number, financial account number, credit card number, or debit card number.  SHI includes medical records and other individually identifiable health information relating to the past, present, or future physical or mental health or conditions of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual.

I-13.   **Interrogatory Responses**:  For specifications requesting answers to written interrogatories:  (a) answer each interrogatory and each interrogatory subpart separately, fully, and in writing; and (b) verify that Your answers are true and correct to Your knowledge by signing the "Certification of Compliance" attached to this CID.

**Submission of Documents in Lieu of Interrogatory Answers**: You may answer any written interrogatory by submitting previously existing Documents that contain the information requested in the interrogatory so long as You clearly indicate in each written interrogatory response which Documents contain the responsive information. For any interrogatory that asks You to identify Documents, You may, at Your option, produce the Documents responsive to the interrogatory so long as You clearly indicate the specific interrogatory to which such Documents are responsive.

**Federal Trade Commission - Bureau of Consumer Protection**
**Production Requirements**
Revised August 2019

In producing information to the FTC, comply with the following requirements, unless the FTC agrees otherwise. If you have questions about these requirements, please contact FTC counsel before production.

## Production Format

1. **General Format**: Provide load-ready electronic productions with:

   a. A delimited data load file (.DAT) containing a line for every document, unique id number for every document (DocID), metadata fields, and native file links where applicable;

   b. A document level text file, named for the DocID, containing the text of each produced document; and

   c. An Opticon image load file (.OPT) containing a line for every image file, where applicable.

2. **Electronically Stored Information (ESI)**: Documents stored in electronic format in the ordinary course of business must be produced in the following format:

   a. For ESI other than the categories below, submit in native format. Include document level extracted text or Optical Character Recognition (OCR), all metadata, and corresponding image renderings converted to Group IV, 300 DPI, single-page TIFF (or color JPEG images when necessary to interpret the contents or render them intelligible).

   b. For Microsoft Excel, Access, or PowerPoint files, submit in native format with extracted text and metadata. Data compilations in Excel spreadsheets or delimited text formats must contain all underlying data, formulas, and algorithms without redaction.

   c. For other spreadsheet, database, presentation, or multimedia formats; instant messages; or proprietary applications, discuss the production format with FTC counsel.

3. **Hard Copy Documents**: Documents stored in hard copy in the ordinary course of business must be scanned and submitted as 300 DPI single page TIFFs (or color JPEGs when necessary to interpret the contents or render them intelligible), with corresponding document-level OCR text and logical document determination in an accompanying load file.

4. **Document Identification**: Provide a unique DocID for each hard copy or electronic document, consisting of a prefix and a consistent number of numerals using leading zeros. Do not use a space to separate the prefix from numbers.

5. **Attachments**: Preserve the parent/child relationship by producing attachments as separate documents, numbering them consecutively to the parent email, and including a reference to all attachments.

6. **Metadata Production**: For each document submitted electronically, include the standard metadata fields listed below in a standard delimited data load file. The first line of the data load file shall include the field names. <u>Submit date and time data in separate fields</u>. Use these standard Concordance delimiters in delimited data load files:

| Description | Symbol | ASCII Character |
|---|---|---|
| Field Separator | ¶ | 20 |
| Quote Character | þ | 254 |
| Multi Entry delimiter | ® | 174 |
| <Return> Value in data | ~ | 126 |

7. **De-duplication**: Do not use de-duplication or email threading software without FTC approval.

8. **Password-Protected Files**: Remove passwords prior to production. If password removal is not possible, provide the original and production filenames and the passwords, under separate cover.

## Producing Data to the FTC

1. Prior to production, scan all data and media for viruses and confirm they are virus-free.

2. For productions smaller than 50 GB, submit data electronically using the FTC's secure file transfer protocol. Contact FTC counsel for instructions. **The FTC cannot accept files via Dropbox, Google Drive, OneDrive, or other third-party file transfer sites**.

3. If you submit data using physical media:

    a. Use only CDs, DVDs, flash drives, or hard drives. Format the media for use with Windows 7;

    b. Use data encryption to protect any Sensitive Personally Identifiable Information or Sensitive Health Information (as defined in the instructions), and provide passwords in advance of delivery, under separate cover; and

    c. Use a courier service (e.g., Federal Express, UPS) because heightened security measures delay postal delivery.

4. Provide a transmittal letter with each production that includes:

    a. Production volume name (e.g., Volume 1) and date of production;

    b. Numeric DocID range of all documents in the production, and any gaps in the DocID range; and

    c. List of custodians and the DocID range for each custodian.

**Standard Metadata Fields**

| DAT FILE FIELDS | DEFINITIONS | POPULATE FIELD FOR: |
|---|---|---|
| DocID | Unique ID number for each document | All Documents |
| FamilyID | Unique ID for all documents in a family including parent and all child documents | All Documents |
| ParentID | Document ID of the parent document. This field will only be populated on child items | All Documents |
| File Path | Path to produced native file | All Documents |
| TextPath | Path to document level text or OCR file | All Documents |
| Custodian | Name of the record owner/holder | All Documents |
| AllCustodians | Names of all custodians that had copy of this record (populate if data was deduplicated or email threading was used) | All Documents |
| Source | Source of documents: CID, Subpoena, Third Party Data, etc. | All Documents |
| Filename | Original file name | All Documents |
| File Size | Size of documents | All Documents |
| File Extensions | Extension of file type | All Documents |
| MD5 Hash | Unique identifier for electronic data used in de-duplication | All Documents |
| PRODUCTION_VOLUME | Production Volume | All Documents |
| HASREDACTIONS | Redacted document | All Documents |
| Exception Reason | Reason for exception encountered during processing (e.g., empty file, source file, password-protected file, virus) | All Documents |
| PRODBEG | Beginning production bates number | Documents with Produced Images |
| PROEND | Ending production bates number | Documents with Produced Images |
| PRODBEG_ATTACH | Beginning production family bates number | Documents with Produced Images |
| PRODEND_ATTACH | Ending production family bates number | Documents with Produced Images |
| Page Count | The number of pages the document contains | Documents with Produced Images |
| From | Names retrieved from the FROM field in a message | Emails |
| To | Names retrieved from the TO field in a message; the recipient(s) | Emails |
| CC | Names retrieved from the CC field in a message; the copied recipient(s) | Emails |
| BCC | Names retrieved from the BCC field in a message; the blind copied recipient(s) | Emails |
| EmailSubject | Email subject line | Emails |
| Date Sent | The date an email message was sent | Emails |
| Time Sent | The time an email message was sent | Emails |
| Date Received | The date an email message was received | Emails |
| Time Received | The time an email message was received | Emails |
| Author | File Author | Loose Native Files and Email Attachments |
| Title | File Title | Loose Native Files and Email Attachments |
| Subject | File Subject | Loose Native Files and Email Attachments |
| Date Created | Date a document was created by the file system | Loose Native Files and Email Attachments |
| Time Created | Time a document was created by the file system | Loose Native Files and Email Attachments |
| Date Modified | Last date a document was modified and recorded by the file system | Loose Native Files and Email Attachments |
| Time Modified | Last time a document was modified and recorded by the file system | Loose Native Files and Email Attachments |
| Date Printed | Last date a document was printed and recorded by the file system | Loose Native Files and Email Attachments |
| Time Printed | Last time a document was printed and recorded by the file system | Loose Native Files and Email Attachments |

UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

COMMISSIONERS:            Edith Ramirez, Chairwoman
                          Maureen K. Ohlhausen
                          Terrell McSweeny

## RESOLUTION DIRECTING USE OF COMPULSORY PROCESS IN A NONPUBLIC INVESTIGATION OF TELEMARKETERS, SELLERS, SUPPLIERS, OR OTHERS

File No. 012 3145

Nature and Scope of Investigation:

To determine whether unnamed telemarketers, sellers, or others assisting them have engaged or are engaging in: (1) unfair or deceptive acts or practices in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (as amended); and/or (2) deceptive or abusive telemarketing acts or practices in violation of the Commission's Telemarketing Sales Rule, 16 C.F.R. pt 310 (as amended), including but not limited to the provision of substantial assistance or support — such as mailing lists, scripts, merchant accounts, and other information, products, or services — to telemarketers engaged in unlawful practices. The investigation is also to determine whether Commission action to obtain monetary relief would be in the public interest.

The Federal Trade Commission hereby resolves and directs that any and all compulsory processes available to it be used in connection with this investigation for a period not to exceed five years from the date of issuance of this resolution. The expiration of this five-year period shall not limit or terminate the investigation or the legal effect of any compulsory process issued during the five-year period. The Federal Trade Commission specifically authorizes the filing or continuation of actions to enforce any such compulsory process after the expiration of the five-year period.

Authority to Conduct Investigation:

Sections 6, 9, 10, and 20 of the Federal Trade Commission Act, 15 U.S.C. §§ 46, 49, 50, 57b-1 (as amended); and FTC Procedures and Rules of Practice, 16 C.F.R. §§ 1.1 et seq. and supplements thereto.

By direction of the Commission.

Donald S. Clark
Secretary

Issued: April 1, 2016

## CERTIFICATION OF COMPLIANCE
**Pursuant to 28 U.S.C. § 1746**

I, _____, certify the following with respect to the Federal Trade Commission's ("FTC") Civil Investigative Demand directed to Nexway, Incorporated (the "Company") FTC File No. 1923239 (the "CID"):

      1.    The Company has identified all documents, information, and/or tangible things ("responsive information") in the Company's possession, custody, or control responsive to the CID and either:

      (a) provided such responsive information to the FTC; or

      (b) for any responsive information not provided, given the FTC written objections setting forth the basis for withholding the responsive information.

      2.    I verify that the responses to the CID are complete and true and correct to my knowledge.

I certify under penalty of perjury that the foregoing is true and correct.

Date: _____

_____
Signature

_____
Printed Name

_____
Title

**CERTIFICATION OF RECORDS OF REGULARLY CONDUCTED ACTIVITY**
**Pursuant to 28 U.S.C. § 1746**

1.  I, _____, have personal knowledge of the facts set forth below and am competent to testify as follows:

2.  I have authority to certify the authenticity of the records produced by Nexway, Incorporated (the "Company") and attached hereto.

3.  The documents produced and attached hereto by the Company are originals or true copies of records of regularly conducted activity that:

    a)  Were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;

    b)  Were kept in the course of the regularly conducted activity of the Company; and

    c)  Were made by the regularly conducted activity as a regular practice of the Company.

I certify under penalty of perjury that the foregoing is true and correct.


Date: _____          _____
                                        Signature

# Exhibit 19

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

Federal Trade Commission
Office of the Secretary
Constitution Center
400 7th Street, SW,  5th Floor
Suite CC-5610
Washington, DC  20024

5610

ATTN: ANITA THOMAS

**SENDER** COMPLETE THIS SECTION

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Nexway, Incorporated
4804 Mission Street
Suite 208
San Francisco, CA
94112

**RETURN RECEIPT REQUESTED**

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____     ☐ Agent
                      ☐ Addressee

B. Received by (Printed Name)     C. Date of Deliver

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☑ Certified Mail      ☐ Express Mail
   ☐ Registered         ☐ Return Receipt for Merchandise
   ☐ Insured Mail       ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)    ☐ Yes

2. Article Number
   (Transfer from service label)    7005 0390 0001 3185 3258

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540

# Exhibit 20

## Coordonnées

www.linkedin.com/in/oliver-von-
kroog-6678a4175 (LinkedIn)

## Languages

**Allemand** (Native or Bilingual)
**Anglais** (Native or Bilingual)
**Français** (Native or Bilingual)

# Oliver von Kroog

Legal Advisor chez Nexway
Montpellier et périphérie

## Expérience

**Nexway**
Legal Advisor / Juriste
mai 2017 - Present (3 ans 11 mois)
Nîmes

**Apimex Sarl**
Associate Manager / Associé gérant
août 2004 - mai 2017 (12 ans 10 mois)
Région de Paris, France

——————

## Formation

**Université de Cergy-Pontoise**
Master 2 (M2) / DESS, International Trade / Commerce
international · (2003 - 2004)

**Université Paris 1 Panthéon-Sorbonne**
Master's degree / Maîtrise, Laws / Droit · (2001 - 2003)

**Universität zu Köln**
Master of Laws - LLM, Droit · (1999 - 2001)

# Exhibit 21

# Document Filed Under Temporary Seal

# Exhibit

# 22





Case 1:21-mc-00145-TNM    Document 1-5    Filed 11/17/21    Page 212 of 245



Leads by Industry    Top Companies    Pricing    Solutions    Our Data    About Us    Sign Up

Overview    Org Chart    Company Insights    Search for a contact or company    Advanced Search

**Where are The Native's headquarters?**

The Native's headquarters are in Gerbergasse 48, Basel, Basel-City, 4001, Switzerland

**What is The Native's phone number?**

The Native's phone number is +41 58 881 10 30

**What is The Native's stock symbol?**

The Native's stock symbol is NTIV

**What is The Native's official website?**

The Native's official website is www.thenative.ch

**What is The Native's Revenue?**

The Native's revenue is $21 Million

**What is The Native's SIC code?**

The Native's SIC: 62,628

**What is The Native's NAICS code?**

The Native's NAICS: 5242,523

**How many employees are working in The Native?**

The Native has 98 employees

**What is The Native's industry?**

The Native is in the industry of: Investment Banking, Finance, Insurance

**What companies has The Native acquired?**

The Native has acquired the companies: Paddle8 Inc, Blacklots

**What is The Native's tech stack?**

The technologies that are used by The Native are: GoDaddy DNS, EuroDNS DNS, Quandl, PHP

See more information about The Native



| Boston | | New York City | | Houston | | Chicago | | Los Angeles | | Atlanta |

A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

**POPULAR FEATURES**

Sales Solutions

Marketing Solutions

Company Contact Search

Buyer Intent Data

CRM Lead Enrichment

**COMPANY**

About Us

Our Leadership

Investor Relations

FAQs

Careers

Contact Us

**B2B DATABASE**

Our Data

Data Transparency

Verify Company Data

Verify Profile Data

Browse Directories

People Search

Company Search

**MORE RESOURCES**

ZoomInfo Videos

Newsroom

Engineering Blog

COVID-19 Newsfeed

Recipes for Success

Privacy Center

Free Trial

Login

866.904.9666

© 2021 ZoomInfo Technologies LLC | Privacy Policy | Terms of Use | Cookies | Status | Do Not Sell My Personal Information

# Exhibit

# 23



# Guidehouse
Outwit *Complexity*

# Your trusted guide for the most complex journeys

Start Navigating



---

Menu Search **Bloomberg** Sign In **Subscribe**

**Quick Links** Stocks Currencies Commodities Rates & Bonds Sectors Watchlist

RECENTLY VIEWED COMPANIES

| **APPLE INC** | **ALIBABA GROUP HO** | **TESLA INC** | **CYTODYN INC** | **LUCKIN COFFE-ADR** | **US TREASURY N/B** |
|---|---|---|---|---|---|
| 149.16 | 175.80 | 867.38 | 1.20 | 13.50 | 96.42 |
| ▲ +0.40 | ▲ +11.00 | ▲ +3.11 | ▲ +0.02 | ▼ -0.14 | ▼ -0.08 |

---

# Lighthouse Capital Ltd

Lighthouse Capital Limited operates as a real estate investment company. The Company invests in commercial, retail, and industrial properties, as well as real estate and infrastructure companies. Lighthouse Capital serves customers worldwide.

CURRENT PRICE

**LTE:SJ** 814.00 ZAr ▼ -14.00 -1.69% AS OF 09:04 AM EDT 10/20/2021 SEE QUOTE

| SECTOR | INDUSTRY | SUB-INDUSTRY | INCORPORATED |
|---|---|---|---|
| Financials | Financial Services | Asset Management | 08/14/2014 |

| ADDRESS | PHONE | WEBSITE |
|---|---|---|
| C1-401, 4th Floor La Croisette Grand Baie Mauritius | 230-269-6664 | www.lighthousecapital.mu |

---

Your monthly limit of free content is about to expire.
**Stay on top of historic market volatility. Try 3 months for $8.75 $0.50 per week. Cancel anytime.**

Claim This Offer

**Sign In**

Bloomberg Anywhere clients get **free access**

ADVERTISING



# Executives

NAME/TITLE

**Stephen Delport**
Chief Executive Officer/Exec Dir

**Jacobus Frederick Van Biljon "Kobus"**
Chief Financial Officer/Exec Dir

**Nina Kretzmann**
Chief Operating Officer

VIEW MORE ⌄

# Board Members

NAME/COMPANY

**Mark Cyril Olivier**

**Paul Edwards**

**Desmond de Beer "Des"**
Resilient REIT Ltd

VIEW MORE ⌄

VIEW MORE ⌄

# Most Popular

AAPL:US
**APPLE INC**
149.16 USD ▲ +0.40 +0.27%

9988:HK
**ALIBABA GROUP HO**
175.80 HKD ▲ +11.00 +6.67%

Your monthly limit of free content is about to expire.
**Stay on top of historic market volatility. Try 3 months for ~~$8.75~~ $0.50 per week. Cancel anytime.**

Claim This Offer

Sign In

Bloomberg Anywhere clients get **free access**

**CYTODYN INC**
1.20 EUR ▲ +0.02 +1.44%

LC0A:GR
**LUCKIN COFFE-ADR**
13.50 EUR ▼ -0.14 -1.03%

# Average Retirement Savings By Age: Are You Normal?

**SmartAsset** | Sponsored

---

# Big Change In Washington Leaves Drivers Fuming

**Otto Insurance** | Sponsored

# Most Americans With A Windows PC Didn't Know This (Do It Now)

**Safe Life Tips** | Sponsored

---

# Washington: Startup Is Changing the Way People Retire

**SmartAsset** | Sponsored

---

# Russia Says Ship Intercepted U.S. Destroyer in Sea of Japan

**Bloomberg**

# Colin Powell's Death From Breakthrough Covid Is Rare Event, Data Show

**Bloomberg**

---

# Take 1 Cup Before Bed, Watch Your Body Fat Melt Away

**Dr. Kellyann** | Sponsored

---

Your monthly limit of free content is about to expire.
**Stay on top of historic market volatility. Try 3 months for $8.75 $0.50 per week. Cancel anytime.**

Claim This Offer     **Sign In**

📖 Bloomberg Anywhere clients get **free access**

## People Also Search For

L4L:SJ
**LONG4LIFE LTD**
510.00 ZAr ▼ -6.00 -1.16%

EMI:SJ
**EMIRA PROPERTY F**
979.00 ZAr ▼ -9.00 -0.91%

0480113D:CH
**DOUBLE BOND CHEMICAL TAIXING**
Private Company

Your monthly limit of free content is about to expire.
**Stay on top of historic market volatility. Try 3 months for $8.75 $0.50 per week. Cancel anytime.**

Claim This Offer

Sign In

Bloomberg Anywhere clients get **free access**

1,444.0000 GBp ▲ +5.0000 +0.3475%

## More From The Financial Web

**What Would You Do With More Cash Back? See 2021's Best Credit Cards**
NerdWallet

**Earn up to a $1,500 cash bonus with required activities. Member FDIC.**
CITI® CHECKING OFFER

**Wall Street legend warns: "A strange day is coming to America"**
Stansberry Research

**Biden's green agenda at risk as coal-state Democrat digs in**
Financial Times

**2022's Top 7 Dividend Stocks To Buy And Hold After the Age 65**
MarketBeat.com

**We're "All In" on This One Stock.**
The Motley Fool

**7 Retirement Income Strategies for Investors With $500k+ [Slideshow]**
Fisher Investments

**Wall Street Legend Says Buy This Now (Watch Video)**
Empire Financial Research

**Save on interest with our Low Intro APR on purchases**
Up Your Savings Game

sponsored by Dianomi

Terms of Service  Do Not Sell My Info (California)   Trademarks  Privacy Policy
©2021 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices     Help

Your monthly limit of free content is about to expire.
**Stay on top of historic market volatility. Try 3 months for $8.75 $0.50 per week. Cancel anytime.**

Claim This Offer          **Sign In**

Bloomberg Anywhere clients get **free access**

# Exhibit

# 24



The Chrysler Building
405 Lexington Avenue, NY, NY 10174-1299
Tel: 212.554.7800    Fax: 212.554.7700
www.mosessinger.com


Howard A. Fischer, Esq.
Direct: 212.554.7872
hfischer@mosessinger.com


February 20, 2020

**VIA EMAIL**

Russell Deitch, Esq.
*(RDEITCH@ftc.gov)*
J. Ronnie Brooke, Esq.
*(JBROOKE@ftc.gov)*
United States Federal Trade Commission
600 Pennsylvania Ave, NW
Mail Stop cc-8528
Washington DC 20580

Re:    **Civil Investigative Demand ("CID"), Matter No. 1923239**

Dear Russell:

    We write in connection with our discussion of February 19, 2020 regarding the response of Nexway, Inc. and related companies (collectively, "Nexway") to the above-referenced CID. For the reasons set out in that discussion, further elucidated below, we are requesting that Nexway be given until March 4, 2020 to provide its initial response to the CID, and until April 3, 2020 to provide its full response thereto.

    We anticipate that the initial response on March 4, 2020, will include responses to Document Requests 1, 2, 3, 7, 8, 9, 10 and 14. It should also include responses to Interrogatories 3, 8, 10, 12, 14, 15 and 16. We will endeavor to include additional responses if possible.

    The above request for a brief extension is well-warranted. As explained in our telephone discussion, Nexway is the result of multiple mergers and acquisitions over the last few years. Consequently, information responsive to the CID is located in multiple offices, and are organized across different modern and legacy systems and storage facilities. Many of the legacy companies now operating within the Nexway umbrella employed different means of organizing and retaining files, including different electronic systems.

    Furthermore, many of the employees at these entities are no longer with the company, further complicating the task of responding to the CID. Over 90 GB of files have been reviewed so far, including tens of thousands of emails, years of contracts, and well as records relating to over 10,000 customer contacts.

    Since receiving the CID, Nexway has devoted significant resources to responding to it, and multiple high level management officials have devoted significant time to this task. Among others, this includes the current Chief Strategy Officer, the Chief Technology Officer, the Chief



Russell Deitch, Esq.
February 20, 2020
Page 2


Executive Officer, internal legal advisors, a senior vice-president in charge of payments and operations, and other senior leaders, including of customer operations, plus additional employees. In total, the team responding to the CID has been spending 200-250 hours per week responding thereto, constituting a significant majority of management resources.

Finally, after the materials has been assembled and collated, counsel will still need to review it for final determinations as to responsiveness and privilege.[1]

Consequently, we are requesting the above adjustment of the response time set out in the CID. We look forward to continue our cooperative and collaborative approach with the FTC. Should we be able to provide responses to the remaining Document Requests and Interrogatories prior to the April 3, 2020 date, we shall endeavor to do so.

Respectfully,

Howard Fischer
Francesco Di Pietro
Counsel for Nexway

---

[1] As I mentioned to you, I will be abroad on business next week and will be out on vacation later in March. While I will continue to monitor the collection of responsive materials while away, the distance will complicate that effort.

# Exhibit

# 25



UNITED STATES OF AMERICA
**Federal Trade Commission**
WASHINGTON, D.C. 20580

Bureua of Consumer Protection
Division of Marketing Practices

February 20, 2020

Howard A. Fischer
Moses & Singer, LLP
The Chrysler Building
405 Lexington Ave.,
New York, NY 10174
hfischer@mosessinger.com
Attorney for Nexway

**BY E-MAIL**

  Re: Civil Investigative Demand Issued on January 28, 2020 to Nexway

Dear Mr. Fischer:

  In response to your request for an extension relating to the Civil Investigative Demand ("CID") issued to Nexway, (1) I am extending the due date of the responses to Document Requests 1, 2, 3, 7, 8, 9, 10 and 14, and Interrogatories 3, 8, 10, 12, 14, 15 and 16 until March 4, 2020; and (2) I am extending the date of the responses to the remainder of the Document Requests and Interrogatories until April 3, 2020.

  This constitutes the *full extent* of any modifications to the CID to which we have agreed pursuant to 16 C.F.R. § 2.7(*l*).  No other extensions or modifications have been granted.

    Sincerely,

    s/Lois C. Greisman/rd

    Lois C. Greisman
    Associate Director

# Exhibit

# 26



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Bureau of Consumer Protection

June 18, 2020

*VIA EMAIL*

**Howard A. Fischer | Partner**
**Moses & Singer LLP**
The Chrysler Building, 405 Lexington Avenue
New York, New York 10174
t: 212.554.7872 | hfischer@mosessinger.com

**RE: Nexway**

Dear Mr. Fischer:

Pursuant to 16 C.F.R. § 4.10(g), the FTC provides notice that it intends to disclose documents that Nexway produced to the FTC, including those produced in response to the FTC Civil Investigative Demand, to Nick Nikiforakis during his Investigatory Hearing.

Section 4.10(g) of the Federal Trade Commission's Rules of Practice, 16 C.F.R. § 4.10(g), provides that persons who provide information to the Commission pursuant to a Civil Investigative Demand have the right to seek a protective order that would prohibit the Commission from publicly disclosing the submitted information. If you intend to seek a protective order, you should do so by June 25, 2020.

If you have any questions, please feel free to call me at (202) 326-2585.

Sincerely,

s/Russell Deitch

# Exhibit 27

**From:** Deitch, Russell S.
**To:** Brooke, J. Ronnie
**Subject:** FW: Please see the attached letter
**Date:** Wednesday, May 26, 2021 9:14:52 AM

FYI

**From:** Howard A. Fischer <hfischer@MOSESSINGER.COM>
**Sent:** Friday, June 19, 2020 12:28 PM
**To:** Deitch, Russell S. <RDEITCH@ftc.gov>
**Subject:** RE: Please see the attached letter

Russell:

As per our discussion earlier today, this will confirm that Nexway has no objection and does not plan to move for a protective order with respect to any materials that might be shown to Professor Nick Nikiforakis at any interview or hearing, to the extent those materials do not include either (i) inadvertently produced privileged material, which should be returned (and we agree that materials sent to third parties that merely mention counsel are not likely to be privileged) and (ii) sensitive economic data about Nexway operations, such as P&L information, pricing data, trade secrets, or similar such data, whose disclosure might put Nexway at a competitive disadvantage.

Stay safe,

Howard

**Howard A. Fischer  |  Partner**
**Moses & Singer LLP**
The Chrysler Building, 405 Lexington Avenue
New York, New York 10174
t: 212.554.7872  |  hfischer@mosessinger.com
www.mosessinger.com
*Celebrating 100 Years and Beyond*

**Please visit the COVID-19 resources page on our website.**

**From:** Deitch, Russell S. [mailto:RDEITCH@ftc.gov]
**Sent:** Thursday, June 18, 2020 9:43 AM
**To:** Howard A. Fischer <hfischer@MOSESSINGER.COM>
**Cc:** Brooke, J. Ronnie <JBROOKE@ftc.gov>
**Subject:** Please see the attached letter

This message is being sent from a Law Firm and may contain CONFIDENTIAL or PRIVILEGED information. If

you are not the intended recipient, do not print, copy or distribute this message or any attachments. Advise the sender immediately by reply e-mail, and delete this message and attachments without retaining a copy

# Exhibit

# 28



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Bureau of Consumer Protection
Division of Marketing Practices

January 4, 2021

*VIA EMAIL*

Howard A. Fischer
Moses & Singer LLP
The Chrysler Building, 405 Lexington
Avenue New York, New York 10174 t:
212.554.7872 |
hfischer@mosessinger.com

**RE: FTC Civil Investigative Demand to Nexway**

Dear Mr. Fischer:

Pursuant to 16 C.F.R. § 4.10(g), the FTC provides notice that the documents produced in response to the FTC Civil Investigative Demand issued to Nexway may be publicly disclosed.

Section 4.10(g) of the Federal Trade Commission's Rules of Practice, 16 C.F.R. § 4.10(g), provides that persons who provide information to the Commission pursuant to a Civil Investigative Demand have the right to seek a protective order that would prohibit the Commission from publicly disclosing the submitted information. If you intend to seek a protective order, you should do so by January 15, 2021. We also request that if you intend to seek a protective order, you do so under seal.

If you intend to seek a protective order or have any questions, please call me at (202) 326-2585 or contact me by email at rdeitch@ftc.gov.

Sincerely,

*sRussell Deitch*

# Exhibit 29

# Document Filed Under Temporary Seal

# Exhibit

# 30

# Document Filed Under Temporary Seal

# Exhibit

# 31

# Document Filed Under Temporary Seal

# Exhibit

# 32

# Document Filed Under Temporary Seal

# Exhibit

# 33

| | |
|---|---|
| **From:** | Deitch, Russell S. |
| **To:** | Howard A. Fischer; Francesco Di Pietro |
| **Cc:** | Brooke, J. Ronnie |
| **Subject:** | Nexway |
| **Date:** | Tuesday, May 4, 2021 11:15:54 AM |
| **Attachments:** | 4.27.2021Letter.pdf |

Hi Howard,

In today's call, we again stated that you need to respond to the letter of April, 27, 2021, including by complying with the requirements of the CID, identifying any documents you claim are privileged, proving that Mr. Kroog is a member of the bar, and establishing all of the elements of the attorney client privilege claim for any document.   The letter includes a 14 day deadline.  Another copy of the letter is attached for ease of reference.

Thanks,

Russ

---

**From:** Deitch, Russell S.
**Sent:** Tuesday, April 27, 2021 5:00 PM
**To:** Howard A. Fischer <hfischer@MOSESSINGER.COM>; Francesco Di Pietro <fdipietro@MOSESSINGER.COM>
**Cc:** Brooke, J. Ronnie <JBROOKE@ftc.gov>
**Subject:** Nexway

Please see the attached letter.

# Exhibit

# 34

| From: | Howard A. Fischer |
|---|---|
| To: | Deitch, Russell S.; Francesco Di Pietro |
| Cc: | Brooke, J. Ronnie |
| Subject: | RE: Nexway |
| Date: | Tuesday, May 11, 2021 5:48:08 PM |

Russell,

We wish to respond to your April 27, 2021, letter as follows.

In your letter you request, *inter alia*, that we identify within 14 days of your letter any "particular documents that Nexway claims are privileged that were inadvertently produced." We object to your request to identify such documents within 14 days, an artificial deadline you unilaterally imposed upon us.

Besides being arbitrary, your request puts an undue and unfair burden on us and our client, and is also contrary to applicable law.

During our conference call of May 4, 2021, you indicated that you are in the process of preparing a draft of a Complaint and that you wish to use certain documents to support it. During the call, you requested that we identify which documents we produced inadvertently that we claim are subject to attorney-client privilege before you prepare any such draft.

You are requesting that we engage on what is likely to be a herculean task (review thousands of pages of documents in an attempt to identify which documents, if any, were inadvertently produced), rather than simply listing those documents you intend to rely on in preparation of your Complaint, so that we could determine whether any of those documents were inadvertently produced and are covered by attorney-client privilege.

Contrary to your request, applicable law does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake. Instead, the law requires that the receiving party notify the sending party and abide by the instructions of the sending party regarding the return or destruction of the writing.

Upon realizing that document 7247 had been inadvertently produced, we immediately claimed privilege and asked that you return (and not use) said document. We also indicated that we may have inadvertently produced other documents covered by attorney-client privilege. You have been advised that the documents in question are between our client and Mr. Von Kroog. You have been instructed to return correspondence between our client and Mr. Von Kroog. You have an obligation to notify us in the event that you received any such documents and abide by our instructions regarding the return of such documents.

With respect to creating a log, we are not withholding any requested documents.

Lastly, respectfully, please show us any relevant and applicable authority providing that we need to prove within 14 days of the date of your letter that Mr. Von Kroog was a member of a bar, as your letter cites to no such authority. Our client considered him as its attorney. *See Gucci America, Inc. v. Guess?, Inc., et al.*, 2011 WL 9375 (S.D.N.Y. Jan. 3, 2011).

All rights are reserved.

Regards,

Howard Fischer

**Howard A. Fischer  |  Partner**
**Moses & Singer LLP**
The Chrysler Building, 405 Lexington Avenue
New York, New York 10174
t: 212.554.7872  |  hfischer@mosessinger.com
www.mosessinger.com
*Celebrating 100 Years and Beyond*

**Please visit the COVID-19 resources page on our website.**

---

**From:** Deitch, Russell S. [mailto:RDEITCH@ftc.gov]
**Sent:** Tuesday, May 04, 2021 11:16 AM
**To:** Howard A. Fischer <hfischer@MOSESSINGER.COM>; Francesco Di Pietro <fdipietro@MOSESSINGER.COM>
**Cc:** Brooke, J. Ronnie <JBROOKE@ftc.gov>
**Subject:** Nexway

Hi Howard,

In today's call, we again stated that you need to respond to the letter of April, 27, 2021, including by complying with the requirements of the CID, identifying any documents you claim are privileged, proving that Mr. Kroog is a member of the bar, and establishing all of the elements of the attorney client privilege claim for any document.   The letter includes a 14 day deadline.  Another copy of the letter is attached for ease of reference.

Thanks,

Russ

---

**From:** Deitch, Russell S.
**Sent:** Tuesday, April 27, 2021 5:00 PM
**To:** Howard A. Fischer <hfischer@MOSESSINGER.COM>; Francesco Di Pietro <fdipietro@MOSESSINGER.COM>
**Cc:** Brooke, J. Ronnie <JBROOKE@ftc.gov>
**Subject:** Nexway

Please see the attached letter.

This message is being sent from a Law Firm and may contain CONFIDENTIAL or PRIVILEGED information. If you are not the intended recipient, do not print, copy or distribute this message or any attachments. Advise the sender immediately by reply e-mail, and delete this message and attachments without retaining a copy